Kelly M. Dermody (State Bar No. 171716)
Heather H. Wong (State Bar No. 238546)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
email: kdermody@lchb.com
email: hwong@lchb.com

Elizabeth A. Alexander (*pro hac vice*)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue, North, Suite 1650
Nashville, TN  37219-2423
Telephone:  (615) 313-9000
Facsimile:  (615) 313-9965
email: ealexander@lchb.com

Cyrus Mehri (*pro hac vice*)
Anna M. Pohl (*pro hac vice*)
MEHRI & SKALET, PLLC
1250 Connecticut Avenue, NW. Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
email: cmehri@findjustice.com
email: lbornstein@findjustice.com
email: apohl@findjustice.com

Adam T. Klein (*pro hac vice*)
Piper Hoffman (*pro hac vice*)
Justin M. Swartz (*pro hac vice*)
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005
atk@outtengolden.com
ph@outtengolden.com
jms@outtengolden.com

James M. Finberg (State Bar No. 114850)
ALTSHULER BERZON LLP
177 Post Street, Ste. 300
San Francisco, CA  94108
Telephone:  (415) 421-7151
Facsimile:  (415) 362-8064
jfinberg@altshulerberzon.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENEE FASSBENDER AMOCHAEV, DEBORAH ORLANDO, KATHRYN N. VARNER and IVY SO on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITIGROUP GLOBAL MARKETS, INC., d/b/a SMITH BARNEY,<br><br>    Defendant. | Case No. C-05-1298 PJH<br><br>**DECLARATION OF KELLY M. DERMODY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER GRANTING PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT AGREEMENT**<br><br>Date:        April 30, 2008<br>Time:        9:00 a.m.<br>Courtroom:  3, 17th Floor |

1    I, Kelly M. Dermody, declare:

2        1.      I am a partner in the firm Lieff, Cabraser, Heimann & Bernstein, LLP, one

3    of the firms serving as counsel for plaintiffs in this matter.  I make these statements based on

4    personal knowledge and would so testify if called as a witness.

5        2.      I am a member in good standing of the bars of the State of California; the

6    United States District Court for the Northern District of California; the United States District

7    Court for the Central District of California; the United States District Court for the District of

8    Colorado; and the United States Courts of Appeals for the Third, Sixth, Seventh, and Ninth

9    Circuits.

10       3.      This Declaration is submitted in support of the plaintiffs' Motion for Order

11   Granting Preliminary Approval of the Proposed Settlement Agreement.

12                              **I. Background and Experience**

13       4.      I graduated *magna cum laude* from Harvard University in 1990, where I

14   majored in History.  I graduated from the University of California at Berkeley Boalt Hall School

15   of Law in 1993.

16       5.      Immediately after I graduated from law school, I clerked for the Honorable

17   John T. Nixon, Chief Judge of the United States District Court for the Middle District of

18   Tennessee.

19       6.      Since 1994, I have practiced with Lieff, Cabraser, Heimann & Bernstein,

20   LLP ("LCHB"), where I became a partner in June 1998.  At LCHB, I have focused on

21   representing plaintiffs in employment litigation (including discrimination and wage and hour

22   disputes) and consumer fraud cases.

23       7.      I, along with other attorneys from my firm and co-counsel, served as

24   plaintiffs' counsel in *Butler v. Home Depot*, Case No. C94-4335 SI (N.D. Cal.), a gender

25   discrimination class action on behalf of 25,000 women in Home Depot's West Coast Division.

26   After defeating the defendant's motion for summary judgment, the plaintiffs negotiated a

27   settlement involving comprehensive injunctive relief regarding hiring, promotions, compensation,

28   training, and evaluations, as well as payment of a common fund of $87.5 million.

8.      I served as one of plaintiffs' lead counsel in *Gonzalez v. Abercrombie & Fitch Stores, Inc.*, Case No. 03-2817 SI (N.D. Cal.), a nationwide race, color, and gender discrimination class action that resulted in a $50 million settlement on behalf of African American and Latino and female applicants and employees, with comprehensive injunctive relief in the areas of hiring, job assignment, and compensation at stores nationwide.

9.      I served as plaintiffs' counsel in *Buttram v. United Parcel Service*, Civ. No. C97-01590-MJJ (N.D. Cal.), a race discrimination class action brought on behalf of African-American part-time hourly employees in the company's Northwest and Pacific Regions that resulted in a settlement involving comprehensive injunctive relief regarding initial assignment and promotions, as well as a common fund of $12.14 million.

10.     I was lead counsel in *Lyon v. TMP Worldwide*, Case No. 993096 (San Francisco County Super. Ct.), a wage and hour class action that resulted in a $1.25 million settlement on behalf of a class of approximately 140 California employees alleging that they had been misclassified as exempt from California labor law overtime provisions.

11.     I served as plaintiffs' counsel in *Trotter v. Perdue Farms, Inc.*, Case No. 99-893 (RRM) (D. Del.), a collective and class action under the Fair Labor Standards Act, the Employee Retirement Income Security Act of 1974, and state wage and hour laws.  The class members were chicken processing employees challenging the company's failure to pay wages and overtime, or provide pension credits, for off-the-clock work.  The case resolved for a payment of $10 million.

12.     I was co-lead counsel in *Foster v. Great Atlantic and Pacific Tea Co., Inc. d/b/a A&P*, Case No. 99 CV 3860 (CM) (S.D.N.Y.), an FLSA collective action that resulted in a $3.05 million settlement on behalf of 855 opt-in plaintiffs who challenged the company's failure to pay wages and overtime for off-the-clock work.

13.     I was co-lead counsel in *Senior v. Adecco USA, Inc. d/b/a Adecco, Inc.* (San Francisco County Super. Ct. 2005); and *Hyatt v. Adecco USA, Inc. d/b/a Adecco, Inc.* (Alameda County Super. Ct. 2005), two related class actions challenging a temporary

1   employment agency's failure to pay both its regular staff and its temporary staff earned vacation

2   wages.  The cases together resulted in settlements of over $3.8 million.

3           14.     I am co-lead counsel in *LaMarca v. Great Atlantic and Pacific Tea*

4   *Company, Inc. d/b/a A&P*, Case No. 04601973 (Cahn) (County of N.Y. Sup. Ct.), a wage and

5   hour class action on behalf of full-time employees denied overtime and forced to work off the

6   clock in defendants' stores across New York State.

7           15.     I am co-lead counsel in *Jaffe v. Morgan Stanley & Co, Inc., f/k/a Morgan*

8   *Stanley DW, Inc.*, Case No. C-06-3903 TEH (N.D. Cal.), a race and gender discrimination class

9   action brought on behalf of national class of female and minority financial advisors alleging

10  discrimination in compensation and business opportunities, which received preliminary

11  settlement approval in January 2008 for a settlement valued at $16 million and requires extensive

12  changes to company practices.

13          16.     I am co-lead counsel in *Holloway v. Best Buy Co., Inc.*, Case No. C-05-

14  5056 PJH (N.D. Cal.), a race and gender discrimination class action challenging hiring, initial job

15  assignment, compensation and promotion practices at Best Buy stores nationwide.

16          17.     I am co-lead counsel in *Wynne v. McCormick & Schmick's Seafood*

17  *Restaurants, Inc.*, Case No. C-06-3153 CW (N.D. Cal.), a race discrimination class action on

18  behalf of a national class of African Americans alleging discrimination in hiring, initial job

19  assignment, compensation and promotions, which has resulted in a preliminary class settlement

20  that will be considered by the Court at the April 3, 2008 hearing on preliminary settlement

21  approval.

22          18.     I have also successfully litigated a wide variety of complex federal and

23  state civil matters during my professional career, including several consumer class actions.  Class

24  action cases I have successfully prosecuted to judgment or settlement, in addition to the

25  foregoing, include:  *Citigroup Loan Cases*, J.C.C.P. No. 4197 (San Francisco County Super. Ct.)

26  (plaintiffs' co-liaison counsel in national consumer class action challenging alleged predatory

27  mortgage lending practices that resulted in $263 million settlement); *Curry v. Fairbanks Capital*

28  *Corp.*, Civil Action No. 03-10895-DPW (D. Mass) (plaintiffs' co-lead counsel in national

consumer class action challenging alleged predatory mortgage servicing practices that resulted in $55.5 million settlement and business practice changes in the areas of customer service, payment processing, collections, lender placed insurance, and delinquent loan resolution); *Providian Credit Card Cases*, J.C.C.P. No. 4085 (San Francisco County Super. Ct.) (co-lead class counsel in national consumer class action against major credit card company that resulted in $105 million settlement); *Sutter Health Uninsured Pricing Cases*, Case No. JCCP 4388 (Sacramento Super. Ct.) (lead class counsel in consumer class action that resulted in over $275 million settlement and comprehensive pricing and collections policy changes for uninsured patients across all Sutter hospitals); *Catholic Healthcare West Cases*, Case No. JCCP 4453 (San Francisco County Super. Ct.) (lead class counsel in consumer class action that resulted in over $423 million settlement and pricing and collections policy changes for uninsured patients across all CHW hospitals).

19.     I am also involved as co-lead counsel in the following cases:  *In re Ameriquest Mortgage Company Mortgage Lending Practices Litigation*, Case No. MDL 1715 (N.D.Ill.) (court-appointed plaintiffs' co-lead counsel in national consumer class action MDL challenging mortgage lender's practice of imposing improper fees and charging improper interest rates and pre-payment penalties on mortgage accounts); *Ricci v. Ameriquest Mortgage Company*, Case No. 27-CV-05-2546 (Hennepin County, Minn. Dist. Ct.) (court-appointed plaintiffs' class counsel in certified statewide consumer class action challenging mortgage lender's practice of imposing improper fees and charging improper interest rates and pre-payment penalties on mortgage accounts);  *In re Ocwen Federal Bank FSB Mortgage Servicing Litigation*, Case No. MDL 1604 (N.D. Ill.) (court-appointed plaintiffs' co-lead counsel national consumer class action MDL challenging mortgage servicer's practice of imposing improper fees and insurance on mortgage accounts); *Schaffer v. Litton Loan Servicing, LP*, Case No. 05-7673-MMM (C.D. Cal.) (plaintiffs' co-lead counsel in certified national consumer class action challenging mortgage servicer's practice of imposing improper fees in violation of RESPA).

20.     In addition to being an active litigator, I have long been involved in many educational and legal groups, including the ABA Labor and Employment Law Section where I currently serve as the Vice-Chair of the Section's Annual Conference.  Previously I have served

1   as Co-Chair of the Section's Committee on Equal Opportunity in the Legal Profession, Co-Chair

2   of the Section's Equal Employment Opportunity Committee, and member of the Section's

3   Katrina Task Force.  I am currently a member of the Board of Directors of the Bar Association of

4   San Francisco, for which I previously served on the Executive Committee of BASF's Litigation

5   Section.  I am currently a Northern District of California Lawyer Representative to the Ninth

6   Circuit Judicial Conference.  I am a member of the National Employment Lawyers' Association,

7   the Consumer Attorneys of California, and the Bay Area Lawyers for Individual Freedom, and

8   serve on the Resource Board of the National Association of Women Judges.  I am a founding

9   Steering Committee member of Carver Healthy Environments and Response to Trauma in

10   Schools (Carver HEARTS), an organization dedicated to addressing pipeline issues, trauma due

11   to violence exposure, and lack of role models for students at an elementary school in one of San

12   Francisco's lowest-income neighborhoods.

13         21.    I have written articles for a variety of legal publications and conferences,

14   including "Class Actions: Latest Developments in Litigating and Settling Employment

15   Discrimination Class Actions" (American Bar Association Labor and Employment Section Equal

16   Employment Opportunity Committee, Midwinter Meeting 2001); "A Road Map to Discovery in

17   Employment Discrimination and Wage/Hour Class Actions" (with James M. Finberg) (Glasser

18   Legal Works Seminar, 2000); "Employment Discrimination Class Actions in the Wake of *Allison*

19   *v. Citgo Petroleum Corp.*," (American Bar Association Litigation Section Annual Meeting 2000);

20   "Employment Discrimination Class Actions in the Wake of *Allison v. Citgo Petroleum Corp.* and

21   Fed. R. Civ. P. 23(f)" (Federal Bar Association Convention, 1999); "Discovery in Employment

22   Discrimination Class Actions" (with James Finberg) in *Litigation and Settlement of Complex*

23   *Class Actions* (1998).

24         22.    I have been a presenter or moderator at numerous legal conferences,

25   including: Presenter, *Beyond the Business Case: The Higher Value of Diversity in the Legal*

26   *Profession* (Bar Association of San Francisco Diversity Conference, 2007); Moderator, *Religious*

27   *Discrimination, Reasonable Accommodation, and Religious Practices in the Workplace* (ABA

28   Labor and Employment Law Section Equal Employment Opportunity Committee, Midwinter

1  Conference 2007); Panelist, *How Not to Take a Deposition* (BASF Program, July 2006);

2  Moderator, *Evolving Concepts of Family, Including Domestic Partnerships, Same-Sex Marriages*

3  *and Civil Unions and the Impact of these New Legal and Social Definitions of Family on*

4  *Workplace Policies, Practices and Benefits* (ABA Labor and Employment Law Section Equal

5  Employment Opportunity Committee, Midwinter Conference 2005); Presenter, *BASF Deposition*

6  *Skills Workshop* (BASF Program, February 2004); Moderator, *Sexual Orientation*

7  *Discrimination, Same-Sex Sexual Harassment and Transgender Discrimination* (ABA Annual

8  Meeting, August 2003); Panelist, *Class Actions: Latest Developments in Litigating and Settling*

9  *Employment Discrimination Class Actions* (ABA Labor and Employment Law Section Equal

10  Employment Opportunity Committee, Midwinter Meeting 2001); Panelist, *Litigation and*

11  *Settlement of Complex Class Actions* (Glasser Legal Works, September 2000, April 1998);

12  Panelist, *Class Actions: The End Game - Trial or Settlement?  How to Bring a Class Action to a*

13  *Successful Conclusion* (ABA Litigation Section Annual Meeting, April 2000); Panelist, *Basic*

14  *Class Actions* (ABA EEO Committee Midwinter Meeting, March 2000); Panelist, *The Fourth*

15  *National Conference for Women Law Firm Partners* (Business Development Associates, March

16  1999).  Moderator, *Equal Employment Opportunity Committee Program: "Pattern and Practice*

17  *Enforcement and Trends" and "Reeves v. Sanderson Plumbing Products, Inc.: The Argument and*

18  *the Aftermath"* (ABA Annual Meeting, July 2000); Moderator, *Recent Developments in the Trial*

19  *of Class Actions* (ABA Section of Labor and Employment Law, Equal Employment Opportunity

20  Committee, Midwinter Meeting, March 1999).

21          23.     In 2001, I taught Employment Law as an Adjunct Professor of Law at the

22  Golden Gate University School of Law.  I have been a guest lecturer at UC Berkeley's Boalt Hall

23  School of Law and at UC Berkeley.

24          24.     I received a California Lawyer Attorney of the Year (CLAY) Award from

25  the *California Lawyer* in 2007; was named one of California's "Top Women Litigators" by the

26  *Daily Journal* in 2007; and was named as one of the *Daily Journal*'s "Top 20 Lawyers Under

27  Age 40" in 2006.  I was a finalist for Trial Lawyer of the Year (2007) from the Public Justice

28  Foundation, and for Consumer Attorney of the Year (2006) from Consumer Attorneys of

1    California.  I also received the following awards:  Community Service Award, Bay Area Lawyers

2    for Individual Freedom (2008), Award of Merit, Bar Association of San Francisco (2007),

3    Northern California Super Lawyer (2004, 2005, 2006, 2007, 2008); Lawyers' Committee for

4    Civil Rights "Living the Dream Partner" (2005); President's Award, Phillips Exeter Academy

5    (1999) (for admissions committee work dedicated to recruiting low-income applicants of color on

6    the West Coast).

7            25.     LCHB, along with other Plaintiff's counsel, has done significant work in

8    identifying and investigating the claims in this action.

9            26.     LCHB is committed to representing the Class in this matter, including

10   devoting significant time and energy to ensuring that the monitoring and reporting requirements

11   set forth in the Settlement Agreement are completed.

12           27.     Attached as Exhibit B to this Declaration is a true and correct copy of the

13   firm resume for Lieff, Cabraser, Heimann & Bernstein, LLP.

14                       **II.  History of Litigation and Discovery**

15           28.     Several of the named plaintiffs first contacted plaintiffs' counsel in 2004.

16   Plaintiffs' counsel commenced an extensive investigation at that time to determine the relative

17   merits of a class-based gender-discrimination claim against Smith Barney on behalf of female

18   Financial Advisors.  At the conclusion of that investigation, Plaintiffs filed a Class Action

19   Complaint on March 31, 2005 in the United States District Court for the Northern District of

20   California.  The Complaint, filed by four named plaintiffs,[1] asserted claims on behalf of a class of

21   all female Financial Advisors employed by Smith Barney in the United States and a subclass of

22   all female Financial Advisors employed by Smith Barney in California.  The Complaint asserted

23   claims for gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

24   §§ 2000e, *et seq.*, and, with respect to California Class Members, the California Fair Employment

25   and Housing Act, Cal. Gov't Code § 12940 ("FEHA").  On November 29, 2006, pursuant to

26

27   _____
     [1] The named plaintiffs were Renee Fassbender Amochaev, Deborah Orlando, Kathryn Varner,
28   and Judy Weil.  Pursuant to Stipulation, Judy Weil voluntarily withdrew as a representative
     plaintiff on September 15, 2006.

1   Stipulation, plaintiffs filed a First Amended Complaint ("FAC") which alleged substantially the

2   same facts and legal claims.

3             29.   Plaintiffs filed a Class Action Complaint on March 31, 2005.  The

4   Complaint, filed by four named plaintiffs,[2] asserted claims on behalf of a class of all female

5   Financial Advisors employed by Smith Barney in the United States and a subclass of all female

6   Financial Advisors employed by Smith Barney in California.  The Complaint asserted claims for

7   gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et*

8   *seq.*, and, with respect to California Class Members, the California Fair Employment and Housing

9   Act, Cal. Gov't Code § 12940 ("FEHA").  On November 29, 2006, pursuant to Stipulation,

10  plaintiffs filed a First Amended Complaint ("FAC") which alleged substantially the same facts

11  and legal claims.[3]

12            30.   Plaintiffs' counsel, who are experienced in litigating class-based

13  employment discrimination claims, have vigorously prosecuted this case since its filing in March

14  2005.  They conducted extensive discovery, including the review of a large volume of electronic

15  and hard-copy documents, as well as completing the depositions of the named plaintiffs and a

16  number of senior executives at Smith Barney who were responsible for the policies and practices

17  at issue in this litigation.  Plaintiffs' counsel also obtained computerized client account data,

18  personnel and payroll data for the class period that was provided to a statistical consulting firm

19  for extensive analysis.

20            31.   By the time the Settlement Agreement was finally negotiated, all class

21  certification discovery had concluded, and the Court had ruled on numerous issues.  Specifically,

22  the parties litigated a motion to transfer pursuant to 28 U.S.C. section 1404(a), a motion to enjoin

23

24  ─────────────────────

[2] The named plaintiffs at that time were Renee Fassbender Amochaev, Deborah Orlando, Kathryn
25  Varner, and Judy Weil.  Pursuant to Stipulation, Judy Weil voluntarily withdrew as a
representative plaintiff on September 15, 2006.  Subsequently, Ivy So was added as a named
26  plaintiff on November 29, 2006.

[3] The FAC added named plaintiffs Ivy So and Lisa Strange Weatherby.  The FAC also asserted a
27  non-class claim of race discrimination on behalf of Ms. So under Title VII, FEHA, and Section
1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.  On February 12, 2007, the Court entered
28  an Order dismissing Lisa Strange Weatherby as a representative plaintiff.

1    discovery, multiple motions to compel, a cross-motion for a protective order, and a motion to

2    dismiss.

3            32.    The parties conducted broad, extensive, and thorough discovery related to

4    class certification throughout 2006 and 2007.  Altogether, the written class certification discovery

5    conducted in this case included six (6) sets of document requests and three (3) sets of

6    interrogatories propounded by plaintiffs, and two (2) sets of document requests and

7    interrogatories propounded by Smith Barney.

8            33.    Smith Barney has produced, and plaintiff's counsel has reviewed over

9    160,000 pages of documents.  Plaintiffs' counsel reviewed, and, with expert assistance, analyzed

10   vast amounts of computerized data, including Smith Barney's client account data as well as

11   personnel, compensation and payroll data for all Financial Advisors from 2001 through 2006.

12           34.    The discovery process has been involved and thorough, and required the

13   parties to engage in numerous and extensive meet and confer conferences concerning the scope of

14   discovery and the analysis of the various produced electronic data files.

15           35.    Deposition discovery was also extensive.  Plaintiffs deposed eleven (11)

16   individuals, including 30(b)6 deponents who testified on a variety of topics, including Smith

17   Barney's compensation, account distribution, and partnership policies; organizational  structure;

18   EEO compliance; human resources functions; training; electronic data storage; retention of

19   documents; and internal complaint and investigation procedures.

20           36.    Plaintiffs also defended the depositions of Ms. Amochaev, Ms. Orlando,

21   Ms. Varner and Ms. So, each of which occurred over three (3) days.

22           37.    Informal discovery has been extensive.  Plaintiffs' experts conducted

23   numerous sophisticated, multi-variant regression analyses related to disparities in compensation

24   and client-account transfers.  In July 2007, plaintiffs' experts completed reports, including reports

25   prepared by a statistician and industrial and organizational psychologist, in preparation for the

26   filing of plaintiffs' motion for class certification.[4]  It is my understanding that Smith Barney's

27

28   _____
     [4] Although completed, plaintiffs did not submit these reports to the Court because the parties
     reached settlement prior to filing of plaintiffs' Motion in Support of Class Certification.

1   experts performed a similar analysis.  These calculations formed the basis for negotiations

2   regarding the monetary terms of the settlement.

3          38.      Plaintiffs' counsel have also been in contact with more than 135 putative

4   class members, and prepared a substantial number of class member declarations.

5          39.      As the result of the substantial investigation of the claims and the discovery

6   that was conducted, the parties negotiated the proposed settlement with a clear understanding of

7   the strengths and weaknesses of the case and the amounts necessary to compensate class members

8   for the harm suffered.

9   **Settlement Negotiations**

10         40.      The settlement was reached under the supervision of experienced mediator,

11  Hunter Hughes, Esq.  Counsel for the parties retained Mr. Hughes for his expertise in mediating

12  many complex actions, including those involving class-based gender and race discrimination

13  cases in the retail financial services sector.

14         41.      The parties here had multiple, face-to-face negotiating sessions in New

15  York and San Francisco at various times in the calendar years 2005, 2007 and 2008.   At least one

16  of the named plaintiffs attended each of the in-person mediation sessions, and all were actively

17  involved in shaping the relief negotiated.  Under the supervision of the mediator at all times

18  during this process, counsel bargained vigorously and at arms' length on behalf of their clients.

19         42.      As a result of the substantial investigation of the claims and the discovery

20  that was conducted, the parties negotiated the proposed settlement with complete knowledge

21  regarding the strengths and weaknesses of the case and the amounts necessary to compensate

22  class members for the harm suffered.

23         43.      The terms of the parties' agreement following negotiations are contained in

24  the Settlement Agreement, attached as Exhibit A hereto, and as Exhibit 1 to the proposed

25  preliminary approval order.  At the time the parties agreed to a settlement in principle, plaintiffs

26  had fully briefed, but not yet filed, their motion for class certification.  Only after all material

27  terms of the settlement had been finalized did the parties discuss the payment of attorneys' fees to

28  plaintiffs' counsel.

### III. Factual Record for Class Certification

44.    Plaintiffs' counsels' investigation of the claims alleged in this matter allowed them to determine that there is a sufficient basis to move for settlement class certification under Rule 23 of the Federal Rules of Civil Procedure.  Those facts include:

45.    During the class period there were approximately 2500 female Financial Advisors employed by Smith Barney.  This number is sufficient to establish that joinder is impracticable and that the numerosity requirement is satisfied under Rule 23(a)(1).

46.    Smith Barney has maintained uniform personnel and management structures across branch offices, and exercises extensive control over branch operations, compensation, and account distribution policies affecting Class members.

47.    Plaintiffs' expert conducted statistical analyses of compensation data and representation rates sufficient to demonstrate common patterns across the Class.

48.    Plaintiffs' allegations of discrimination in compensation on behalf of themselves and all others similarly situated are typical of the class as a whole.

49.    As set forth above and in the Declarations of Adam Klein, Cyrus Mehri and James M. Finberg, also filed herewith in support of the Plaintiffs' Motion for Order Granting Preliminary Approval of the Proposed Settlement Agreement, the attorneys for the representative plaintiffs are qualified, experienced, and generally able to conduct the litigation.

### IV. The Proposed Settlement is Fair and Reasonable and is in the Best Interest of the Class

50.    While plaintiffs are convinced that they have a compelling case, there is substantial risk in proceeding to class certification and to trial.  Pretrial preparation would be arduous and trial lengthy, involving dozens of witnesses nationwide.

51.    Even if plaintiffs were victorious at class certification, past summary judgment, and through trial, the judgment would likely be appealed, further delaying the result and increasing the cost of litigation.  Nor would a victory at a merits trial guarantee plaintiffs and the class members any affirmative class-wide relief whatsoever.  Were the plaintiffs to prevail at trial, the parties would likely enter into negotiations to determine the parameters of relief.  Ultimately, even an overwhelming court victory for plaintiffs would not ensure that the plaintiffs

1   would obtain the substantial injunctive relief that is included in this Settlement Agreement. And

2   the relief set forth in the Settlement Agreement will be implemented more quickly then through a

3   court order after verdict or by agreement of the parties after a class-wide liability finding.

4         52.     Given the significant risks at class certification, summary judgment, and

5   trial, and the likely appeal and inevitable delay of continued litigation, it is my opinion that the

6   proposed settlement is appropriate and in the best interests of the class.  Moreover, the proposed

7   Settlement Agreement provides substantial injunctive and monetary relief for the allegations of

8   systemic discrimination Plaintiffs allege.  Based on my experience in employment discrimination

9   class action litigation, it is my opinion that this settlement is fair, adequate and reasonable, and is

10  in the best interest of the Class and the Named Plaintiffs.

11        53.     In this case, all of the class representatives performed important services

12  for the benefit of the plaintiff classes.  They provided information regarding the structure of the

13  company and their job duties during lengthy interviews; they produced relevant documents; they

14  prepared for and were deposed for three (3) days each; they worked with plaintiffs' counsel

15  through the case, including during the mediation process.  Plaintiffs Amochaev, Orlando and

16  Varner, each of whom joined the case at its inception, participated in the initial press conference.

17  Each named plaintiff attended one or more mediation sessions, and all reviewed the drafts of the

18  Settlement Agreement and provided input.  The valuable efforts of the class representatives and

19  charging parties, their willingness to litigate and pursue their representative claims, and the

20  strength of their claims have resulted in a settlement that will benefit all settlement class

21  members.  The payment of less than one percent of the $33 million total to the named plaintiffs is

22  appropriate.

23        54.     As of the end of March 2008, plaintiffs' counsel had incurred over

24  $800,000 in unreimbursed out-of-pocket costs.  In addition, plaintiffs' counsel had invested over

25  12,000 hours, constituting a lodestar of over $ 4,800,00,  in investigating, prosecuting and settling

26  this case, with more work to be completed before final settlement approval.  In addition,

27  plaintiffs' counsel anticipate expending substantial additional time and costs during the 4-year

28  term of the Agreement, during which they will have substantial monitoring responsibilities and

1    semi-annual compliance meetings with Smith Barney, as set forth in the Settlement Agreement,

2    Section VIII.  Plaintiffs' counsel took this case on a contingency basis, involving a risk of

3    attorney time and expense.

4              55.    I believe that the notice mandated in this case pursuant to the Settlement

5    Agreement is reasonably calculated to provide notice to the class members.  It is my opinion that

6    the procedures and practices of the claims administrator as articulated in the Settlement

7    Agreement meet the due process requirements under Fed. R. Civ. Proc. 23(e).

8              56.    The parties have selected Settlement Services, Inc. in Tallahassee, Florida,

9    to act as the claims administrator.  Settlement Services, Inc. has substantial experience and an

10   excellent reputation in providing notice and settlement administration services in class actions.

11

12        I declare under penalty of perjury under the laws of the United States that the foregoing is

13   true and correct.  Executed this 2nd day of April 2008 in San Francisco, California.

14

15                                              Kelly M. Dermody

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -         DECL. OF KELLY M. DERMODY ISO MOT. FOR ORDER
                                                          GRANTING PRELIM APP OF PROP. SETTLEMENT AGREEMENT
                                                                                CASE NO. 05-1298 PJH

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENEE FASSBENDER AMOCHAEV, DEBORAH ORLANDO, KATHRYN N. VARNER and IVY SO, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>CITIGROUP GLOBAL MARKETS, INC., d/b/a SMITH BARNEY,<br><br>        Defendant. | Case No.  C- 05-1298 PJH<br><br>CLASS ACTION |

**SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................... 1

II.     NATURE AND RESOLUTION OF THE CASE ................................................. 1

    A.   The Parties Engaged in Substantial Discovery ......................... 2

    B.   Settlement Reached After Extended Negotiations ....................... 3

III.    GENERAL TERMS OF THE SETTLEMENT AGREEMENT ........................... 4

    A.   Definitions ........................................................... 4

    B.   Duration of the Settlement ............................................ 7

    C.   Cooperation ........................................................... 7

    D.   Persons Covered by this Settlement Agreement .......................... 7

        1.   Definition of "Settlement Class," "Class" or "Class Members." ....... 7

        2.   Certification .................................................... 8

IV.     COURT APPROVAL/NOTICE AND FAIRNESS HEARING ........................... 8

    A.   Jurisdiction and Venue ................................................ 8

    B.   Preliminary Approval .................................................. 8

    C.   Notice and Settlement Hearing ......................................... 9

V.      RELEASE/BAR OF CLAIMS ............................................... 13

    A.   Class Member Release ................................................. 13

    B.   Individual Claims of Named Plaintiffs ................................ 13

    C.   ..................................................................... 14

    D.   ..................................................................... 14

    E.   ..................................................................... 14

    F.   ..................................................................... 15

    G.   No Bar to Future Claims .............................................. 15

VI.     NO ADMISSION, NO DETERMINATION ..................................... 15

VII.    PROGRAMMATIC RELIEF ................................................ 16

    A.   Communications ....................................................... 16

    B.   Branch Management/Mobility ........................................... 17

    C.   Account Distribution ................................................. 19

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| | 1. | Power Rankings ............................................................. 19 |
| | 2. | Account Distribution Policies ....................................... 20 |
| | 3. | Disputes Concerning Account Distributions ............................... 22 |
| | 4. | Financial Life Services and Bank-Based Advisors .................... 23 |
| | 5. | Up-front Bonuses ......................................................... 23 |
| | 6. | Retiring Financial Advisors ...................................... 24 |
| | 7. | Partnerships .............................................................. 24 |
| | 8. | Leads, Call-ins, and Walk-ins ....................................... 25 |
| D. | | Development Opportunities ................................................ 27 |
| E. | | Complaint Process and Training ......................................... 28 |
| F. | | Appointments ..................................................................... 29 |
| | 1. | Diversity Monitor .......................................................... 29 |
| | 2. | Industrial Psychologist ................................................. 32 |
| G. | | General Non-Discrimination Provisions ................................ 35 |
| H. | | Duration of the Settlement ................................................ 36 |
| VIII. | | MONITORING ...................................................................... 36 |
| A. | | Data Collection ................................................................... 36 |
| B. | | Monitoring System .............................................................. 36 |
| C. | | Reports ................................................................................ 37 |
| D. | | Meetings .............................................................................. 37 |
| IX. | | MONETARY RELIEF ............................................................ 37 |
| A. | | Settlement Fund. ................................................................. 37 |
| B. | | Administration by Trustee ................................................... 39 |
| C. | | Claims Filing Procedures for Settlement of Claims of Named Plaintiffs and Class Members ....................................... 39 |
| D. | | Claims Administrator Authority to Determine Award Eligibility. .......... 40 |
| E. | | Confidentiality Regarding Amount of Monetary Award ....................... 41 |
| F. | | Non-Admissibility of Fact of Award (or Non-Award) ........................ 41 |
| G. | | Tax Treatment .................................................................... 42 |

## TABLE OF CONTENTS
### (continued)

Page

|  |  | 1. | Qualified Tax Status and Tax Responsibilities. | 42 |
|  |  | 2. | Payment of Federal, State and Local Taxes. | 42 |
|  | H. | Smith Barney Has No Further Obligation, Liability or Responsibility | | 45 |
| X. | ATTORNEYS' FEES, EXPENSES OF CLASS COUNSEL AND ADMINISTRATIVE EXPENSES | | | 45 |
|  | A. | Class Counsel Fees and Costs | | 45 |
|  | B. | Smith Barney's Non-Opposition | | 46 |
|  | C. | Timing of Fee Payment | | 46 |
|  | D. | Satisfaction of Fee and Cost Obligations under the Settlement | | 46 |
|  | E. | Service Award | | 46 |
| XI. | TERMINATION OF THE SETTLEMENT AGREEMENT | | | 47 |
| XII. | CONFIDENTIALITY | | | 47 |
|  | A. | Documents and Information Produced by Smith Barney and Class Counsel. | | 47 |
|  | B. | Return or Disposal of Confidential Documents and Information | | 48 |
| XIII. | GOVERNING LAW | | | 48 |
| XIV. | OTHER CONDITIONS OF SETTLEMENT | | | 48 |
|  | A. | Exhibits | | 48 |
|  | B. | Notices to Counsel | | 49 |
|  | C. | Failure to Insist on Strict Compliance | | 49 |
|  | D. | Modifications to this Agreement | | 49 |
|  | E. | No Drafting Presumption | | 49 |
|  | F. | Dispute As To Meaning of Agreement Terms | | 49 |
|  | G. | Interpretation of Terms | | 50 |
|  | H. | Severability | | 50 |
|  | I. | Paragraph and Section Headings | | 50 |
|  | J. | Counterparts | | 50 |
|  | K. | Agreement Binding. | | 50 |
|  | L. | Enforcement. | | 51 |

I.      **INTRODUCTION**

Subject to approval by the United States District Court for the Northern District of

California (the "Court"), this Settlement Agreement ("Settlement Agreement," "Settlement" or

"Agreement") sets forth the full and final terms by which Renee Fassbender Amochaev, Deborah

Orlando, Kathryn Varner and Ivy So (the "Named Plaintiffs"), on behalf of themselves and

members of the Class defined herein, and Defendant Citigroup Global Markets, Inc., d/b/a Smith

Barney ("Smith Barney," "Defendant," "Firm," or "Company") have settled and resolved all

claims that have been raised in the First Amended Complaint ("FAC") filed by the Named

Plaintiffs on November 29, 2006.  This Action and Settlement applies to female Financial

Advisors employed by Smith Barney at any time during the relevant time period.

II.     **NATURE AND RESOLUTION OF THE CASE**

Plaintiffs filed a Class Action Complaint in the Northern District of California on March

31, 2005.  The Complaint, filed by four named plaintiffs,[1] asserted claims on behalf of a class of

all women employed as Financial Advisors in (i) the United States branches of Smith Barney's

retail brokerage division at any time from August 24, 2003 forward or (ii) the California

branches of Smith Barney's retail brokerage division at any time from June 25, 2003 forward.

The Complaint asserted claims for gender discrimination under Title VII of the Civil Rights Act

of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and, with respect to California Class Members, the

California Fair Employment and Housing Act, Cal. Gov't Code § 12940 ("FEHA").  On

---

[1] The named plaintiffs at that time were Renee Fassbender Amochaev, Deborah Orlando,
Kathryn Varner, and Judy Weil.  Pursuant to Stipulation, Judy Weil voluntarily withdrew as a
representative plaintiff on September 15, 2006.  Subsequently, Ivy So was added as a named
plaintiff on November 29, 2006.

November 29, 2006, pursuant to Stipulation, plaintiffs filed a First Amended Complaint ("FAC") that alleged substantially the same facts and legal claims.[2]

Smith Barney denies the allegations in the Complaint and the First Amended Complaint, including alleged liability under Title VII of the Civil Rights Act of 1964 or any other federal, state or local laws, and specifically denies that it unlawfully discriminated against Plaintiffs or Class Members on the basis of sex, or that Plaintiffs or Class Members are otherwise entitled to the relief requested.

A.      **The Parties Engaged in Substantial Discovery**

The parties conducted broad, extensive, and thorough discovery related to class certification throughout 2006 and 2007.  Altogether, the written class certification discovery conducted in this case included six sets of document requests and three sets of interrogatories propounded by plaintiffs, and two sets of document requests and interrogatories propounded by Smith Barney.  Smith Barney has produced, and plaintiffs' counsel has reviewed, over 160,000 pages of documents.  Plaintiffs' counsel also reviewed, and, with expert assistance, analyzed vast amounts of computerized data, including Smith Barney's client account data as well as personnel, compensation and payroll data for Financial Advisors.  The discovery process has been thorough, and it required the parties to engage in numerous and extensive meetings and conferences concerning the scope of discovery and the analysis regarding the various electronic data, policy documents, and complaint files produced.

Deposition discovery was also extensive.  Plaintiffs deposed 10 individuals, including 30(b)(6) deponents who testified on a variety of topics, including Smith Barney's compensation,

---

[2] The FAC added named plaintiffs Ivy So and Lisa Strange Weatherby.  The FAC also asserted a non-class claim of race discrimination on behalf of Ms. So under Title VII, FEHA, and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.  On February 12, 2007, the Court entered an Order dismissing Lisa Strange Weatherby as a representative plaintiff.

737223.6

account distribution, and partnership policies; organizational structure; EEO compliance; human

resources functions; training; electronic data storage; retention of documents; and internal

complaint and investigation procedures.  Smith Barney took the depositions of Ms. Amochaev,

Ms. Orlando, Ms. Varner and Ms. So, each of which occurred over three days.

> **B.**   **Settlement Reached After Extended Negotiations**

Plaintiffs' Counsel and counsel for Smith Barney recognize the costs and risks of

prosecuting this litigation through class certification, summary judgment, trial, and appeal.

Plaintiffs' Counsel believe that it is in the interest of all members of the Settlement Class to

resolve finally and completely the potential claims of the Class Members against Smith Barney.

Plaintiffs' Counsel believe that the terms of the Settlement Agreement are in the best interests of

the Class and are fair, reasonable, and adequate.  Smith Barney wishes to bring the litigation to a

conclusion on the terms set forth in this Settlement Agreement.

This Settlement was reached under the supervision of experienced mediator Hunter

Hughes, Esq.  Counsel for the parties are experienced class action lawyers who retained Mr.

Hughes for his expertise in mediating many complex class actions, including those involving

gender discrimination in employment.  Mr. Hughes conducted multiple mediation sessions

between the parties in San Francisco and New York.  At least one of the named Plaintiffs

attended each of the mediation sessions, and all were actively involved in shaping the monetary

and injunctive relief set forth in the Settlement Agreement.  At all times during this process,

counsel bargained vigorously and at arm's-length on behalf of their clients.

Without any admission or concession by Smith Barney of any liability or wrongdoing

with respect to the allegations in the Complaint or the Amended Complaint, all released claims

shall be finally and fully compromised, settled, and released subject to the terms and conditions

of this Settlement Agreement, which were the subject of extensive negotiation and ultimate agreement by the parties.

## III.   GENERAL TERMS OF THE SETTLEMENT AGREEMENT

### A.   Definitions.

In addition to terms identified and defined elsewhere in this Settlement Agreement, and as used in this Settlement Agreement, the terms below shall have the following meanings:

1.   "Action" means the lawsuit filed in the Northern District of California, and described above and the allegations contained in the First Amended Complaint filed on November 29, 2006.

2.   "Amended Complaint" means the First Amended Complaint filed in this action on November 29, 2006.

3.   "Attorneys' Fees and Expenses" means the settlement amounts approved by the Court for payment to Plaintiffs' Counsel, including attorneys' fees, costs, and litigation expenses, plus accrued interest as of October 1, 2008, as described in Section X herein.

4.   "Claims Administrator" means Settlement Services, Inc. ("SSI") which has been jointly designated by counsel for the parties to administer the Settlement Fund pursuant to Section IX below and orders of the Court.

5.   "Claim Form" means the form agreed to by the parties and attached to the Notice. The Claim Form must be submitted by any eligible Class Member to the Claims Administrator as part of the claims process.

6.   "Claimant" means a Class Member who has submitted a timely Claim Form.

7.   "Class Counsel" means the law firms of Lieff Cabraser Heimann & Bernstein, LLP, Outten & Golden, LLP, Mehri & Skalet, PLLC, and Altshuler Berzon LLP.

737223.6

8.      "Class Member" means any person who meets the criteria set forth in the definition of "Settlement Class" below.

9.      "Complaint" means the Complaint filed in this Action on March 31, 2005.

10.     "Court" means the United States District Court for the Northern District of California.

11.     "Defendant" or "Smith Barney" or "Firm" or "Company" means Citigroup Global Markets Inc., d/b/a Smith Barney and its predecessors in interest.

12.     "Defendant's Counsel" means the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP.

13.     "Depository Bank" means Wells Fargo Bank or another bank jointly selected by counsel for the parties to receive, hold, invest, and disburse the Settlement Fund, subject to the direction of the Claims Administrator.

14.     "Diversity Monitor" means the jointly selected individual appointed by the parties to carry out the duties specified in Section VII.F.1 of this Agreement.

15.     "Effective Date" means the date on which all of the following have occurred: (1) the Court has finally approved this Settlement Agreement and has signed and entered an order so indicating; (2) the Court has entered an Order and Judgment dismissing the Action with prejudice, with continuing jurisdiction limited to enforcing this Settlement Agreement; and (3) the time for appeal has either run without an appeal being filed or any appeal (including any requests for rehearing *en banc*, petitions for certiorari or appellate review) has been finally resolved.

16.     "Final Approval" means the date on which the United States District Court grants final approval of the Settlement.

17.     "Financial Advisor" or "FA" or "Financial Consultant" or "FC" means a person employed by Smith Barney as a Financial Advisor, but does not include a person employed as a Financial Advisor Associate or a Financial Consultant Associate.

18.     "Lead Class Counsel" means Lieff Cabraser Heimann & Bernstein LLP, Outten & Golden, LLP, and Mehri & Skalet, PLLC.

19.     "Notice" means the Notice of Class Action, Proposed Settlement Agreement, and Settlement Hearing, which is to be mailed directly to Class Members, substantially in the form attached hereto as Exhibit B.

20.     "Notice of Award" means the letter sent to each eligible Claimant by the Claims Administrator specifying the amount of that Claimant's award, as determined by the Claims Administrator.

21.     "Plaintiffs" or "Named Plaintiffs" means Renee Amochaev, Deborah Orlando, Kathryn Varner and Ivy So.

22.     "Preliminary Approval" means the Order of the Court preliminarily certifying the Settlement Class and preliminarily approving this Settlement Agreement and the form of Notice to be sent to Class Members.

23.     "Settlement," "Agreement," and "Settlement Agreement" each mean the settlement agreed to by the parties as reflected in this Settlement Agreement.

24.     "Settlement Class" or "Class" means the class that the parties jointly seek to have certified, solely for the purposes of this Settlement Agreement, which is defined as all women employed as Financial Advisors in (i) the United States branches of Smith Barney's retail brokerage division at any time from August 24, 2003 through March 1, 2008 or (ii) the California branches of Smith Barney's retail brokerage division at any time from June 25, 2003

through March 1, 2008.  The "Settlement Class" or "Class" does not include, for example, (i) brokers in Smith Barney's Financial Life Services (FLS) program, (ii) Smith Barney's bank-based advisors; or (iii) Financial Advisor Associates or Financial Consultant Associates.

25.     "Settlement Fund" or "Fund" means the settlement monies transferred by Smith Barney to the Depository Bank, pursuant to this Settlement Agreement, including all interest earned thereon, to be held, invested, administered, and disbursed pursuant to this Settlement Agreement.

26.     "Settlement Hearing" means the hearing at which the Court will consider final approval of this Settlement Agreement and related matters.

### B.     Duration of the Settlement.

The programmatic relief embodied in this Settlement Agreement and the agreements incorporated in it shall remain binding on the parties and their agents and successors for a period of four years following the Effective Date.

### C.     Cooperation.

The parties agree that they will cooperate to effectuate and implement all terms and conditions of this Settlement Agreement, and exercise good faith efforts to accomplish the terms and conditions of this Settlement Agreement. The parties agree to accept non-material and procedural changes to this Settlement Agreement if so required by the Court in connection with Final Approval of the Settlement, but are not obligated to accept any changes in the monetary amount of relief or the substantive programmatic relief provided for herein, or any other substantive change.

D.    **Persons Covered by this Settlement Agreement**

1.    **Definition of "Settlement Class," "Class" or "Class Members."**

Solely for purposes of settlement and judicial approval of this Settlement Agreement, the parties stipulate to the certification of the Settlement Class, defined as all women employed as Financial Advisors in (i) the United States branches of Smith Barney's retail brokerage division at any time from August 24, 2003 through March 1, 2008 or (ii) the California branches of Smith Barney's retail brokerage division at any time from June 25, 2003 through March 1, 2008 (the "Class Period").  The Settlement Class does not include, for example, (i) brokers in Smith Barney's Financial Life Services (FLS) program, (ii) Smith Barney's bank-based advisors; or (iii) Financial Advisor Associates or Financial Consultant Associates.

2.    **Certification.**

The parties will propose to the Court that the Class be certified pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

IV.    **COURT APPROVAL/NOTICE AND FAIRNESS HEARING**

A.    **Jurisdiction and Venue**

a.    The parties agree that the Court has jurisdiction over the parties and the subject matter of this Action and that venue is proper.  The Court shall retain jurisdiction of this Action for four years from the Effective Date of the Settlement Agreement solely for the purpose of entering all orders and judgments authorized hereunder that may be necessary to implement and enforce the relief provided herein.

B.    **Preliminary Approval**

a.    Prior to execution of this Settlement Agreement, the parties agreed upon a form for written Notice of this Settlement Agreement to Class Members, attached as Exhibit B, subject to Court approval.

737223.6

b.      By April 2, 2008, the parties shall petition the Court for the following orders:

i.      preliminarily certifying the Settlement Class; preliminarily approving this Settlement Agreement; approving the Notice to be sent to Class Members describing the terms of the Settlement and informing them of their rights to submit objections and to opt out; and

ii.      pending Final Approval, preliminarily enjoining each member of the Settlement Class, including any members who make an irrevocable election to exclude themselves from the monetary relief provisions of the Settlement, from commencing, prosecuting or maintaining in any court or forum other than this Court any claim, action or other proceeding that challenges or seeks review of or relief from any order, judgment, act, decision or ruling of the Court in connection with this Settlement Agreement or otherwise in connection with this Action.  Effective as of the date specified for Class Members to opt out of the Settlement, further enjoining any member of the Settlement Class who has not made an irrevocable election to exclude themselves from the monetary relief provisions of the Settlement from commencing, prosecuting or maintaining either directly, representatively or in any other capacity any claim that is subsumed within the Settlement Agreement.

iii.      entering Administrative Order No. 1 relating to this Settlement Agreement to be proposed to the Court by the parties.

C.      **Notice and Settlement Hearing**

a.      Smith Barney shall identify all Class Members and will provide to the Claims Administrator, within ten (10) days after Preliminary Approval of this Settlement Agreement, the name, social security number, and last known address of each Class Member. The Claims Administrator shall utilize Class Members' social security numbers only for the

purpose of locating and identifying Class Members and shall keep those social security numbers confidential.

　　　　　　　b.　　Within twenty (20) days after Preliminary Approval of the Settlement Agreement, the Claims Administrator will mail the Notice to each Class Member in the form agreed upon by the parties or such other form as approved by the Court.  The parties intend to provide actual notice to each Class Member, to the extent practicable.  The Claims Administrator shall mail a Claim Form to each Class Member at the same time the Notice is sent.

　　　　　　　c.　　Within thirty-five (35) days after Preliminary Approval, the Claims Administrator shall provide to Lead Class Counsel a list of those Class Members who have not been located and the Claims Administrator may engage third-party vendors in order to locate Class Members.   The Claims Administrator will maintain a log of its activities undertaken pursuant to this section.    The expenses of the Claims Administrator shall be paid by the Settlement Fund described at Section IX below.

　　　　　　　d.　　Class Member objections to this Settlement Agreement, if any, must be submitted in writing, and must include a detailed description of the basis of the objection. Objections must be filed with the Court, with copies served on Lead Class Counsel and counsel for Smith Barney, postmarked on or before forty-five (45) days after the Notice is mailed to Class Members.  No one may appear at the Settlement Hearing for the purpose of objecting to the Settlement Agreement without first having filed and served her objection(s) in writing postmarked on or before forty-five (45) days after the Notice was mailed to Class Members.

　　　　　　　e.　　Any Class Member who wishes to opt out of the Settlement Class must mail to the Claims Administrator a written, signed statement that she is opting out, as set forth below.  The Claims Administrator shall provide to all counsel and file with the Court all opt-out statements that are timely received.  The Settlement Class will not include those individuals who file and serve a timely opt-out statement, and individuals who opt out are not entitled to any monetary award under this Settlement Agreement.  With respect to each such

737223.6

individual, the statute of limitations for her to assert any claim for individual relief will resume running on the postmark date of her signed, written statement that she is opting out of the Settlement Class.  Among other things, the Notice shall advise Class Members that:

- Any Class Member who wishes to opt out of the Settlement Class must mail a written, signed statement that she is opting out of the Settlement Class to the Claims Administrator at the address listed in the Notice.

- To be effective, this opt-out statement must be post-marked on or before forty-five (45) days after the date the Notice is mailed to Class Members.

- To be effective, the opt-out letter and statement must include a written statement confirming that the individual is aware that by opting out she will forego the opportunity to receive monetary benefits from this Settlement.

- Class Members who file opt-outs may rescind their opt-outs.

- To be effective, such rescissions must be in writing sent to the Claims Administrator and must be post-marked on or before sixty (60) days after the date the Notice is mailed to Class Members.

- In the event that a Class Member files a claim form and an opt out letter, the opt out letter shall be deemed invalid.

    f.  If Preliminary Approval is granted, a briefing schedule and Settlement Hearing date will be set at the Court's convenience.  The parties' Motion for Final Approval and for Certification of the Settlement Class will be due no earlier than fifteen (15) days following the close of the objection and opt-out period, and the Settlement Hearing will be held no earlier than one-hundred (100) days following the filing of this Agreement with the Court, and no earlier than thirty (30) days following the close of the objection and opt-out period.

    g.  The time periods referenced in this Section IV.C. are guidelines; actual dates will be inserted in the Preliminary Approval Order by the Court.

    h.  In the event that this Settlement Agreement does not become final and binding, no party shall be deemed to have waived any claims, objections, rights or defenses,

- 11 -

737223.6

or legal arguments or positions, including, but not limited to, claims or objections to class

certification, or claims or defenses on the merits. Neither this Settlement Agreement nor the

Court's Preliminary or Final Approval thereof shall be admissible in any court regarding the

propriety of class certification or regarding any other issue or subject (except for the purpose of

enforcing this Settlement Agreement). Each party reserves the right to prosecute or defend this

Action in the event that the Settlement Agreement does not become final and binding.

          i.      If Smith Barney exercises its option to withdraw from the

Settlement or if this Settlement Agreement is not approved by the Court or for any other reason

is terminated or fails to become effective in accordance with its terms (or, if following approval

by this Court, such approval is reversed or substantively modified), the parties shall be restored

to their respective positions that existed in this Action prior to entering into this Settlement

Agreement; the terms and provisions of this Settlement Agreement shall have no force or effect

and shall not be used in this Action or in any proceeding for any purpose; the Settlement Fund

shall be returned to Smith Barney, including the interest earned by the Settlement Fund through

the date of termination (after deducting all costs and expenses, including costs of providing

Notice to Class Members, paid or incurred by the Claims Administrator as of the date of

termination); any Judgment entered by the Court in accordance with the terms of this Settlement

Agreement shall be treated as vacated, *nunc pro tunc*; and the litigation of the Action will resume

as if there had been no Settlement Agreement, with no stipulated Class.  The parties retain all

rights, claims, and defenses as to class certification and otherwise as to any of the allegations

asserted in this Action. This Settlement Agreement will not be considered an admission of

liability by Smith Barney nor represent a cap on damages available to the Named Plaintiffs or the

Class.

V.   **RELEASE/BAR OF CLAIMS**

A.   **Class Member Release.**

All Class Members, as a condition of receiving a monetary payment in conjunction with this Settlement Agreement, will be required to execute and deliver to the Claims Administrator a Class Member Release in the form agreed to by counsel for the parties and attached hereto as Exhibit A, a copy of which shall be provided to counsel for Smith Barney.  The Class Member Release will release all claims, known and unknown, existing through the date of preliminary approval, under any federal, state or local legal theory, for gender discrimination against Smith Barney, with the exception of claims for non-economic damages (such as emotional pain, distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-economic losses) that arise from sexual harassment (as that term is defined in 29 C.F.R. § 1604.11(a)) ("Class Member Release").  By way of example only, and without any intent to limit the scope of the preceding release, this settlement would bar a claim for loss of compensation of any type or description (including but not limited to commissions, salary, bonuses, deferred compensation and incentive awards) arising from or relating to any type of sex or gender discrimination (including but not limited to sexual harassment), but would not bar a claim of emotional distress, costs of medical treatment, or other such non-economic compensatory damages arising from or related to sexual harassment.

B.   **Individual Claims of Named Plaintiffs.**

Each Class Representative will receive an additional payment for the release of her non-class claims, including race and age discrimination and non-economic losses that arise from sexual harassment, to be determined by the neutral Claims Administrator.  These decisions shall be based upon a review of the factual record and shall be non-appealable.  In no event will the

total of all such awards exceed $550,000.  Each Class Representative will be required to execute and deliver to the Claims Administrator a Named Plaintiff Release in the form agreed to by counsel for the parties and attached hereto as Exhibit B, which shall entitle them to receive payments for the release of both their class and non-class claims.  A copy of each executed Named Plaintiff Release shall be provided to counsel for Smith Barney.  The Named Plaintiff Release is not a limited release of claims of gender discrimination but instead releases all claims of any nature against Smith Barney under federal, state or local laws for any period up through the date of preliminary approval.

C.       The Claims Administrator shall provide all Class Members with the Class Member Release, and all Named Plaintiffs with the Named Plaintiff Release, at the time the Notice is provided to them.

D.       The terms of the Releases, attached hereto as Exhibits A and B, are a material part of this Settlement Agreement and are hereby incorporated as if fully set forth in the Settlement Agreement; if these Releases, attached hereto as Exhibits A and B, are not finally approved by the Court, or the Settlement Agreement cannot become effective for any reason and the Settlement set forth in this Settlement Agreement shall terminate as provided in Section XI of this Settlement Agreement, then the Named Plaintiff Releases and Class Member Releases shall terminate *nunc pro tunc* and be of no force and effect.

E.       In the event that any Class Member does not execute and timely deliver a Class Member Release, or if any Named Plaintiff does not execute and timely deliver a Named Plaintiff Release, she will be ineligible for, and forever barred from receiving, monetary relief under this Settlement Agreement, even if said Class Member or Named Plaintiff has not opted out.

**F.**     Class Members who neither timely opt out nor timely file a Claim Form shall, upon the Effective Date, be ineligible to receive any monetary award pursuant to this Settlement Agreement and be deemed to have fully, finally and irrevocably waived, released and discharged Smith Barney from any and all claims of gender discrimination, to the same extent as specified in Section V.A. above, whether known or unknown, actual or potential, arising at any time on or before the Preliminary Approval Date.

**G.     No Bar to Future Claims.**

Nothing in the Settlement Agreement shall be construed to bar any claims of members of the Settlement Class or Plaintiffs that arise from conduct occurring after the Preliminary Approval Date.

**VI.     NO ADMISSION, NO DETERMINATION**

1.     This Settlement Agreement does not, and is not intended to constitute, nor shall it be deemed to constitute, an admission by any party as to the merits, validity or accuracy of any of the allegations, claims or defenses of any party in this case.  The Class Members continue to assert the merits and validity of their claims under Title VII or parallel state and local laws prohibiting gender discrimination.  By entering into this Agreement, Smith Barney does not admit or concede, expressly or impliedly, but denies that it has in any way violated Title VII, parallel state and local laws prohibiting gender discrimination, the common law of any jurisdiction, or any other federal, state or local law, statute, ordinance, regulation, rule or executive order, or any obligation or duty at law or in equity.  Neither the Court nor any other court has made any findings or expressed any opinion concerning the merits, validity or accuracy of any of the allegations, claims or defenses in this case.

2.      Nothing in this Settlement Agreement, nor any action taken in implementation thereof, nor any statements, discussions or communications, nor any materials prepared, exchanged, issued or used during the course of the mediation or negotiations leading to this Settlement Agreement, is intended by the parties to, nor shall any of the foregoing constitute, be introduced, be used or be admissible in any way in this case or any other judicial, arbitral, administrative, investigative or other proceeding of whatsoever kind or nature (including, without limitation, the results of the Claims Process established under this Settlement Agreement) as evidence of discrimination, retaliation or sexual harassment or as evidence of any violation of Title VII, parallel state and local laws prohibiting gender discrimination, the common law of any jurisdiction, or any other federal, state or local law, statute, ordinance, regulation, rule or executive order, or any obligation or duty at law or in equity.

Notwithstanding the foregoing, this Settlement Agreement may be used in any proceeding in the Court or in mediation or arbitration to enforce or implement any provision of this Settlement Agreement or implement any orders or judgments of the Court entered into in connection herewith.

## VII.   PROGRAMMATIC RELIEF

### A.      Communications.

Smith Barney shall distribute its Non-Discrimination, Anti-Harassment and Anti-Retaliation Policy to all employees upon hire (in hard copy or by electronic mail) and then on an annual basis via email from Smith Barney's CEO.  Employees shall be required to submit an acknowledgment of receipt.

737223.6

In addition, the CEO of Global Wealth Management shall issue a statement annually in support of the Policy and its underlying tenets.  The Policy will be available on the Firm's intranet site and will be incorporated into various other Firm policies including its Code of Conduct and its Internet and Electronic Communications Usage Policy.

The Non-Discrimination, Anti-Harassment and Anti-Retaliation Policies and the behaviors they seek to promote and prevent shall be the subject of mandatory training that all employees will be required to complete upon hire.

**B.**     **<u>Branch Management/Mobility</u>.**

All available branch management positions (including minimum requirements for qualification) will be posted to Financial Advisors who either:  (i) have successfully completed the branch management assessment program, or (ii) are already in branch management and request to be informed of new management job postings.  These positions currently are titled: National Development Officer; Divisional Development Officers; Regional Development Officers; Sales Manager; Branch Manager; and Assistant Branch Manager.  All positions will be posted for a minimum of five (5) business days.  Either the hiring manager or Human Resources will follow up with each applicant/candidate in a timely manner.  In addition, Smith Barney shall develop and implement a computerized system to generate an electronic mail notification of new management job postings to Financial Advisors who either: (i) have successfully completed the branch management assessment program, or (ii) are already in branch management and request to be informed of new management job postings.

Smith Barney shall post a written description of the branch management assessment program and the criteria for admission on the Firm's intranet site.

737223.6

The Industrial Psychologist shall review Smith Barney's branch management assessment program and, if appropriate, make recommendations for increasing the participation of females in the branch manager assessment program (including review of the criteria for admission) and in branch management.  These recommendations shall be made in accordance with Section F.2 below.

Smith Barney shall provide all management personnel with diversity training no less than every other year.  The format of such training may vary from jurisdiction to jurisdiction depending on the relevant legal requirements.  However, all managers shall, at a minimum, be required to complete an interactive, customized, e-learning training program.  The positions to be trained are:  Divisional Directors; Regional Directors; Regional Administrative Officers; Branch Managers; Assistant Branch Managers; Sales Managers; and Operations Managers.

Branch Manager compensation shall have a diversity component designed to measure and reward efforts at diversifying representation rates in the Financial Advisor position, including the following areas as appropriate:  recruiting, mentoring, training, retaining and promoting female Financial Advisors.  Smith Barney agrees that it shall develop and implement a standardized annual process whereby Branch Managers shall be required to report on their efforts and results in promoting a diverse workforce (including, for example, their efforts to retain female Financial Advisors and their efforts to assist female Financial Advisors in, among other things, increasing their production, participating in partnerships in the branch, participating in the Franchise Protection Program, being added to the branch management bench, and obtaining promotions to branch management), and whereby senior Smith Barney management will review these efforts and take them into account when determining the diversity component of each Branch Manager's compensation.  These reports on diversity efforts by Branch

- 18 -

Managers, as well as the recommendations regarding each Branch Manager's diversity component of compensation, shall be provided to the Diversity Monitor annually.

###    C.    <u>Account Distribution</u>.

Under this Settlement, Smith Barney has agreed to make significant changes to its procedures for distributing accounts of departing Financial Advisors, including reducing reliance on historical factors, such as assets under management and length of service with Smith Barney, and more heavily weighting criteria that reflect recent performance. Smith Barney has also agreed to automate the account distribution process based on a "Power Rankings" system and to limit the exceptions that can be made to the Power Rankings. The Power Ranking factors are set forth in **Appendix 1** filed under seal along with this Settlement Agreement.

###    1.    <u>Power Rankings</u>

a.    All Power Ranking factors that measure performance from the previous twelve-month period will be adjusted to encompass a 12-month period exclusive of absence for parental leave or short-term disability leave. For example, if a Financial Advisor or Financial Advisor Associate ("FAA") was on a leave of absence for four of the preceding twelve months, the previous 12 months measure will instead count the last twelve months that the employee was active.

b.    The methodology for calculating the Power Rankings will be provided to each Financial Advisor and FAA, including the name of each factor, an explanation of each factor, and how each factor is weighted. Upon hire, each Financial Advisor and FAA will be individually provided with the methodology of the objective measures utilized in the Power Ranking calculation and the manner in which calculations are completed and this will be available to all Financial Advisors and FAAs electronically. Smith Barney agrees to provide

notice to Financial Advisors and FAAs regarding any modification to the Power Ranking methodology.

        c.      Smith Barney shall inform each Financial Advisor and FAA of her or his individual ranking at the time any distribution is made.  The actual distribution of a departing Financial Advisor's book will be made available to the Financial Advisors and FAAs in the Branch and such communication shall include the rankings and (without identification of any particular Financial Advisor or FAA by name) the number of accounts and the assets distributed to each ranked Financial Advisor and FAA.

        **2.**      **Account Distribution Policies**

        a.      Smith Barney senior management will issue a comprehensive account distribution policy statement, which shall include policies covering the distribution of the accounts of departing Financial Advisors, retiring Financial Advisors (other than accounts distributed through the Franchise Protection Program), departing partners, and leads, call-ins, and walk-ins.  The statement shall be issued via email to all field employees and shall be posted on Smith Barney's intranet site and shall include a prohibition on discrimination.  In addition, Smith Barney will train all current Branch Managers on account distribution policies and procedures at the time the settlement becomes effective, and will similarly train all new managers that are subsequently hired.

        b.      Branch Managers shall have discretion to disqualify a Financial Advisor from an account distribution for improper conduct, such as, for example, if a Financial Advisor is:  (1) currently on heightened supervision consistent with industry standards; (2) subject to any regulatory action reportable as a "yes" answer on Form U-4 questions 14C-G; (3) subject to discipline reported on Form RE-3 in the last 12 months; or (4) subject to any written

performance or workplace conduct warning in the last 90 days and to disqualify any FAA who is not meeting minimum performance standards; provided, however, that where such an exception to the Power Ranking process is made, it shall be documented by the Branch Manager or his/her designee in writing and included in the quarterly reports on exceptions provided to the Diversity Monitor.  Financial Advisors and FAAs are not eligible for an account distribution if they:  (1) have voluntarily opted-out of the distribution; (2) are not in the product specialty group to which the distributed accounts belong (e.g. IIG/IFG); or (3) are on parental or short-term disability leave at the time the account distribution is made.

        c.      Where an exception is made to the Power Ranking process because of, for example, a client relationship or client service needs, each individual exception shall be documented by the Branch Manager or his/her designee in writing, including the legitimate business reasons for the exception.  Customer preference based on a bias against women cannot be used as a legitimate business reason for an exception, provided, however, that Smith Barney shall have no obligation to inquire as to or otherwise attempt to discover the reason for a customer preference for or against a Financial Advisor or FAA.  Records of all exceptions shall be kept for purposes of monitoring policy compliance and regularly reviewed by the Regional Director and the Diversity Monitor.  The Company shall provide the Diversity Monitor quarterly reports on exceptions being made in the branches including information on the identity of the branches, the branch managers who approved the exceptions and an explanation of the exceptions.  If a Financial Advisor or FAA receives an account through an exception, that Financial Advisor or FAA will not receive another account in the same distribution until every eligible Financial Advisor and FAA has first received an account from those accounts that come next in the ranking of accounts in that distribution; provided, however, that if that Financial

Advisor or FAA is the only qualified broker in the branch to service a later account in the

distribution, that Financial Advisor or FAA shall receive that account even if not every eligible

Financial Advisor and FAA has already received an account in the distribution, and such

exception shall be documented in accordance with this paragraph C.2.b.  An individual Financial

Advisor or FAA who does not receive a specific account as a result of an exception shall receive

the next available account in the same distribution that he/she is qualified to service.  Branch

Managers who are determined to have distributed an account pursuant to any improper exception

shall receive an appropriate discipline, which can include a material reduction in their annual

bonus, and which discipline shall be reviewed by the Diversity Monitor in accordance with

Section F.1.b.

> d.      Smith Barney shall enhance its technology to allow its account

distribution process to be computer automated, subject to branch manager review to ensure

compliance with regulatory requirements and consideration of the best interests of the firm's

clients.  Account distributions will be made through this automated process, subject to

exceptions described in paragraph C.2.b and c above.  The results of all account distributions

shall be stored and readily retrievable for monitoring to ensure compliance with account

distribution policies.

### 3.      Disputes Concerning Account Distributions

> The parties agree that if at any time during the term of this Settlement Agreement

a dispute shall arise between Smith Barney and a Financial Advisor concerning any account

distribution, such dispute shall—at the written request of the Financial Advisor—go through

Smith Barney's internal complaint process, which includes access to mediation.  However,

nothing herein shall prevent any Class Member from individually pursuing any legal claim not

737223.6

released under this Settlement through any applicable governmental agency, arbitration forum or court of law if she is otherwise entitled to do so.  If a Financial Advisor submits a gender-related complaint through Smith Barney's alternative dispute resolution system, that person shall receive a written description of the ADR process—and a written notice indicating that the statutes of limitations on her/his legal claims will be tolled for 120 days from the date of his/her submission of the ADR complaint.

### 4.     Financial Life Services and Bank-Based Advisors

The parties agree that the changes to Smith Barney's procedures for distributing accounts of departing Financial Advisors described herein shall in no way apply to or affect:  (i) Smith Barney's Financial Life Services (FLS) program or any accounts transferred, or identified for transfer, to or from FLS; or (ii) accounts serviced by Smith Barney's bank-based advisors.

### 5.     Up-front Bonuses

a.     The Industrial Psychologist shall review and, if appropriate, make recommendations for developing a standard and nationwide process for determining up-front bonuses, forgivable loans, and other transitional compensation packages given to lateral recruits. These recommendations shall be designed to promote gender equity in the receipt and amount of transitional compensation packages—after taking into consideration factors such as the lateral recruit's production start date, production, assets under management, return on assets, product mix and any non-discriminatory factors—and shall be made in accordance with Section F.2. below.

b.     To the extent that Smith Barney does not already have such a system, with input from the Industrial Psychologist, Smith Barney shall develop and implement a system to keep records of all up-front bonuses, forgivable loans, and other transitional

compensation packages given to lateral recruits, including the name, gender, production start date, production, assets under management, return on assets and product mix of those recruits. Smith Barney shall provide a summary of this information to the Diversity Monitor and Class Counsel.   The summary information will include comparative data on gender, and information on geographic location, amount of up-front bonuses, methodology used to determine the up-front bonus amounts and any other factors taken into consideration in offering up-front bonuses, forgivable loans, and other transitional compensation to lateral recruits.  The Diversity Monitor will review and report on these records to the Industrial Psychologist.

### 6.        Retiring Financial Advisors

a.        The book of business formerly serviced by a retiring Financial Advisor who is not participating in the Franchise Protection Program will be distributed through the Power Ranking system set forth in Sections C.1. and C.2. above.

b.        Smith Barney will consider the efforts made by branch management to increase participation by female Financial Advisors in the Franchise Protection Program in determining the diversity component of Branch Manager compensation.

c.        The Industrial Psychologist shall review and, if appropriate, make recommendations to promote equitable participation of female Financial Advisors in the firm's Franchise Protection Program, including participation as retiring and receiving brokers.  These recommendations shall be made in accordance with Section F.2. below.

d.        The Diversity Monitor will review female FA participation in Franchise Protection Programs, both as retiring and receiving brokers, and will receive information from Smith Barney about the gender of persons receiving assets and the value of assets transferred.

7.      **Partnerships**

a.      In the event that a Financial Advisor or FAA who is part of a team leaves Smith Barney, the team member(s) who remain at Smith Barney will presumptively retain the book of business formerly serviced by the departing Financial Advisor, provided that the remaining team member(s) is/are qualified to service those accounts.  The Diversity Monitor shall receive semi-annual reports from Smith Barney relating to redistributed accounts from partnerships, including number of accounts, FA revenue, asset value, and gender of receiving Financial Advisor.

b.      Smith Barney will consider the efforts made and results achieved by branch management to increase participation by female Financial Advisors in partnerships in the branch in determining the diversity component of Branch Manager compensation.

c.      The Industrial Psychologist shall review and, if appropriate, make recommendations to promote equitable participation of female Financial Advisors in partnerships and teams.  These recommendations shall be made in accordance with Section F.2. below.

d.      For purposes of a Financial Advisor's or FAA's Power Rankings, Smith Barney will count partnership assets under management based on the percentage of the commission split specified in the Joint Production Agreement.

e.      All Joint Production Agreements will include a plan for the distribution of partnership assets in the event of the partnership's or team's dissolution.

f.      The Diversity Monitor will review female FA participation in partnerships and will receive information from Smith Barney about partnership splits based on gender and the value of assets under each partnership based on gender. The Diversity Monitor will receive copies of any complaints made to Smith Barney management or its legal counsel by

- 25 -

female Financial Advisors regarding any aspect of partnerships.  The Diversity Monitor will be advised of any partnership dissolution involving a female Financial Advisor.

**8.      Leads, Call-ins, and Walk-ins**

a.      Each Branch Office shall implement a "Financial Advisor of the Day" program.  Pursuant to this program, all client prospects who either walk in or telephone the branch and who are seeking a Financial Advisor shall be directed to the Financial Advisor serving as the Financial Advisor of the Day.  The daily assignments shall be made alphabetically and announced on a monthly basis on or before the last day of the preceding month.  The monthly roster shall be posted in a conspicuous location within the branch where all other Firm policies are posted.  Participation among eligible Financial Advisors shall be voluntary each month.

b.      Each Financial Advisor of the Day shall complete a "Financial Advisor of the Day Activity Log," which will detail all telephone calls and walk-in prospects fielded by the Financial Advisor and the disposition of each.  The logs shall be maintained within the branch in a Financial Advisor of the Day file for the duration of the Decree.

c.      If a prospect insists on speaking to the Branch Manager, the Branch Manager will direct the individual to the Financial Advisor of the Day.  If the Branch Manager determines that the Financial Advisor of the Day is not qualified to handle the prospect's account based on legitimate business reasons, the Branch Manager shall direct the prospect to other qualified Financial Advisor(s), which decision shall be documented by the Branch Manager and available to the Diversity Monitor in accordance with the procedure described in paragraph 8.d. below.  Customer preference based on bias against women shall not be a legitimate reason for a prospect to be directed away from the Financial Advisor of the Day,

provided, however, that Smith Barney shall have no obligation to inquire as to or otherwise attempt to discover the reason why a prospective client elects not to work with a particular Financial Advisor.

        d.     If the Branch Manager determines that the Financial Advisor of the Day is not qualified to handle a walk-in or a call-in prospect, the Branch Manager shall complete an exception report specifying the reason why the Financial Advisor of the Day was not selected. The Diversity Monitor shall receive this exception report.

        e.     All Financial Advisors who are in good standing shall be eligible to be Financial Advisor of the Day.  Producing Branch Managers may participate in the Financial Advisor of the Day program to the same extent as Financial Advisors, except they too must comply with the process described in this Section 8, including use of exception reports described in paragraph 8.d. above, and may receive leads, call-ins, and walk-ins only when they are the designated Financial Advisor of the Day.

        f.     Unauthorized failure to perform Financial Advisor of the Day obligations as designated shall render a Financial Advisor ineligible to participate in the Program for a period of six (6) months.  The branch shall maintain a list of those Financial Advisors who elect not to participate or who otherwise were ineligible.

        **D.**     **Development Opportunities.**

        Smith Barney shall work with the Industrial Psychologist to develop workplace initiatives designed to retain women at Smith Barney as Financial Advisors, and to enhance their success, including targeted mentoring and training.  Training and mentoring may include, but is not limited to, training, conference calls, online courses, and in-person seminars.  The Industrial Psychologist, if appropriate, shall make recommendations to promote equitable participation of

female Financial Advisors in development opportunities.  These recommendations will be made in accordance with Section F.2. below.

Smith Barney additionally agrees to provide exit questionnaires to Financial Advisors who terminate voluntarily in order to gain a better understanding as to the reason for the departures.  The exit questionnaires submitted by female Financial Advisors shall be available to the Industrial Psychologist and the Diversity Monitor, who shall report his or her findings to Human Resources.

Smith Barney agrees to maintain its commitment to its female broker networking meetings.

E.      **Complaint Process and Training**.

The complaint process, including Smith Barney's prohibition against retaliation, as provided in the Non-Discrimination and Anti-Harassment Policy, shall be communicated in writing to all Financial Advisors upon hire, and annually to all Financial Advisors.  New hires shall be required to submit an acknowledgment of receipt of this communication.

Smith Barney will provide its Human Resources staff with appropriate training regarding compliance with state, federal, and local EEO laws; Smith Barney's anti-discrimination and harassment policies; and this Settlement Agreement.

Smith Barney will provide its Human Resources staff with appropriate training regarding best practices for complaint investigation and resolution.  Human Resources will be trained to treat all complaints or inquiries as confidentially as possible and to carry out their duties in a manner consistent with the law.  In addition, Human Resources will implement controls designed to ensure that only employees or managers with a need-to-know will be advised of a complaint or investigation.  If Human Resources decides that it must inform any

employees or managers of the identity of the complainant, Human Resources will notify the complainant in advance that her/his identity will be released and to whom it will be released.  In all instances, upon being informed of a complaint or investigation, the employees and managers so informed will be reminded of Smith Barney's policy against retaliation.

Smith Barney will retain documents sufficient to show complaints of sex discrimination, sex bias, and/or retaliation related to such complaints for the term of the Settlement Agreement.  This includes, but is not limited to, complaints made directly to in-house or outside counsel.  Smith Barney will provide copies of all sex discrimination, sex bias, and retaliation complaints, as well as copies of the Complaint Log and Legal Complaint Log to the Diversity Monitor on a quarterly basis.

**F.**     **Appointments.**

**1.**     **Diversity Monitor**

The parties shall jointly appoint a Diversity Monitor.  The Diversity Monitor shall be external to and independent of Smith Barney, but will report directly to the CEO of Global Wealth Management.  The Diversity Monitor shall monitor Smith Barney's efforts to carry out the terms of the Settlement Agreement.  This shall include the following:

a.     The Diversity Monitor will receive quarterly reports regarding complaints of female Financial Advisors alleging sex discrimination, sex bias, or retaliation and the resolution of investigations of such complaints through any Smith Barney ADR program.

b.     The Diversity Monitor will review reports by the Company on the diversity-related annual assessment process for Branch Managers, including the self-assessments completed by Branch Managers, and annual data and information provided by the Company related to the diversity component of each Branch Managers' compensation.

737223.6

c.      The Diversity Monitor shall review reports on exceptions to the account distribution system being made in the branches, including information on the identity of the branches, the branch managers who approved the exceptions and an explanation of the exceptions.

d.      On an annual basis, the Diversity Monitor will review up-front bonuses, forgivable loans and other transitional compensation packages that Smith Barney provided to lateral recruits, and will report on these records to the Industrial Psychologist.   In addition, the Diversity Monitor will receive a copy of the summaries set forth in Section C.5.b above and in connection with management approval of any forgivable loan provided to a lateral recruit and may interview the appropriate branch manager about the rationale for any up-front bonuses, forgivable loans, or transitional compensation packages.

e.      On an annual basis, the Diversity Monitor will review female FA participation in the Franchise Protection Program, both as retiring and receiving brokers, and will receive information from Smith Barney semi-annually about the gender of persons receiving assets and the value of assets transferred.

f.      On a semi-annual basis, the Diversity Monitor will review reports relating to redistributed accounts from partnerships including number of accounts, FA revenue, asset value and gender of receiving Financial Advisor as well as female FA participation in partnerships and will receive information from Smith Barney about partnership splits based on gender and the value of assets under each partnership based on gender.

g.      The Diversity Monitor will monitor bi-annual training of management on EEO policies, and policies against discrimination and retaliation, and ensure that the training agreed to was implemented.

737223.6

        h.      The Diversity Monitor will review exception reports regarding the Financial Advisor of the Day program.

        i.      The Diversity Monitor will review how Human Resources handles investigations and the resolution process for inquiries and complaints.

        j.      The Diversity Monitor will review the exit questionnaires completed by departing female Financial Advisors, as well as information regarding the retention of female Financial Advisors annually, and report his/her findings to Human Resources.

        k.      If the Diversity Monitor identifies issues of potential non-compliance, the Diversity Monitor will inform Smith Barney and Lead Class Counsel. In consultation with Lead Class Counsel, Smith Barney will take appropriate corrective action to address all instances of non-compliance with the provisions herein unless Smith Barney can show that corrective action would be inconsistent with legitimate business and client needs and objectives.  If Lead Class Counsel disagrees with Smith Barney's determination on the implementation of corrective action, Lead Class Counsel may initiate a meet and confer session with Smith Barney's counsel and, if necessary, seek mediation, pursuant to Section J herein. Smith Barney shall inform the Diversity Monitor and Lead Class Counsel of any corrective action taken pursuant to this paragraph.  Where potential non-compliance has been identified, the Diversity Monitor shall have the right to audit the activities in a branch, by reviewing documents, asking branch management to provide explanations and, if necessary, speaking to Financial Advisors in the branch, and the right to receive relevant information from Smith Barney headquarters upon reasonable request.  Nothing herein shall alter or restrict Lead Class Counsel's right to enforce this Settlement Agreement under the Dispute Resolution provisions of this Settlement Agreement, set forth in Section J below.

l.      The Diversity Monitor will provide reports to Lead Class Counsel and Smith Barney at least semi-annually regarding the items described in this Agreement to be monitored, including in Section F.1.a-k herein, and including the analysis of the account distribution system.  The Diversity Monitor may report incidents of potential material non-compliance with this Settlement Agreement to Lead Class Counsel and Smith Barney on a more frequent basis.

m.      The Diversity Monitor will maintain records for the term of this Settlement Agreement.

### 2.      Industrial Psychologist

a.      The parties shall jointly appoint an Industrial Psychologist, who shall work with Smith Barney and Class Counsel to develop innovative, meaningful, novel, state-of-the-art programs and, if appropriate, to make recommendations concerning:

i.      The production and earnings of female Financial Advisors, including policies and practices with respect to training, development, mentoring, and business-related allocations;

ii.      Participation of female Financial Advisors in the Franchise Protection Program, both as retiring Financial Advisors and as receiving Financial Advisors;

iii.      Participation of female Financial Advisors in partnerships and teams, including commission splits between male and female partners, and dissolution of partnerships and teams;

iv.      Up-front bonuses, forgivable loans, and other transitional compensation packages offered to lateral recruits;

- 32 -

v.      Policies and practices with respect to training,

development, and mentoring for female Financial Advisors. Training and development may

include, but is not limited to, training, conference calls, online courses, and in-person seminars;

vi.      Participation of females in Smith Barney's branch

management assessment program and in branch management; and

vii.      A mentoring program for all Financial Advisors.

b.      The Industrial Psychologist shall review the actual implementation

of the programs, policies, and initiatives that Smith Barney is obligated to undertake by virtue of

this Agreement and shall, on an annual basis, report the results of this review to the Diversity

Monitor.  The Industrial Psychologist shall review on an annual basis the retention rates of

women in the Financial Advisor position and shall report the results of this review to the

Diversity Monitor.

c.      The Industrial Psychologist shall present any recommendations to

the members of Senior Management at Smith Barney who are most appropriate to address each

issue.  A copy of the recommendations will also be provided to Lead Class Counsel.  All

recommendations of the Industrial Psychologist will be designed to advance the purposes of this

Settlement Agreement consistent with Smith Barney's legitimate business needs and objectives.

If Smith Barney does not agree with any such recommendations, but Lead Class Counsel still

thinks they should be implemented notwithstanding Smith Barney's objections, the Industrial

Psychologist, along with Lead Class Counsel, will have the opportunity to present the

recommendations to Smith Barney's highest ranking officer overseeing FA compensation,

currently the Director of Field Management.  Smith Barney shall decide in good faith consistent with the purposes of this Settlement Agreement whether to implement such recommendations.

             d.       The Industrial Psychologist shall provide to the parties statistical analyses on the Power Ranking criteria.  These analyses shall report on data at the 12, 20, 36 and 44 month intervals from the Effective Date.  With the analysis, the Industrial Psychologist shall determine whether female brokers have received less than their pro rata share of distributed accounts, and if so, whether the difference is statistically significant.  This determination shall be based on an aggregate comparison of (i) the value of the accounts distributed, based on their account value at the end of the month prior to their distribution; and (ii) the representation of men and women in the population of Financial Advisors in the retail brokerage division of Smith Barney, including only those brokers who were active within the time period being measured.

             e.       The Power Rankings may be changed at any time upon agreement between Smith Barney and Lead Class Counsel following a meet and confer process.  If, following the meet and confer process, Lead Class Counsel do not agree to a change proposed by Smith Barney, Smith Barney may seek authority from Hunter R. Hughes, Esq. or another mutually selected mediator (the "Mediator") to implement the proposed change(s) to the Power Ranking system, which authority will not be unreasonably withheld.  To bring about such changes, Smith Barney must show to the satisfaction of the Mediator through the binding mediation outlined in paragraph c below that (a) the changes are necessary to comply with applicable law; or (b) each of the criteria they seek to change is having a significant adverse impact on Smith Barney's business and that the change(s) sought would not disadvantage female Financial Advisors or FAAs relative to the criteria being displaced.

737223.6

f.      If, following either the 20 or 44 month reports, the Industrial Psychologist determines that female brokers have received less than their pro rata share of distributed accounts, and that the difference is statistically significant, then Lead Class Counsel may initiate a meet and confer session with Smith Barney's counsel.  If, in the judgment of Lead Class Counsel, the meet and confer does not result in a satisfactory resolution, Lead Class Counsel may request a hearing before the Mediator solely for the purpose of resolving whether there should be any change to the Power Ranking factors or any adjustment to their weight. Such a process shall be completed within 4 months under a schedule and with written submissions in a form determined by the mediator, but allowing at least twenty-one days for a response by the responding party (unless the responding party seeks shortened time for its own submission).  Smith Barney shall pay the cost of such binding mediation.  The Mediator shall review each party's submissions and make a final, non-appealable determination regarding whether there should be any change to the Power Ranking factors or any adjustment to their weight.

g.      Subject to signing an appropriate confidentiality agreement, and upon reasonable advance notice, the Diversity Monitor and the Industrial Psychologist described in Sections F.1. and F.2. herein will have reasonable access to relevant documents, data, and Smith Barney employees.  The Diversity Monitor and the Industrial Psychologist will be compensated by Smith Barney.

h.      If it becomes necessary to replace the Diversity Monitor or the Industrial Psychologist, the parties shall select a replacement by mutual agreement.

G.      **General Non-Discrimination Provisions.**

Pursuant to Smith Barney's Non-Discrimination and Anti-Harassment Policy, female Financial Advisors will enjoy terms and conditions of employment comparable to their male counterparts.

Smith Barney shall reaffirm its commitment to the following general policies using a method agreed to by the parties:

1.      Prohibition against discrimination on the basis of sex in compensation and business opportunity allocations.

2.      Prohibition against retaliation for reporting sex discrimination, participating in any Smith Barney ADR program, participating in this or any discrimination settlement, filing a lawsuit or complaint with any outside agency or entity alleging sex discrimination, or for refusing to participate in sex discrimination.

3.      Smith Barney will reaffirm that its policy is, and has been, to prohibit reimbursement of business expenses that are directly or indirectly related to male-only entertainment establishments.

4.      The parties agree that it shall be a violation of this Settlement Agreement for a Smith Barney supervisor to retaliate against any Class Member for her participation in the prosecution of the allegations contained in the charges underlying this Settlement or in the Settlement itself.  Nothing in this Settlement will prevent a Class Member from pursuing whatever legal rights or remedies she otherwise may have with respect to any individual claim not covered by the claims released through this Settlement.

H.      **Duration of the Settlement.**

The programmatic relief embodied in this Settlement Agreement and the agreements incorporated herein shall remain binding on the parties and their agents and successors for a four-year period following the Effective Date.

VIII.   **MONITORING**

A.      **Data Collection.**

Smith Barney will collect data which will include, but not be limited to:  (1) compensation of Financial Advisors; (2) partnerships between active Financial Advisors or partnerships between active and retiring Financial Advisors; (3) account distributions, defined to include all transfers of accounts from one Financial Advisor to another within Smith Barney such as those of retiring and deceased Financial Advisors, not just the distribution of the accounts of departing Financial Advisors; and (4) any other areas agreed upon by Smith Barney and Lead Class Counsel.  Smith Barney will include several variables in its collection of this data, including but not limited to, gender, production and length of experience.

B.      **Monitoring System.**

Smith Barney, with input from the Industrial Psychologists and consent from Lead Class Counsel, will create and implement a system of monitoring compliance with each policy described herein, including, without limitation, the account distribution policy using the Power Ranking methodology.

C.      **Reports.**

Lead Class Counsel will receive semi-annual reports from the Diversity Monitor.

### D.   Meetings.

Smith Barney and Lead Class Counsel will meet at least once every six (6) months, beginning six months after the Effective Date, regarding compliance, and may confer more frequently at their discretion or as dictated by information either side gathers.

## IX.   MONETARY RELIEF

### A.   Settlement Fund.

No later than ten (10) days after Preliminary Approval, Smith Barney shall pay by wire transfer to the Depository Bank, the sum of Thirty-three Million Dollars ($33,000,000) plus an amount equal to the daily LIBOR rate on that $33,000,000.00 calculated from December 14, 2007 to the date of deposit ("Settlement  Sum"). The Settlement Sum will be placed in an interest-bearing account titled in the name of Smith Barney Financial Advisor Gender Discrimination Settlement Fund, a Qualified Settlement Fund organized and existing under the laws of the State of Florida, intended by the parties to be a "Qualified Settlement Fund" as described in Section 468B of the Internal Revenue Code of 1986, as amended, and Treas. Reg. Section 1.468B-1, *et seq*.   This payment is made in order to satisfy the claims of the Named Plaintiffs and Class Members, as well as for other purposes identified in this paragraph. The monies so transferred, together with interest subsequently earned thereon, shall constitute the Settlement Fund.  The Settlement Sum transferred into the Settlement Fund by Smith Barney shall, with the additional Employer Payroll Tax Payment described below, constitute the total settlement cash outlay by Smith Barney in connection with:  (1) the resolution of this matter; (2) this Settlement Agreement (and attachments); and (3) the dismissal of this Action.  Except as provided in Section IX.F.2.  (*i.e.*, employment taxes), this sum is inclusive of payment for: (a) all amounts paid to Class Members, including the Named Plaintiffs, which are to be distributed pursuant to Section IX.D, below; (b) the non-class claims of the Named Plaintiffs in an amount

737223.6

not to exceed $550,000; (c) all attorneys' fees and costs awarded by the Court, including those in connection with securing court approval of the Settlement, and the claims process and monitoring by Class Counsel of the Settlement Agreement other than fees and costs awarded in connection with any successful proceeding to enforce the terms of this Settlement Agreement; (d) all costs in connection with the Settlement Fund including, but not limited to, those related to notice, claims processing, independent legal advice obtained by the Fund Administrator relating to the establishment of the Qualified Settlement Fund and tax treatment and tax reporting of awards to claimants, and preparation of the Fund's tax returns (and the taxes associated with such tax returns as defined below); and (e) applicable federal, state and local income taxes, and all federal and state unemployment taxes required by law to be withheld and/or paid by Smith Barney.  The Settlement Sum payment to the Settlement Fund does not include Smith Barney's share of taxes or contributions (*i.e.*, FICA, FUTA, SUTA and Medicare) which will be paid separately by Smith Barney to the Claims Administrator. Smith Barney shall, upon notice from the Claims Administrator as required in Section IX.F.2. below, remit any required tax payment to the Claims Administrator.

Nothing in the foregoing provisions of this Section, however, shall release Smith Barney from expending the resources required to fulfill its responsibilities under this Settlement Agreement.

### B.   Administration by Trustee.

The Claims Administrator shall serve as Trustee of the Settlement Fund and shall act as a fiduciary with respect to the handling, management and distribution of the Settlement Fund.  The Claims Administrator shall act in a manner necessary to qualify the Settlement Fund as a

"Qualified Settlement Fund" under Section 468B of the Internal Revenue Code of 1986, as amended, and Treas. Reg. Section 1.468B-1, *et seq.*, and to maintain that qualification.

### C.     Claims Filing Procedures for Settlement of Claims of Named Plaintiffs and Class Members.

Class Members shall be entitled to submit their Claim Forms to the Claims Administrator in accordance with the procedures set forth on the Claim Form.  Any Class Member who previously released claims which would otherwise be covered by this Settlement Agreement, or who obtained a final judicial determination concerning claims that would otherwise be covered by this Settlement Agreement, is not eligible to receive a monetary award for those claims.

In order to be eligible for an award from the Settlement Fund, Class Members, including the Named Plaintiffs, must submit a Claim Form postmarked by the date established by the Court.  The Claim Form shall be completed in its entirety to the extent applicable.

The Claims Administrator will provide counsel for Smith Barney and Smith Barney's payroll department with the names and social security numbers of all Class Members who submitted Claim Forms ("Claimants"). The identity of the Claimants will not be disclosed to anyone at Smith Barney other than its counsel and those employees necessary to retrieve the information to be provided to the Claims Administrator under this Section.  The content of the Claims Form will be kept confidential.

After receiving the Claimant information discussed in the paragraph above, Smith Barney, through its counsel, will provide the Claims Administrator with the dates each Claimant was employed by Smith Barney as a Financial Advisor.  The Claims Administrator will provide that information to each Claimant.  To the extent there is any disagreement relating to the accuracy of the information provided to the Claimants, the disagreement shall be resolved by the Claims Administrator.

737223.6

D.      **Claims Administrator Authority to Determine Award Eligibility.**

Within a reasonable time period after the date specified for receipt of the Claim Forms, the Claims Administrator shall render a determination as to the monetary award, if any, that should be paid to each Claimant from the Settlement Fund.  Class Members who submit a Claim Form will be eligible to receive monies based on the Claimant's length of tenure (e.g., weeks worked) at Smith Barney as a Financial Advisor, as well as upon information (if supplied by the Class Member) regarding termination because of gender-based discrimination.  The Claims Administrator's determination shall be final and not subject to review by, or appeal to, any court, mediator, arbitrator or other judicial body, including without limitation this Court.  As will be reflected in the final order approving this Settlement, Smith Barney and Class Counsel shall have no responsibility, and may not be held liable, for any determination reached by the Claims Administrator.

The total amount of such awards shall not exceed the net amount of the Settlement Fund after all costs and Class Counsel's attorney's fees, as discussed in Section IX.A. above, are considered.

Following his or her determination as to the monetary award, if any, that should be paid to each Claimant from the Settlement Fund, the Claims Administrator shall send a Notice of Award to each eligible Claimant, along with a Named Plaintiff Release or a Class Member Release, whichever is applicable.  Within a reasonable time period after receipt of an executed Named Plaintiff Release from a Named Plaintiff or an executed Class Member Release from a Class Member, the Claims Administrator shall send the Named Plaintiff or Class Member her award payment.  Any Named Plaintiff who does not execute and timely deliver an executed Named Plaintiff Release, and any Class Member who does not execute and timely deliver an executed Class Member Release to the Claims Administrator within six (6) months of the date

the Notice of Award was mailed to her shall be ineligible for, and forever barred from receiving, monetary relief under this Settlement Agreement, even if said Named Plaintiff or Class Member has not opted out. Any undistributed funds that remain after six (6) months from the mailing of the Notice of Award due to uncashed checks shall be distributed to 501(c)(3) organizations advancing career opportunities for women, including career opportunities in the financial services industry, as jointly selected by Lead Class Counsel and Smith Barney.

The Claims Administrator shall maintain the distribution plan and allocation list for a period of five (5) years. Smith Barney shall have access to individual allocation amounts only upon written notice to Class Counsel and a showing of good cause (*e.g.*, actual or threatened litigation by a Claimant). Any dispute as to whether good cause exists for such a requested disclosure shall be resolved through the Dispute Resolution process set forth in Section III.J of this Settlement Agreement.

###    E.    Confidentiality Regarding Amount of Monetary Award.

All Claimants receiving monetary awards will be required to keep the amount of their award confidential.

###    F.    Non-Admissibility of Fact of Award (or Non-Award).

Except to the extent that it would constitute a set off in an action for damages claimed for any period covered by this Settlement, neither the fact nor the amount of an award, nor the fact of any non-award, shall be admissible in any other proceeding for any purpose other than to enforce a Named Plaintiff Release or a Class Member Release executed in accordance with the claims process, nor shall it be deemed to be a finding as to the merits of any claim.

G.     **Tax Treatment**

1.     **Qualified Tax Status and Tax Responsibilities.**

The Settlement Fund shall be established as a Qualified Settlement Fund within the meaning of Section 468B of the Internal Revenue Code of 1986, as amended, and Treas. Reg. Section 1.468B-1, *et seq*., and shall be administered by the Claims Administrator under the Court's supervision.  Smith Barney shall hereby be deemed to have made an election under Section 468B of the Revenue Code to have the Fund treated as a "qualified settlement fund." Smith Barney shall timely furnish a statement to the Trustee that complies with Treasury Regulation § 1.468B-3(e) and shall attach a copy of the statement to its federal income tax return that is filed for the taxable year in which Smith Barney  makes the required payment(s) to the Settlement Fund.  The parties shall cooperate to ensure such treatment and shall not take a position in any filing or before any tax authority inconsistent with such treatment.

2.     **Payment of Federal, State and Local Taxes.**

The parties recognize that the awards to eligible Claimants will be subject to applicable tax withholding and reporting, which will be handled as follows: The Claims Administrator shall serve as trustee of the Settlement Fund and shall act as a fiduciary with respect to the handling, management, and distribution of the Settlement, including the handling of tax-related issues and payments.  Specifically, the Claims Administrator shall be responsible for withholding, remitting and reporting of the Claimant's share of the payroll taxes from the Settlement Fund, and Smith Barney shall be responsible for the employer's share of payroll taxes as set forth in this section.

The Claims Administrator will establish, for tax purposes, the allocation of the payments made to Claimants to wages, interest, compensatory damages, or such other tax character of such payout as the Claims Administrator may determine, based on the principles set forth in Treas.

Reg. §1.468B-4 by reference to the claims pursuant to which distributions are made and as if Smith Barney made such payments directly to Claimants.

The Claims Administrator shall inform Smith Barney in writing of the employer's share of all taxes or contributions (*i.e.*, FICA, FUTA, SUTA, and Medicare) required to be paid by Smith Barney.  Smith Barney shall, within twenty (20) business days of such notice, remit all such payments (net of the credit for opt outs, if any, as provided for in Section IV.C.9. above) to the Claims Administrator for payment to appropriate taxing authorities ("Employer Payroll Tax Payment").

The Claims Administrator shall be responsible for the timely reporting and remitting of the Employer Payroll Tax Payment to the appropriate taxing authorities and shall indemnify Smith Barney for any penalty arising out of an incorrect calculation and/or interest with respect to late deposit of the same.  Subject to the Claims Administrator's obligation to comply with applicable laws, the parties anticipate that any amounts designated as interest shall not be subject to withholding and shall be reported, if required, to the IRS and to the Claimants on Form 1099-INT.  The amounts paid for emotional distress shall not be subject to withholding and shall be reported to the IRS and to the Claimants on Form 1099.

Except with respect to the Employer Payroll Tax Payment, the Claims Administrator shall be responsible to satisfy from the Settlement Fund any and all federal, state and local employment and withholding taxes, including, without limitation, federal and state income tax withholding, FICA, FUTA, SUTA, Medicare and any state employment taxes.  The Claims Administrator shall satisfy all federal, state, local, and other reporting requirements (including any applicable reporting with respect to attorneys' fees and other costs subject to reporting), and

any and all taxes, penalties and other obligations with respect to the payments or distributions from the Settlement Fund not otherwise addressed herein.

The Claims Administrator shall be responsible for procuring an executed Named Plaintiff Release and Form W-4 and Form W-9, and any other required tax forms, from each Named Plaintiff prior to making any monetary allocations to such Named Plaintiff. The Claims Administrator shall be responsible for procuring an executed Class Member Release and Form W-4 and Form W-9, and any other required tax forms, from each Class Member prior to making any monetary allocations to such Class Member.

All (i) taxes (including any estimated taxes, interest or penalties) arising with respect to the income earned by the Settlement Fund, including any taxes or tax detriments that may be imposed on Smith Barney with respect to income earned for any period during which the Settlement Fund does not qualify as a "Qualified Settlement Fund" for federal and state income tax purposes (hereinafter "Settlement Fund Taxes"), and (ii) expenses and costs incurred in connection with the operation and implementation of this paragraph (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) any returns described herein or otherwise required to be filed pursuant to applicable authorities) (hereinafter "Settlement Fund Tax Expenses"), shall be paid out of the Settlement Fund. Further, Settlement Fund Taxes and Settlement Fund Tax Expenses shall be treated as a cost of the administration of the Settlement Fund. The parties hereto agree to cooperate with the Claims Administrator, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions set forth in this paragraph.

**H.      Smith Barney Has No Further Obligation, Liability or Responsibility.**

Other than Smith Barney's responsibility for the employer's share of payroll taxes as discussed in Section IX.G.2. above, Smith Barney shall have no withholding, reporting or any other tax reporting or payment responsibilities with regard to the Settlement Fund or its distribution to Class Members.  Moreover, Smith Barney shall have no liability, obligation, or responsibility for the administration of the Settlement Fund, the determination of any formulas for disbursement, or the disbursement of any monies from the Settlement Fund except for (1) its obligation to pay the Settlement Sum specified in Section IX.A. no later than ten (10) days after Preliminary Approval; (2) its obligation related to the Employer Payroll Tax Payment as set forth in Section IX.G.2.; and (3) its agreement to cooperate in providing information which is necessary for Settlement administration set forth herein.

**X.      ATTORNEYS' FEES, EXPENSES OF CLASS COUNSEL AND ADMINISTRATIVE EXPENSES.**

**A.      Class Counsel Fees and Costs.**

Class Counsel shall be entitled to apply to the Court for an award of attorneys' fees, costs and expenses in a total amount not to exceed $6.5 million plus accrued interest as of October 1, 2008 for attorneys' fees and an additional amount not to exceed $900,000 plus accrued interest as of October 1, 2008 for out of pocket costs and expenses, as well as $500,000 plus accrued interest as of October 1, 2008 for Class Counsel's future work implementing and monitoring the Settlement during the 4-year term of the Agreement according to the following schedule: $200,000 one year from the Court order for final approval, and $100,000 for each of the three years thereafter.

B.      **Smith Barney's Non-Opposition.**

Smith Barney and its attorneys agree not to oppose any applications for attorneys' fees, costs or expenses by Class Counsel as set forth in Section X.A.1. of this Settlement Agreement.

C.      **Timing of Fee Payment.**

Any attorneys' fees, costs or expenses payable to Class Counsel shall be distributed from the Settlement Fund pursuant to the Settlement Agreement by the Claims Administrator serving as Trustee of the Settlement Fund.  No distribution shall occur prior to the Effective Date.  Smith Barney shall have no liability or other responsibility for the allocation of such attorneys' fees among and between Class Counsel.

D.      **Satisfaction of Fee and Cost Obligations under the Settlement.**

Smith Barney's payment of Class Counsel's attorneys' fees, costs and expenses as described herein shall constitute full satisfaction of Smith Barney's obligation to pay any person, attorney or law firm for attorneys' fees, costs, and expenses incurred on behalf of the Settlement Class, and shall relieve Smith Barney from any other claims or liability to any other attorney or law firm or person for any attorneys' fees, expenses and costs to which any of them may claim to be entitled on behalf the Settlement Class that are in any way related to the Released Claims.

E.      **Service Award.**

Class Counsel will seek and Smith Barney will not oppose Court approval for Service Awards of $50,000 to Named Plaintiffs Renee Amochaev, Deborah Orlando, and Kathryn Varner, and $35,000 to Named Plaintiff Ivy So for their participation in the prosecution and settlement of this case. This participation included each Plaintiff preparing for and then being

deposed for 3 days, participating in responding to discovery requests, assisting counsel in developing strategy, and providing input into settlement discussions and the ultimate Settlement Agreement.  Plaintiffs Amochaev, Orlando and Varner each joined the case at its inception (Plaintiff So joined one and one-half years later), participated in the initial press conference, and attended one or more mediation sessions with Smith Barney.  All Plaintiffs reviewed the drafts of the Settlement Agreement and provided input, with several spending hours on line edits and substantive input.  The proposed Service Awards will be in addition to Settlement Class benefits available to the Named Plaintiffs under the Agreement and are subject to Court approval.

## XI.   TERMINATION OF THE SETTLEMENT AGREEMENT

If the number of Class Members who have duly requested exclusion from the Settlement Class, in the manner provided in the Preliminary Approval Order, is equal to, or exceeds, the number in **Appendix 2** filed under seal along with this Settlement Agreement, then Smith Barney shall have the right, for 20 days following the date specified in the Preliminary Approval Order for Class Members to submit written requests for exclusion from the Settlement Class, either to withdraw from and fully terminate this Settlement Agreement by providing written notice to Class Counsel and the Court, *or* not to withdraw from this Settlement Agreement and take the opt-out credit described below.  The opt-out credit shall be a pro rata share of the Settlement Fund based on the number of Class Members who have opted out in relation to the total number of Class Members.

## XII.   CONFIDENTIALITY

### A.   Documents and Information Produced by Smith Barney and Class Counsel.

All proprietary and confidential documents or information that have previously been provided to either Smith Barney or Lead Class Counsel as of the date this Settlement Agreement

is executed, or which are produced by Smith Barney or Lead Class Counsel pursuant to any provision of this Settlement Agreement shall, unless otherwise agreed, be treated as, and thereafter remain, confidential.  Said documents and information shall not be disclosed to anyone other than the mediator, arbitrator or the Court (pursuant to the protective order entered in this case) in connection with any proceeding to enforce any provision of this Settlement Agreement.

> **B.      Return or Disposal of Confidential Documents and Information.**

All proprietary and confidential documents or information that have previously been provided to Lead Class Counsel or to Smith Barney as of the date this Settlement Agreement is executed, or which are produced by Smith Barney or Lead Class Counsel pursuant to any provision of this Settlement Agreement, shall be destroyed or returned to counsel pursuant to the protective order entered in this case.

## XIII.   GOVERNING LAW

The parties agree that federal law shall govern the validity, construction and enforcement of this Settlement Agreement.  To the extent that it is determined that the validity, construction or enforcement of this Settlement Agreement is governed by state law, the law of the State of California shall apply.

This Settlement Agreement, including the Exhibits hereto, contains the entire agreement and understanding of the parties with respect to the Settlement.  This Settlement Agreement does not impose any obligations on the parties beyond the terms and conditions stated herein. Accordingly, this Settlement Agreement shall not prevent or preclude Smith Barney from revising its employment practices and policies or taking other personnel actions during the term of this Settlement Agreement so long as they are consistent with this Settlement Agreement.

737223.6

## XIV.  OTHER CONDITIONS OF SETTLEMENT

### A.  Exhibits.

The Exhibits to this Settlement Agreement are material and integral parts hereof and are fully incorporated herein by this reference.

### B.  Notices to Counsel.

All notices to counsel required or desired to be given under this Settlement Agreement shall be in writing and by overnight mail and e-mail to lead counsel for the respective parties. Specifically, such notices shall be mailed to Kelly M. Dermody of Lieff Cabraser Heimann & Bernstein, LLP, Adam T. Klein of Outten & Golden, LLP, Cyrus Mehri of Mehri & Skalet, PLLC, for the Plaintiffs, and Jay Cohen of Paul, Weiss, Rifkind, Wharton & Garrison, LLP for Smith Barney at their respective addresses set forth below (or to such other address as any such party or counsel may designate in a notice).

### C.  Failure to Insist on Strict Compliance.

The failure of any party to insist in any one or more instances on strict compliance with the terms and conditions hereof shall not be construed to be a waiver of remedies available with respect to any prior or subsequent breach.

### D.  Modifications to this Agreement.

No material modifications to this Agreement may be made without written agreement of all parties and prior Court approval.

**E.**     **No Drafting Presumption.**

All parties hereto have participated, through their respective counsel, in the drafting of this Settlement Agreement and, therefore, this Settlement Agreement shall not be construed more strictly against one party than another.

**F.**     **Dispute As To Meaning of Agreement Terms.**

In the event of any dispute or disagreement with respect to the meaning, effect or interpretation of this Settlement Agreement or any Exhibit hereto, or in the event of a claimed breach of the Settlement Agreement, the parties agree that such dispute will be resolved and adjudicated only in accordance with the dispute resolution provisions of Section XIV.L. of this Settlement Agreement.

**G.**     **Interpretation of Terms.**

Whenever possible, each provision and term of this Settlement Agreement shall be interpreted in such a manner as to be valid and enforceable.

**H.**     **Severability**

If any portion of this Settlement Agreement is judged to be unenforceable, the remainder of the Agreement shall continue to be valid and enforceable.

**I.**     **Paragraph and Section Headings.**

Paragraph and section headings are for convenience of reference only and are not intended to create substantive rights or obligations.

**J.**     **Counterparts.**

This Settlement Agreement may be executed in counterparts. Each signed counterpart together with the others shall constitute the full Settlement Agreement.

737223.6

K.      **Agreement Binding.**

As of the date on which counsel for the parties execute this Settlement Agreement, this Settlement Agreement will be binding in all respects, unless it is terminated as set forth in Section XI, or unless the Court fails to approve this Settlement Agreement and the Settlement Agreement is thus vacated.  This Settlement Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, dependents, executors, administrators, trustees, legal representatives, personal representatives, agents, successors and assigns; provided, however, that this Settlement Agreement shall not inure to the benefit of any third party.

L.      **Enforcement.**

1.      Enforcement of this Settlement Agreement shall be prosecuted by Lead Class Counsel or counsel for Smith Barney only, not third parties.  Lead Class Counsel shall meet and confer with counsel for Smith Barney prior to commencement of any enforcement proceedings.

2.      The parties will work diligently and in good faith to resolve all disputes that may arise during the term of this Settlement Agreement concerning the rights, obligations and duties of the parties to the Settlement Agreement.  In the event the parties cannot agree, the parties will attempt to resolve the dispute with the facilitation of Hunter R. Hughes, Esq. or another mutually selected mediator whose services shall be paid for by Smith Barney.

3.      Any enforcement proceedings related to or arising out of this Settlement Agreement will be resolved and adjudicated only by the Honorable Phyllis J. Hamilton of the United States District Court for the Northern District of California, or by any other judge to whom this case subsequently may be assigned, unless otherwise provided in this Settlement Agreement.

737223.6

Dated: April 2, 2008                       LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By: _____
                   Kelly M. Dermody

Kelly M. Dermody
Heather H. Wong
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Elizabeth A. Alexander
One Nashville Place
150 Fourth Avenue, N., Ste. 1650
Nashville, TN 37219-2423
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

Dated: April 2, 2008                       OUTTEN & GOLDEN LLP

By: _____
                   Adam T. Klein

Adam T. Klein
Piper Hoffman
Justin M. Swartz
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005

- 53 -

Dated:  April 2, 2008          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP


By:   _____
              Kelly M. Dermody

Kelly M. Dermody
Heather H. Wong
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Elizabeth A. Alexander
One Nashville Place
150 Fourth Avenue, N., Ste. 1650
Nashville, TN 37219-2423
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

Dated:  April 2, 2008          OUTTEN & GOLDEN LLP


By:   _____
              Adam T. Klein

Adam T. Klein
Piper Hoffman
Justin M. Swartz
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000
Facsimile:  (212) 977-4005

Dated:  April 2, 2008          MEHRI & SKALET, PLLC


                               By: _____
                                       Cyrus Mehri

                               Cyrus Mehri
                               Lisa M. Bornstein
                               Anna M. Pohl
                               1250 Connecticut Ave, NW, Suite 300
                               Washington, DC 20036
                               Telephone: (202) 822-5100
                               Facsimile: (202) 822-4997

Dated:  April 2, 2008          ALTSHULER BERZON LLP



                               By: _____
                                       James M. Finberg

                               James M. Finberg
                               177 Post Street, Ste. 300
                               San Francisco, CA  94108
                               Telephone:  (415) 421-7151
                               Facsimile:  (415) 362-8064

                               *Attorneys for Plaintiffs and the Class*

Dated:  April 2, 2008                    MEHRI & SKALET, PLLC


                                         By: _____
                                                Cyrus Mehri

                                         Cyrus Mehri
                                         Lisa M. Bornstein
                                         Anna M. Pohl
                                         1250 Connecticut Ave, NW, Suite 300
                                         Washington, DC 20036
                                         Telephone: (202) 822-5100
                                         Facsimile: (202) 822-4997

Dated:  April 2, 2008                    ALTSHULER BERZON LLP


                                         By: _____
                                                James M. Finberg

                                         James M. Finberg
                                         177 Post Street, Ste. 300
                                         San Francisco, CA  94108
                                         Telephone:  (415) 421-7151
                                         Facsimile:  (415) 362-8064

                                         *Attorneys for Plaintiffs and the Class*

                                       - 54 -

756966.1

Dated:  April 2, 2008

PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP

By:

Jay Cohen

Jay Cohen
Brad S. Karp
Daniel J. Toal
1285 Avenue of the Americas
New York, NY 10019- 6064
Telephone: (212) 373-3000
Facsimile: (212) 757- 3990

Malcolm A. Heinicke (State Bar No. 194174)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
27th Floor
San Francisco, California 94105
Telephone: 415 512-4000
Facsimile: 415 512-4077

***Attorneys for the Defendant***

- 55 -

737223.6

# EXHIBIT A

**THIS IS A NOTICE OF A PROPOSED CLASS ACTION SETTLEMENT**
**FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO / OAKLAND DIVISION

RENEE FASSBENDER AMOCHAEV, DEBORAH ORLANDO, KATHRYN N. VARNER and IVY SO, on behalf of themselves and all others similarly situated,

                  Plaintiffs,

   v.

CITIGROUP GLOBAL MARKETS, INC., d/b/a SMITH BARNEY,

                  Defendant.

                  Case No. C-05-1298 PJH

**NOTICE OF CLASS ACTION, PROPOSED SETTLEMENT AGREEMENT, AND**
**SETTLEMENT HEARING**

**IF YOU ARE FEMALE AND WERE EMPLOYED AS A FINANCIAL ADVISOR OR FINANCIAL CONSULTANT WITH CITIGROUP GLOBAL MARKETS, INC., d/b/a SMITH BARNEY OR ITS PREDECESSOR(S) IN THE UNITED STATES BRANCHES OF SMITH BARNEY'S RETAIL BROKERAGE DIVISION AT ANY TIME FROM AUGUST 30, 2003 THROUGH MARCH 1, 2008 OR ARE A FEMALE AND WERE EMPLOYED AS A FINANCIAL ADVISOR WITH CITIGROUP GLOBAL MARKETS, INC., d/b/a SMITH BARNEY OR ITS PREDECESSOR(S) IN THE CALIFORNIA BRANCHES OF SMITH BARNEY'S RETAIL BROKERAGE DIVISION FROM JUNE 25, 2003 THROUGH MARCH 1, 2008,  A PROPOSED CLASS ACTION SETTLEMENT MAY AFFECT YOUR RIGHTS.**

*A federal court has authorized this Notice. This is not a solicitation from a lawyer.*

      Please read this Notice carefully and fully.  This Notice describes a proposed settlement and related matters, including the procedures for seeking monies from a Settlement Fund.

        This Notice is intended to inform you about the terms of a proposed settlement (the "Settlement") of a pending legal action and your rights in connection with this Settlement. This Notice describes the steps you must take to be eligible to receive Settlement Fund monies if this Settlement is finally approved by the Court.  If you do not wish to be part of the class, this Notice details the steps you must take to be excluded from the class.

756963.1

**General Overview**

Renee Fassbender Amochaev, Deborah Orlando, Kathryn N. Varner and Ivy So ("Plaintiffs"), former Financial Advisors, on behalf of themselves and all other current and former Smith Barney female Financial Advisors, have sued Citigroup Global Markets, Inc. d/b/a Smith Barney ("Smith Barney" or "the Company") for gender discrimination. After extensive discussions, the Plaintiffs and the Company have agreed on the terms of a Settlement.

Smith Barney denies that it has done anything wrong, and the Court did not make a determination on that issue. However, the Company has agreed to be bound by the terms of this Settlement.

The Court has reviewed the Settlement and has given it preliminary approval. Before deciding whether to grant final approval to the Settlement, the Court wishes to inform you of the general terms of the Settlement, what actions you need to take to participate in the monetary provisions of the Settlement, and of your rights to opt-out of the monetary relief portion of the Settlement or to object to the Settlement, if you would like to do so.

• The Court has allowed the following Class to assert claims for monetary relief:

All women employed as Financial Advisors with Smith Barney in (i) the United States branches of Smith Barney's Retail Brokerage Division at any time from August 30, 2003 through March 1, 2008 or (ii) in the California branches of Smith Barney's Retail Brokerage Division at any time from June 25, 2003 through March 1, 2008  The Class does not include, among others:  (i) brokers in Smith Barney's Financial Life Services (FLS) program, (ii) Smith Barney's bank-based advisors; or (iii) Financial Advisor Associates.

If you fit one of the above definitions, then you are a Class Member. This Notice will explain the terms of the Settlement that will be presented to the Court for final approval.

If the Court grants final approval to the Settlement, the changes to be made to the Company's policies and practices, known as "programmatic relief," will apply to all women who are currently employed as Financial Advisors in the United States branches of Smith Barney's Retail Brokerage Division, including Class Members who opt-out of the Settlement. It is not possible to opt-out of the programmatic relief portion of the Settlement.

If, after reviewing the terms of the Settlement you would like to participate in the Settlement by making a claim for monetary relief, then you must fill out the attached Claim Form.

If you want to opt-out of the Settlement and not receive any monetary relief through this Settlement, or you want to object to the Settlement before the Court, this Notice will describe the procedures to do so.

The Court will hold a Settlement Hearing to consider whether the Settlement is fair, reasonable, and adequate, and to decide whether to give final approval to this Settlement. The hearing will be held at 9:00 a.m. on April 13, 2008, in the courtroom of the Honorable Phyllis Hamilton at the United States District Court for the Northern District of California, Courtroom 3, U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102. If the Court grants final approval of the Settlement after the Settlement Hearing, the Court's judgment will be final and binding.

• You are not required to appear at the hearing. If you are a Class Member you will be represented by attorneys for the Class at no cost to you. If you wish to opt-out of the Settlement Class, you must submit a request to opt-out in writing by the July 7, 2008 deadline, but you do not need to appear at the hearing. If you wish to object to the Settlement, you must submit a written objection by the July 7, 2008 deadline. Those who wish to object to the Settlement may present their objection in writing only, or may, in addition to a written objection, appear and be heard by the Court, either by yourself or, at your own expense, with an attorney of your choice.

If you wish to remain a Class Member and to have an opportunity to receive a share of the monetary relief you must return the attached Claim Form postmarked no later than September 12, 2008.

If you wish to opt-out and exclude yourself from the Settlement, your opt-out request must be received by July 7, 2008.

If you wish to object to the Settlement, your objection must be received by July 7, 2008. For additional information, you may visit: http://www.genderlawsuitagainstsmithbarney.com.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT | |
|---|---|
| **Submit a Claim Form** | **The *only* way to be eligible to receive money from the Settlement.** |
| **Do Nothing** | **Stay in this lawsuit.  Receive no money from the Settlement.  Give up certain rights.** By doing nothing, you will not receive any money from the Settlement Fund, and you give up any right to pursue claims against Smith Barney separately about the gender discrimination claims covered by the Settlement. |
| **Ask to Be Excluded (Opt-Out)** | **Opt out of the Settlement Class (opt-out).  Receive no money from the Settlement Fund. Keep any rights you might have to pursue monetary claims against Smith Barney separately.** If you ask to be excluded from the Settlement Class, you will not be eligible to receive any money from the Settlement, but you will keep any rights you might have to pursue claims involving the same issues in this lawsuit against Smith Barney separately. |
| **Object** | **Write to the Court about why you don't think the settlement is fair to the class.** If you do not opt out, you may object to the Settlement whether or not you submit a Claim Form. |
| **Go to the Hearing** | **You may, but are not required to, ask to speak in Court about the fairness of the Settlement.** |

## WHAT THIS NOTICE CONTAINS

1       Purpose of this Notice...................................................................................................  4

2       Background: About the Lawsuit ..................................................................................... 4

3       Class Definition—You are Part of the Class .................................................................... 5

4       Summary Of Settlement Terms ........................................................................................ 6

5       Settlement Hearing........................................................................................................ 14

6       How to Proceed: Your Options........................................................................................ 15

7       Release ..........................................................................................................................18

8       How Will My Settlement Award Be Calculated?............................................................. 19

9       The Lawyers Representing You And The Class................................................................. 20

10      Payments to Named Plaintiffs..……….. ........................................................................... 21

11      Getting More Information................................................................................................ 22

## BASIC INFORMATION

### 1. <u>Purpose of this Notice</u>

The purpose of this Notice is to inform you about this litigation, the certification of a class (the "Class"), the terms of a proposed settlement (the "Settlement"), and your rights in connection with a hearing to be held before the Court on August 13, 2008, to consider the fairness, reasonableness, and adequacy of the Settlement and related matters.  This Notice also describes the steps to be taken by those who wish to be excluded from the Class and, for those who remain Class Members, the steps necessary to seek a share in the distribution of the Settlement Fund in the event the Settlement is approved by the Court.

### 2. <u>Background: About the Lawsuit</u>

On March 31, 2005, Plaintiffs Renee Fassbender Amochaev, Deborah Orlando and Kathryn N. Varner filed a lawsuit in federal court in San Francisco.  The Plaintiffs alleged, among other things, that they were subjected to gender discrimination.  On November 29, 2006, Plaintiff Ivy So joined that complaint.  Specifically, Plaintiffs allege discrimination by Smith Barney against female Financial Advisors (formerly referred to as "Financial Consultants") in compensation, account distributions, partnerships, acquisition of books of business of retiring Financial Advisors, and other business opportunities that were not afforded to female Financial Advisors in a manner equal to their male counterparts.  Plaintiffs also claim that Smith Barney terminated them and denied them equal terms and conditions of employment.

Because these Plaintiffs brought this action on behalf of a group, or "class" of female Financial

Advisors who have similar claims, they filed the case as a "class action," and are referred to as "Named Plaintiffs."

You can read all of the Plaintiffs' claims in the Plaintiffs' Amended Complaint, which can be found at http://www.genderlawsuitagainstsmithbarney.com.

Smith Barney denies that it discriminated against female Financial Advisors or that it otherwise did anything wrong. The Company maintains that female Financial Advisors were compensated pursuant to a production-based system that treats similarly situated male and female Financial Advisors equally. Smith Barney also maintains that female Financial Advisors were not terminated or denied equal terms and conditions of employment on the basis of their gender. Smith Barney maintains that it does not allow or condone discrimination against female Financial Advisors and that it is an equal opportunity employer. By entering into the proposed Settlement, Smith Barney does not admit any wrongdoing.

The Settlement resolves claims of gender discrimination in compensation and other terms and conditions of employment, including those brought under Title VII of the Civil Rights Act of 1964 and, with respect to California Class Members, the California Fair Employment and Housing Act, Cal. Gov't Code § 12940. The Settlement also resolves any and all individual, non-class claims the Named Plaintiffs made or could have made in the First Amended Complaint or in their EEOC charges. The Court has not made and will not make any determination regarding whether or not Smith Barney discriminated against female Financial Advisors. This Notice should not be regarded as an expression of any opinion by the Court on the merits of any claims or defenses of the Parties. No trial has occurred. There has been no finding or determination by the Court that Smith Barney has violated any law or obligation, or that, in the event that the Settlement does not become effective, a recovery could or could not be made by the Named Plaintiffs or other members of the Class. Because the Named Plaintiffs and the Company together came to the Court to ask that the Court approve the Settlement that the two sides agreed to, the Court will simply examine the Settlement Agreement to determine whether or not it is fair, adequate and reasonable.

The Court has reviewed the Settlement and has preliminarily approved it as being fair, adequate and reasonable. Before deciding whether to give the Settlement final approval, the Court wishes to inform you of the general terms of the Settlement and of your right to comment on the Settlement, if you so desire, as well as your right to opt-out, or be excluded, from participating in the Settlement.

### 3. Class Definition—You are Part of the Class

You are a member of the Class affected by the Settlement if you fit within this definition:

All women employed as Financial Advisors in (i) the United States branches of Smith Barney's Retail Brokerage Division at any time from August 30, 2003 through March 1, 2008, or (ii) the California branches of Smith Barney's Retail Brokerage Division at any time from June 25, 2003 through March 1, 2008. Excluded from the Class are, among others: (i) brokers in Smith Barney's Financial Life Services (FLS) program, (ii) Smith Barney's bank-based advisors; or (iii) Financial Advisor Associates.

If you received this Notice in a mailing addressed to you, then Smith Barney's records show that you were employed by Smith Barney as a Financial Advisor in the United States branches of Smith Barney's Retail Brokerage Division at some time from August 30, 2003 through March 1, 2008 or employed by Smith Barney as a Financial Advisor in the California branches of Smith Barney's Retail Brokerage Division at any time from June 25, 2003 through March 1, 2008. Therefore, you are considered a Class Member. You have legal rights and options that you may exercise before the Court

finally approves the Settlement.

**Do I Have to Be Part of this Lawsuit?**

You may exclude yourself from, or "opt-out" of, the Settlement.  If you do so, you will not be required to give up any legal rights that you would otherwise have to sue Smith Barney individually for gender discrimination, and you will not be permitted to share in the monetary portion of the Settlement.  Information about how to opt-out is included below.  You may not exclude yourself from the programmatic relief provisions of the Settlement.  If the Court approves the Settlement, you will be bound by the programmatic relief provisions of the Settlement even if you opt-out of the Settlement Class.

**4.      Summary Of Settlement Terms**

**What Are the Terms of the Settlement?**

The Settlement requires Smith Barney to establish a Settlement Fund and to implement changes to its policies and practices. The programmatic portions of the Settlement will last for four years.

**The Settlement Fund**

Following preliminary approval of the Settlement, Smith Barney will deposit Thirty-Three Million Dollars ($33,000,000) plus an amount equal to the daily LIBOR rate on that $33,000,000 calculated from December 14, 2007 to the date of deposit ("Settlement Sum").  The Settlement Fund will be deposited into an interest bearing account.  The Settlement Fund is expected to accrue sufficient interest prior to distribution to the Class to cover all or virtually all of the payments to the Named Plaintiffs for service awards and non-class claims.  In addition, a portion of the Settlement Fund will be used to reimburse costs and expenses of the litigation, pay Class Counsel's fees as awarded by the Court, and pay for the administration of the settlement process. The remainder of the Settlement Fund will be distributed to the eligible Named Plaintiffs and Class Members who submit Claim Forms to compensate them for the asserted claims.

**What Does Smith Barney Have to Do Under the Settlement?**

Smith Barney has agreed to implement various revisions to its policies and practices.  These revisions are intended to further enhance opportunities for employment, earnings and advancement of female Financial Advisors, and to further promote a workplace that is fair for all employees.  It is expected that these programs will benefit female Financial Advisors at Smith Barney and increase their earnings potential.  These benefits are in addition to the Thirty-Three Million Dollars ($33,000,000) plus interest in the Settlement Fund.

Under the Settlement, Smith Barney will make the following revisions to its policies and practices, or perform the following tasks, during the four-year term of the Settlement Agreement:

    **Communications**

    A.    Smith Barney shall distribute its Non-Discrimination, Anti-Harassment and Anti-Retaliation Policies to all employees upon hire (in hard copy or by electronic mail) and then on an annual basis via email from Smith Barney's CEO.

    B.    The CEO of Global Wealth Management shall issue a statement annually in support of the policy. The policy shall be available on the Firm's intranet site and will be incorporated into various other Firm policies, including its Code of Conduct and its

Internet and Electronic Communications Usage Policy.

C.   The Non-Discrimination, Anti-Harassment and Anti-Retaliation Policies and the behaviors they seek to promote and prevent shall be the subject of mandatory training that all employees will be required to complete upon hire.

**Branch Management Mobility**

A.   All available branch management positions (including minimum requirements for qualification) will be posted for a minimum of five (5) business days for Financial Advisors who either: (i) have successfully completed the branch management assessment program, or (ii) are already in branch management and request to be informed of new management job postings.  Either the hiring manager or Human Resources will follow up with each applicant/candidate in a timely manner.

B.   Smith Barney shall develop and implement a computerized system to generate an electronic mail notification of new management job postings to Financial Advisors who either: (i) have successfully completed the branch management assessment program, or (ii) are already in branch management and request to be informed of new management job postings.  Smith Barney shall post a written description of the branch management assessment program and the criteria for admission on the Firm's intranet site.

C.   An Industrial Psychologist shall be jointly appointed.  The Industrial Psychologist shall review Smith Barney's branch management assessment program and, if appropriate, make recommendations for increasing the participation of females in the branch manager assessment program (including review of the criteria for admission) and in branch management.

D.   Smith Barney shall provide all management personnel with diversity training no less than every other year. The format of such training may vary from jurisdiction to jurisdiction depending on the relevant legal requirements.  However, all managers shall, at a minimum, be required to complete an interactive, customized, e-learning training program.

E.   Branch Manager compensation shall be revised to include a diversity component designed to measure and reward efforts at diversifying representation rates in the Financial Advisor position. Smith Barney shall develop and implement a standardized annual process whereby Branch Managers shall be required to report on their efforts and results in promoting a diverse workforce and whereby senior Smith Barney management will review these efforts and take them into account when determining the diversity component of each Branch Manager's compensation.

**Account Distribution**

A.   The Power Ranking system, which will be used to determine account distributions, will be provided to each Financial Advisor and Financial Advisor Associate ("FAA") upon hire and will be available to all Financial Advisors and FAAs electronically.  Smith Barney will provide notice to Financial Advisors and FAAs regarding any modification to the Power Ranking methodology.

B.   Smith Barney will also inform each Financial Advisor and FAA of her or his individual ranking at the time any distribution is made.  The actual distribution of a departing Financial Advisor's book will be made available to all Financial Advisors and FAAs in the Branch.

C.   All Power Ranking factors that measure performance from the previous twelve-month period

will be adjusted to encompass a 12-month period exclusive of absence for parental leave or short-term disability leave.

D.    Smith Barney senior management will issue a comprehensive account distribution policy statement, which shall include policies covering the distribution of the accounts of departing Financial Advisors, retiring Financial Advisors (other than accounts distributed through the Franchise Protection Program), departing partners, and leads, call-ins, and walk-ins.  This policy statement will be sent via email to all field employees.  It will also be posted on Smith Barney's intranet site and shall include a prohibition on discrimination. In addition, Smith Barney will train all current Branch Managers on account distribution policies and procedures at the time the settlement becomes effective, and will similarly train all new managers that are subsequently hired.

E.    Branch Managers shall have discretion to disqualify a Financial Advisor from an account distribution for improper conduct; provided, however, that where such an exception to the Power Ranking process is made, it shall be documented by the Branch Manager or his/her designee in writing and included in the quarterly reports on exceptions provided to the Diversity Monitor. Financial Advisors and FAAs will not be eligible for an account distribution if they:  (1) have voluntarily opted-out of the distribution; (2) are not in the product specialty group to which the distributed accounts belong (e.g. IIG/IFG); or (3) are on parental or short-term disability leave at the time the account distribution is made.

F.    Where an exception is made to the Power Ranking process for compliance purposes or to accommodate non-discriminatory client preferences, each individual exception shall be documented and kept for purposes of monitoring policy compliance and regularly reviewed by the Regional Director and the Diversity Monitor.

G.    If a Financial Advisor or FAA receives an account through an exception, that Financial Advisor or FAA will not receive another account in the same distribution until every eligible Financial Advisor and FAA has first received an account from those accounts that come next in the ranking of accounts in that distribution; provided, however, that if that Financial Advisor or FAA is the only qualified Financial Advisor in the branch to service a later account in the distribution, that Financial Advisor or FAA shall receive that account even if not every eligible Financial Advisor and FAA has already received an account in the distribution, and such exception shall be documented.  An individual Financial Advisor or FAA who does not receive a specific account as a result of an exception shall receive the next available account in the same distribution that he/she is qualified to service.

H.    Smith Barney shall provide quarterly reports to the Diversity Monitor on exceptions being made in the branches.  Branch Managers who are determined to have distributed an account pursuant to any improper exception shall receive an appropriate discipline.

I.    Smith Barney shall enhance its technology to allow its account distribution process to be computer automated.  Account distributions will be made through this automated process subject to exceptions to ensure compliance with regulatory requirements and non-discriminatory client preferences.  The results of all account distributions shall be stored and readily retrievable for monitoring to ensure compliance with account distribution policies.

J.    If at any time during the term of this Settlement Agreement a dispute arises between Smith Barney and a Financial Advisor concerning any account distribution, such dispute shall—at the written request of the Financial Advisor—go through Smith Barney's internal complaint process, which includes access to mediation.  However nothing in the Settlement Agreement

shall prevent any Class Member or Named Plaintiff from individually pursuing any legal claim not released under the Settlement through any applicable governmental agency, arbitration forum or court of law if she is otherwise entitled to do so, including, but not limited to, claims for race discrimination, age discrimination or non-economic damages arising from sexual harassment.  If a Financial Advisor submits a gender-related complaint through Smith Barney's alternative dispute resolution system, that person shall receive a written description of the ADR process—and a written notice indicating that the statutes of limitations on her/his legal claims will be tolled for 120 days from the date of his/her submission of the ADR complaint.

K.   No changes to Smith Barney's procedures for distributing accounts of departing Financial Advisors described in the Settlement Agreement shall apply to or affect:  (i) Smith Barney's Financial Life Services (FLS) program or any accounts transferred, or identified for transfer, to or from FLS; or (ii) accounts serviced by Smith Barney's bank-based Financial Advisors.

L.   The Industrial Psychologist shall review and, if appropriate, make recommendations for developing a standard and nationwide process for determining up-front bonuses, forgivable loans, and other transitional compensation packages given to lateral recruits.  Any such recommendations shall be designed to promote equal opportunity in the receipt and amount of transitional compensation packages—after taking into consideration factors such as the lateral recruit's production start date, production, assets under management, return on assets, product mix and any other legitimate factors.

M.   To the extent that Smith Barney does not already have such a system, with input from the Industrial Psychologist, Smith Barney shall develop and implement a system to keep records of all up-front bonuses, forgivable loans, and other transitional compensation packages given to lateral Financial Advisor recruits.  Smith Barney shall provide a summary of this information to the Diversity Monitor and Class Counsel. The Diversity Monitor will review and report on these records to the Industrial Psychologist.

N.   The book of business formerly serviced by a retiring Financial Advisor who is not participating in the Franchise Protection Program will be distributed through the Power Ranking System. Smith Barney will consider the efforts made by branch management to increase participation by female Financial Advisors in the Franchise Protection Program in determining the diversity component of Branch Manager compensation.

O.   The Industrial Psychologist shall review and, if appropriate, make recommendations to promote participation of female Financial Advisors in the firm's Franchise Protection Program, including female Financial Advisors' participation as retiring Financial Advisors and receiving Financial Advisors in the Franchise Protection Program. The Diversity Monitor will review female Financial Advisor participation in Franchise Protection Programs, both as retiring Financial Advisors and as receiving Financial Advisors, and will receive information from Smith Barney about the gender of persons receiving assets and the value of assets transferred.

P.   Smith Barney shall collect data about the account distribution process and shall report such data to the Diversity Monitor, Industrial Psychologist and Class Counsel. As described below (under Industrial Psychologist), after the 20- and 44- month periods and subject to certain conditions, Class Counsel may initiate a binding dispute resolution process before a neutral mediator if they believe the system should be changed and Smith Barney disagrees. The parties may initiate changes on a more frequent basis by agreement.

Q.   In the event that a Financial Advisor or FAA who is part of a team leaves Smith Barney, the team member(s) who remain at Smith Barney will presumptively retain the book of business

formerly serviced by the departing Financial Advisor, provided that the remaining team member(s) is/are qualified to service those accounts. The Diversity Monitor shall receive semi-annual reports from Smith Barney relating to redistributed accounts from partnerships, including number of accounts, Financial Advisor revenue, asset value, and gender of receiving Financial Advisor.

R.    Smith Barney will consider the efforts made and results achieved by branch management to increase participation by female Financial Advisors in partnerships in the branch in determining the diversity component of Branch Manager compensation.

S.    The Industrial Psychologist shall review and, if appropriate, make recommendations to promote participation of female Financial Advisors in partnerships and teams.

T.    For purposes of a Financial Advisor's or FAA's Power Rankings, Smith Barney will count partnership assets under management based on the percentage of the commission split specified in the Joint Production Agreement.

U.    All Joint Production Agreements will include a plan for the distribution of partnership assets in the event of the partnership's or team's dissolution.

V.    The Diversity Monitor will review female Financial Advisor participation in partnerships and will receive information from Smith Barney about partnership splits based on gender and the value of assets under each partnership based on gender. The Diversity Monitor will receive copies of any complaints made to Smith Barney management or its legal counsel by female Financial Advisors regarding any aspect of partnerships.  The Diversity Monitor will be advised of any partnership dissolution involving a female Financial Advisor.

W.    Each Branch Office will implement a voluntary "Financial Advisor of the Day" program in which all client prospects who either walk in or telephone the branch and who are seeking a Financial Advisor shall be directed to the Financial Advisor serving as the Financial Advisor of the Day.

**Development Opportunities**

A.    Smith Barney shall work with the Industrial Psychologist to develop initiatives designed to attract and retain women at Smith Barney as Financial Advisors, and to enhance their success. The Industrial Psychologist shall make recommendations to promote participation of female Financial Advisors in development opportunities.

B.    Smith Barney will provide exit questionnaires to Financial Advisors who terminate their employment voluntarily in order to gain a better understanding of the reasons for each departure.  The exit questionnaires submitted by female Financial Advisors shall be available to the Industrial Psychologist and the Diversity Monitor, who shall report his or her findings to Human Resources.

C.    Smith Barney will maintain its commitment to its female Financial Advisor networking meetings.

**Complaint Process and Training**

A.    The complaint process will be communicated in writing to all Financial Advisors upon hire and

annually.

B.    Smith Barney will provide its Human Resources staff with appropriate training regarding compliance with state, federal, and local EEO laws; Smith Barney's anti-discrimination and harassment policies; the Settlement Agreement; and the best practices for complaint investigation and resolution. Human Resources will be trained to treat all complaints or inquiries as confidentially as legally possible and to carry out their duties in a manner consistent with the law.  In addition, Human Resources will implement controls designed to ensure that only non-complaining employees or managers with a need to know will be advised of a complaint or investigation.  If Human Resources decides that it must inform any employees or managers of the identity of the complainant, Human Resources will notify the complainant in advance that her/his identity will be released and to whom it will be released.  In all instances, upon being informed of a complaint or investigation, the employees and managers so informed will be reminded of Smith Barney's policy against retaliation.

C.    Smith Barney will retain documents sufficient to show complaints of sex discrimination, sex bias and/or retaliation related to such complaints for the term of the Settlement Agreement.  This includes, but is not limited to, complaints made directly to in-house or outside counsel.  Smith Barney will provide copies of all sex discrimination, sex bias, and retaliation complaints, as well as copies of the Complaint Log and Legal Complaint Log to the Diversity Monitor on a quarterly basis.

**Diversity Monitor**

A.    The parties will jointly appoint a Diversity Monitor who shall be external to and independent of Smith Barney, but will report directly to the CEO of Global Wealth Management.

B.    The Diversity Monitor shall monitor Smith Barney's efforts to carry out the terms of the Settlement Agreement.  This shall include the following:

1.   receiving quarterly reports regarding complaints of female Financial Advisors alleging sex discrimination, sex bias, or retaliation and the resolution of investigations of such complaints through any Smith Barney ADR program.
2.   reviewing reports by Smith Barney on the diversity-related annual assessment process for Branch Managers, including the self-assessments completed by Branch Managers, and annual data and information provided by the Company related to the diversity component of each Branch Managers' compensation.
3.   reviewing reports on exceptions to the account distribution system being made in the branches, including information on the identity of the branches, the branch managers who approved the exceptions and an explanation of the exceptions.
4.   annually reviewing up-front bonuses, forgivable loans and other transitional compensation packages that Smith Barney provided to lateral recruits, and reporting on these records to the Industrial Psychologist.

5.   receiving a copy of the summaries provided in connection with management approval of any forgivable loan provided to a lateral recruit and interviewing the appropriate branch manager about the rationale for any up-front bonuses, forgivable loans, or transitional compensation packages.
6.   annually reviewing female Financial Advisor participation in Franchise Protection Programs, both as retiring Financial Advisors and as receiving Financial Advisors, and receiving information from Smith Barney semi-annually about the gender of persons receiving assets

and the value of assets transferred.

7. semi-annually reviewing reports relating to redistributed accounts from partnerships, including the number of accounts, Financial Advisor revenue, asset value and gender of receiving Financial Advisor as well as female Financial Advisor participation in partnerships and receiving information from Smith Barney about partnership splits based on gender and the value of assets under each partnership based on gender.

8. monitoring bi-annual training of management on EEO policies, and policies against discrimination and retaliation, and ensuring that the training agreed to was implemented.

9. reviewing exception reports regarding the Financial Advisor of the Day program.

10. reviewing how Human Resources handles investigations and the resolution process for inquiries and complaints.

11. reviewing the exit questionnaires completed by departing female Financial Advisors, as well as information regarding the retention of female Financial Advisors annually, and reporting his/her findings to Human Resources.

12. identifying issues of potential non-compliance and reporting them to Smith Barney and Lead Class Counsel.

13. providing reports to Lead Class Counsel and Smith Barney at least semi-annually regarding the items described in this Agreement to be monitored.

14. maintaining records for the term of the Settlement Agreement.

C. If any instances of non-compliance with the provisions of the Settlement Agreement are identified by the Diversity Monitor, in consultation with Lead Class Counsel, Smith Barney will take appropriate corrective action to address them unless Smith Barney can show that corrective action would be inconsistent with legitimate business and client needs and objectives.

D. If Lead Class Counsel disagrees with Smith Barney's determination on the implementation of corrective action, Lead Class Counsel may initiate a meet and confer session with Smith Barney's counsel and, if necessary, seek mediation.

E. Smith Barney shall inform the Diversity Monitor and Lead Class Counsel of any corrective action taken. Where potential non-compliance has been identified, the Diversity Monitor shall have the right to audit the activities in a branch, by reviewing documents, asking branch management to provide explanations and, if necessary, speaking to Financial Advisors in the branch, and the right to receive relevant information from Smith Barney headquarters upon reasonable request.

**Industrial Psychologist**

A. The parties shall also jointly appoint an Industrial Psychologist, who shall work with Smith Barney and Class Counsel to develop innovative, meaningful, novel, state-of-the-art programs and, if appropriate, to make recommendations concerning:

1. The production and earnings of female Financial Advisors, including policies and practices with respect to training, development, mentoring, and business-related allocations;

2. The participation of female Financial Advisors in the Franchise Protection Program, both as retiring Financial Advisors and as receiving Financial Advisors;

3. The participation of female Financial Advisors in partnerships and teams, including commission splits between male and female partners, and dissolution of partnerships and teams;

4. Up-front bonuses, forgivable loans, and other transitional compensation packages offered to

lateral recruits;

5. Policies and practices with respect to training, development, and mentoring for female Financial Advisors. Training and development may include, but is not limited to, training, conference calls, online courses, and in-person seminars;

6. The participation of females in Smith Barney's branch management assessment program and in branch management; and

7. A mentoring program for all Financial Advisors.

B     The Industrial Psychologist shall review the actual implementation of the programs, policies, and initiatives that Smith Barney is obligated to undertake by virtue of the Settlement Agreement and shall, on an annual basis, report the results of this review to the Diversity Monitor. The Industrial Psychologist shall review on an annual basis the retention rates of women in the Financial Advisor position and shall report the results of this review to the Diversity Monitor.

C.    The Industrial Psychologist shall present any recommendations to the members of Senior Management at Smith Barney who are most appropriate to address each issue.  A copy of the recommendations will also be provided to Lead Class Counsel.  All recommendations of the Industrial Psychologist will be designed to advance the purposes of the Settlement Agreement consistent with Smith Barney's legitimate business needs and objectives.  If Smith Barney does not agree with any such recommendations, but Lead Class Counsel still thinks they should be implemented notwithstanding Smith Barney's objections, the Industrial Psychologist, along with Lead Class Counsel, will have the opportunity to present the recommendations to Smith Barney's highest ranking officer overseeing Financial Advisor compensation, currently the Director of Field Management.  Smith Barney shall decide in good faith consistent with the purposes of this Settlement Agreement whether to implement such recommendations.

D.    The Industrial Psychologist shall provide to the parties statistical analyses on the Power Ranking criteria. These analyses shall report on data at the 12, 20, 36 and 44 month intervals from the Effective Date.  With the analysis, the Industrial Psychologist shall determine whether female Financial Advisors have received less than their pro rata share of distributed accounts, and if so, whether the difference is statistically significant.  This determination shall be based on an aggregate comparison of (i) the value of the accounts distributed, based on their account value at the end of the month prior to their distribution; and (ii) the representation of men and women in the population of Financial Advisors in the retail brokerage division of Smith Barney, including only those Financial Advisors who were active within the time period being measured.

E.    The Power Rankings may be changed at any time upon agreement between Smith Barney and Lead Class Counsel following a meet and confer process.  If, following the meet and confer process, Lead Class Counsel do not agree to a change proposed by Smith Barney, Smith Barney may seek authority from Hunter R. Hughes, Esq. or another mutually selected mediator (the "Mediator") to implement the proposed change(s) to the Power Ranking systems, which authority will not be unreasonably withheld.  To bring about such changes, Smith Barney must show to the satisfaction of the Mediator through binding mediation that (a) the changes are necessary to comply with applicable law; or (b) each of the criteria they seek to change is having a significant adverse impact on Smith Barney's business and that the change(s) sought would not disadvantage female Financial Advisors or FAAs relative to the criteria being displaced.

F.    If, following either the 20 or 44 month reports, the Industrial Psychologist determines that female Financial Advisors have received less than their pro rata share of distributed accounts, and that the difference is statistically significant, then Lead Class Counsel may initiate a meet and confer session with Smith Barney's counsel.  If, in the judgment of Lead Class Counsel, the meet and confer does not result in a satisfactory resolution, Lead Class Counsel may request a

hearing before the Mediator solely for the purpose of resolving whether there should be any change to the Power Ranking factors or any adjustment to their weight.  Such a process shall be completed within 4 months under a schedule and with written submissions in a form determined by the mediator, but allowing at least twenty-one days for a response by the responding party (unless the responding party seeks shortened time for its own submission).  Smith Barney shall pay the cost of such binding mediation.  The Mediator shall review each party's submissions and make a final, non-appealable determination regarding whether there should be any change to the Power Ranking factors or any adjustment to their weight.

G.    Subject to signing an appropriate confidentiality agreement, and upon reasonable advance notice, the Diversity Monitor and the Industrial Psychologist will have reasonable access to relevant documents, data, and Smith Barney employees. The Diversity Monitor and the Industrial Psychologist will be compensated by Smith Barney.

H.    If it becomes necessary to replace the Diversity Monitor or the Industrial Psychologist, the parties shall select a replacement by mutual agreement.

**General Non-Discrimination Provisions**

Pursuant to Smith Barney's Non-Discrimination and Anti-Harassment Policy, female Financial Advisors will enjoy terms and conditions of employment comparable to their male counterparts. Smith Barney shall reaffirm its commitment to the following general policies using a method agreed to by the parties:

1. Prohibition against discrimination on the basis of sex in compensation and business opportunity allocations.
2. Prohibition against retaliation for reporting sex discrimination, participating in any Smith Barney ADR program, participating in this or any discrimination settlement, filing a lawsuit or complaint with any outside agency or entity alleging sex discrimination, or for refusing to participate in sex discrimination.
3. Prohibition against reimbursement of business expenses that are directly or indirectly related to male-only entertainment establishments.
4. Prohibition against any Smith Barney supervisor retaliating against any Class Member for her participation in the prosecution of the allegations contained in the charges underlying this Settlement or in the Settlement itself.

**5.    Settlement Hearing**

The hearing will be held at 9:00 a.m. on August 12, 2008 , in the courtroom of the Honorable Phyllis J. Hamilton at the United States District Court for the Northern District of California, Courtroom 3, U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102.  At this hearing, the Court will determine whether the proposed Settlement is fair, reasonable, and adequate and whether it should be approved.  The Court will also consider whether the motion of the Plaintiffs' attorneys, or "Class Counsel," for an award of attorneys' fees and expenses should be approved, and whether, in accordance with the Settlement, an order and judgment should be entered bringing the litigation to a conclusion.

**Do I Have To Come To The Settlement Hearing?**

You are not required to appear at the hearing.  Attorneys representing the Class will appear at the hearing on behalf of all Class Members at no cost to you.  However, if you would like to comment on the terms of the Settlement, you may appear and be heard at the Settlement Hearing, either by yourself or, at your own expense, with an attorney of your choice.  Information about how to comment on or object to the Settlement is included below.  If the Court gives final approval to this Settlement, the

Court's judgment will be final and binding on all Class Members who have not opted out.

**6.**     **How to Proceed: Your Options**

After reviewing the terms of the Settlement set forth in this Notice, you have three options.  You must decide at this stage whether you want to (A) remain a Class Member and retain an opportunity to share in the distribution of the Settlement Fund; or (B) opt-out and exclude yourself from sharing in the monetary relief portion of the Settlement.  You may also object to the Settlement but, you may only do so if you remain a Class Member.  If you opt-out of the Settlement, you may not object to the Settlement.

**A. Remain a Class Member**

If you do not request to be excluded, you will remain a part of the Class. The Court will hold the Settlement Hearing and you, as a Class Member, will be represented by Class Counsel at no cost to you. In order to be eligible to receive a share of the Settlement Fund, you must fill out a Claim Form, Form W-4, Form W-9, and any other required tax forms, and return it to the Claims Administrator, Settlement Services Inc., postmarked by no later than September 12, 2008.  If you are a Class Member and you file a timely Claim Form, you may be eligible to obtain money from this Settlement.  The Claim Form asks for information about your employment with Smith Barney, and the share of money that you will receive, if any, if the Settlement is finalized, will be determined partly based on your answers to the questions on this Claim Form.  After submitting a Claim Form, you will not have a right to present any further information concerning your particular situation; nor any right to challenge the final allocation and distribution determined by the Court Appointed Claims Administrator.

Each Class Member, including each Named Plaintiff, who is eligible to receive a monetary award from the Settlement will be required to sign a Release before receiving the settlement award.  If you are a Class Member but have already signed a document that releases claims against Smith Barney, it is possible that you may have lost your right to recover any money under the Settlement for the claims you released.

Whether or not you submit a Claim Form, unless you opt out, all claims that you may have against Smith Barney up through April 30, 2008 that fall within the scope of claims released by this Settlement will be extinguished and barred.  Unless you opt out, you remain eligible to object to the Settlement pursuant to Option C below, whether or not you submit a Claim Form.

**B. Opt-Out: How Do I Exclude Myself from the Settlement?**

You may request to opt-out, or be excluded, from the Settlement Class.  If you opt-out, you will not be eligible for any monetary award as part of this Settlement.  Any Class Member who wishes to opt-out must mail a written, signed statement that she is opting out of the monetary portion of the Settlement to:

Kelly M. Dermody, Esq.
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West

275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

and

Jay Cohen, Esq.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 11019-6064

You may not opt-out of the injunctive relief provisions of the Settlement.

To be effective, this opt-out statement must be postmarked on or before July 7, 2008, and must contain each of the following:

      (a)     your name, current address, social security number and telephone number;

      (b)     the name and number of this case (*Amochaev, et al. v. Citigroup Global Markets, Inc. d/b/a Smith Barney*, Case No. C-05-01298 (PJH)).

      (c)     a statement that you wish to be excluded from the Settlement, including the following language, which must be contained in your request:

> "I understand that I am requesting to be excluded from the Class Settlement and that I will receive no money from the settlement fund created under the Settlement Agreement entered into by Smith Barney.  I understand that if I am excluded from the Class Settlement, I may bring a separate legal action seeking damages, but might receive nothing or less than what I would have received if I had filed a claim under the class monetary settlement procedure in this case.  I also understand that I may not seek exclusion from the Class with respect to injunctive relief and that I am bound by the injunctive provisions of the Settlement Agreement entered into by Smith Barney."

Only those Class Members who request exclusion in the time and manner set forth herein shall be excluded from the Class.  Pursuant to Federal Rules of Civil Procedure 23(b)(3) and (c)(2), the terms and provisions of the Settlement Agreement concerning monetary relief shall have no binding effect on any person who makes a timely request for exclusion in the manner required by this Order.

Please note that Class Members who submit timely and valid requests for exclusion will have no right to object to the Settlement in court and will no longer be represented by Class Counsel.

If you submit both a valid opt-out request and a valid claim form, your opt-out request will not be valid and your claim form will be processed.

If you choose to opt-out of the Settlement Class, and submit the necessary information to do so, but later decide to re-join the Class, you may rescind your opt-out request.  To be effective, such a rescission must be in writing and signed, and must be postmarked on or before July 7, 2008 to the following:

Kelly M. Dermody, Esq.

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

and


Jay Cohen, Esq.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019

## C. Object to the Settlement

In determining whether to grant final approval to the Settlement, the Court must assess the overall
fairness and reasonableness of the Settlement to the Class.  Class Members who have not opted-out of
the Settlement may object to the Settlement.  If you opt-out of the Settlement, you may not object to
the Settlement.

In order to speak at the Settlement Hearing, or have your objection to the Settlement considered by the
Court, you must submit a written objection to the Settlement prior to the Settlement Hearing. This
statement must be signed, and must include the name and number of this case (*Amochaev, et al. v.
Citigroup Global Markets, Inc. d/b/a Smith Barney*, Case No. C-05-01298-(PJH)) and a detailed
description of the basis for the objection.  This statement must be postmarked on or before July 7, 2008,
and sent to:

Kelly M. Dermody, Esq.
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

and


Jay Cohen, Esq.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019


You need not appear at the Settlement Hearing for your written comments or objections to be
considered by the Court, but you may appear if you so desire.  If you plan to comment on or object to
the Settlement in person at the Settlement Hearing, you must file a written notice of appearance
identifying yourself and any attorney you may retain at your own expense with your objection, which
must be signed, include a detailed description of the basis for the objection, and be postmarked to:

Kelly M. Dermody, Esq.
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West

275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

and


Jay Cohen, Esq.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019

Please note that no one may appear at the Settlement Hearing for the purpose of objecting to the Settlement without first having filed and served her objection(s) in writing within the time period described above. Objections raised at the Settlement Hearing will be limited to those previously submitted in writing.  Any Class Member who does not timely file and serve such a written objection shall not be permitted to raise such objection, except for good cause shown.

## 7. **Release**


If the Court grants final approval of the Settlement, then all Class Members who do not opt out will release Smith Barney for all claims certified by the Court in the lawsuit.  When claims are "released," that means that a person covered by the release cannot sue Smith Barney for any of the claims that are covered by the release.  Unless you opt out of the lawsuit, you will be covered by the release, even if you do not submit a Claim Form for money damages.

   The exact terms of the Class Member Release are:

> The Class Members, excluding those who timely opt out, release all claims, known and unknown, existing through the date of preliminary approval, under any federal, state or local legal theory, for gender discrimination against Smith Barney, with the exception of claims for non-economic damages that arise from sexual harassment (as that term is defined by the Equal Employment Opportunity Commission).  By way of example only, and without any intent to limit the scope of the preceding release, this settlement would bar a claim for loss of compensation of any type or description (including but not limited to commissions, salary, bonuses, deferred compensation and incentive awards) arising from or relating to any type of sex or gender discrimination, but would not bar a claim of emotional distress, costs of medical treatment, or other such non-economic compensatory damages arising from or related to sexual harassment.

Named Plaintiffs release all claims of any nature against Smith Barney under federal, state or local laws for any period up through the date of preliminary approval.


## 8. **How Will My Settlement Award Be Calculated?**

Each Class Member, including each Named Plaintiff, who files a timely Claim Form will have their claim reviewed by a Claims Administrator appointed by the Court.  Class Members who submit a Claim Form will be eligible to receive monies based on length of tenure (e.g. weeks worked) at Smith Barney as a Financial Advisor.  Class Members may also receive additional credit if they provide information in their Claim Form regarding termination or constructive discharge allegedly resulting from gender-based discrimination, though Class Members are not required to provide such information and may participate

in the settlement based solely upon length of service.

The Claims Administrator will allocate points to each Class Member submitting a Claim Form. Each claimant will receive 1 point for each week worked as a Financial Advisor, either between August 30, 2003 and March 1, 2008, or between June 25, 2003 and March 1, 2008 if they worked as a Financial Advisor in California. Claimants will also be eligible to receive up to 50 additional points if they provide information on the Claim Form about their termination or constructive discharge from Smith Barney as the result of alleged gender-based discrimination.

For example, if a claimant worked for 2 years as a Financial Advisor, she would receive a total of 104 points (one point for each week worked). The Claims Administrator may also allocate 50 points to the claimant for information she provided on the Claim Form regarding her termination or constructive discharge as the result of alleged gender-based discrimination. In this case, the claimant's final point total would be 154 (104 for each week worked plus 50 for Claim Form points for termination or constructive discharge). The claimant's share of the Class monetary award would thus be expressed as:

Claimant's 154 points divided by total points of all claimants.

The Claims Administrator will make all determinations regarding Claim Form points. You will not have a right to challenge the allocation and distribution determined by the Claims Administrator.

The total amount of awards made to the Named Plaintiffs and the Claimants shall not exceed the net amount of the Settlement Fund after deduction for notice and administration costs, Class Counsel's attorney's fees and costs, and Named Plaintiff service awards and non-class claims.

The Claims Administrator shall send a Notice of Award to each eligible Claimant disclosing her award payment, along with a Named Plaintiff Release or a Class Member Release, whichever is applicable. Within a reasonable time period after receipt of an executed Named Plaintiff Release from a Named Plaintiff or an executed Class Member Release from a Class Member, the Claims Administrator shall send the Named Plaintiff or Class Member her award payment. Any Named Plaintiff who does not execute and timely deliver an executed Named Plaintiff Release, and any Class Member who does not execute and timely deliver an executed Class Member Release to the Claims Administrator within six (6) months of the date the Notice of Award was mailed to her shall be ineligible for, and forever barred from receiving, monetary relief under this Settlement Agreement, even if said Named Plaintiff or Class Member has not opted out. Any undistributed funds that remain after six (6) months from the mailing of the Notice of Award due to uncashed checks shall be distributed to 501(c)(3) organizations which advance career opportunities for women, including career opportunities in the financial services industry, as jointly selected by Lead Class Counsel and Smith Barney.

The Claims Administrator shall maintain the distribution plan and allocation list for a period of seven (7) years. Smith Barney shall have access to individual allocation amounts only upon written notice to Class Counsel and a showing of good cause (*e.g.*, actual or threatened litigation by a Claimant). Any dispute as to whether good cause exists for such a requested disclosure shall be resolved through the Dispute Resolution process set forth in the Settlement Agreement.

The information provided on the Claim Form may be verified for accuracy against Smith Barney's computerized personnel, payroll, commission, or account data, or documents provided by claimants.

**Are There Tax Consequences For Any Money I Might Get?**

Any award you receive from the Settlement Fund will have tax consequences for you. The Claims Administrator will be responsible for withholding, remitting and reporting each Claimant's share of

payroll taxes from the Settlement Fund.  Smith Barney will be responsible to pay for the employer's share of taxes and costs, including FICA, FUTA, SUTA and Medicare.  The Claims Administrator will withhold the employee's share of taxes and costs, including any applicable FICA, FUTA, SUTA and/or Medicare, from Claimants' awards and remit those amounts to the appropriate taxing authorities.  Class Counsel are not tax advisors and cannot give you advice on any tax matters. Class Counsel urge you to consult your tax advisor for answers to any questions you may have about the tax implications of any potential award.

## 9. The Lawyers Representing You And The Class

As a Class Member, you are represented in this litigation by Class Counsel: Kelly M. Dermody of Lieff, Cabraser, Heimann & Bernstein, LLP; Cyrus Mehri of Mehri & Skalet, PLLC; Adam Klein of Outten & Golden, LLP; and James M. Finberg of Altshuler Berzon:

Kelly M. Dermody
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008

Adam Klein
OUTTEN & GOLDEN, LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005

James M. Finberg
ALTSHULER BERZON
177 Post Street, Ste. 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile:  (415) 362-8064

Cyrus Mehri
MEHRI & SKALET, PLLC
1250 Connecticut Avenue, NW, Ste 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997

Unless you elect to exclude yourself from the Settlement, you will continue to be represented by Class Counsel in connection with implementation and monitoring of the Settlement throughout the four-year duration of the terms of the Settlement at no cost to you. Although it is not necessary, you may, if you wish to do so, retain your own attorney at your own expense.

**How Will The Lawyers Be Paid?**

Class Counsel have pursued these claims on behalf of Plaintiffs and the Class without receiving any compensation for their services or reimbursement of their incurred litigation expenses.  Class Counsel have undertaken substantial risks in pursuing this matter.  They have done so with the understanding that, if they obtained a recovery for the class, their expenses would be reimbursed and they would receive fees from the fund recovered.

In connection with the Settlement, the Court will award Class Counsel reasonable attorneys' fees and expenses out of the Settlement Fund.  If you are a Class Member and receive an award from the Settlement Fund, you will not owe any fees or expenses to the lawyers who have represented you as part of the Class. The attorneys' fees and expenses of Class Counsel, as awarded by the Court, will be paid out of the Settlement Fund and only if and after the Settlement has been approved by the Court.

As is routine in class action cases, Class Counsel will file with the Court a motion for an award of attorneys' fees and litigation expenses already incurred as well as the fees and expenses that will be incurred during the four-year term of the Settlement.  In its motion, Class Counsel will request that the Court award them the costs they have incurred not to exceed $900,000, plus attorneys' fees for the work performed and results achieved to date in the amount of $6.5 million, plus $500,000 in total for

future work they will perform monitoring the Agreement over its four-year term.

Costs of providing notice to the Class will also be paid from the $33 million Settlement Fund.

## 10. Payments to Named Plaintiffs

The Named Plaintiffs may participate in the class monetary award by filing a claim form like any other Class member.

In addition, Class Counsel will ask the Court to grant service payments to Named Plaintiffs Renee Amochaev, Deborah Orlando, and Kathryn Varner in the amount of $50,000.00, and to Named Plaintiff Ivy So in the amount of $35,000.00.  The proposed awards would recognize the extraordinary service that the Named Plaintiffs provided here, including for their participation in the prosecution and settlement of this case.  This participation included each Named Plaintiff preparing for and then being deposed for three days, participating in responding to discovery requests, assisting counsel in developing strategy, and providing input into settlement discussions and the ultimate Settlement Agreement.  Named Plaintiffs Amochaev, Orlando and Varner each joined the case at its inception (Plaintiff So joined one and one-half years later), participated in the initial press conference, and attended one or more mediation sessions with Smith Barney.  All Named Plaintiffs reviewed the drafts of the Settlement Agreement and provided input.

Unlike other Class Members, each Named Plaintiff will execute a broader, general release of all potential claims against Smith Barney and will dismiss their administrative charges of discrimination.  The Named Plaintiffs will also receive payment for their non-class claims, which they will be required to release in addition to releasing class claims under the Class Member Release.  Plaintiffs' non-class claims include claims for race discrimination, age discrimination, and non-economic damages arising from sexual harassment.  The payment for these claims will be determined by the Claims Administrator based upon a review of the factual record. In no event will the total of all such non-class awards exceed $550,000.00.   These payments will come from the $33 million Settlement Fund, though it is expected that interest earned on the Settlement Fund will pay for all or virtually all of the non-class payments and service awards of the Named Plaintiffs.

## 11. Getting More Information

If you have further questions or are still not sure whether you are included, you can get free help at http://www.genderlawsuitagainstsmithbarney.com or by calling or writing to Class Counsel in this case at the contact numbers/address listed in paragraph 9.

This Notice contains only a summary of the terms of the Settlement, the provisions of the releases and related matters.  For further information, the Settlement Agreement (which includes the complete terms of the Settlement), the Claim Form, the Release, and numerous other documents connected with the Settlement are available for review and/or downloading on the web at: http://www.genderlawsuitagainstsmithbarney.com or can be viewed in hard copy in the Office of the Clerk of the United States District Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, CA  94102. Other orders that the Court may issue from time to time regarding the administration of the Consent Decree will also be on file with the Court and some will be available on the web at http://www.genderlawsuitagainstsmithbarney.com.

Again, the important deadlines are:

**Last Day To Submit A Claim Form: September 12, 2008**

**Last Day To "Opt Out" Of The Settlement Class: July 7, 2008**

**Last Day To Object To The Settlement: July 7, 2008**

PLEASE DO NOT CALL OR CONTACT THE COURT, THE OFFICE OF THE CLERK OF COURT, OR SMITH BARNEY WITH QUESTIONS REGARDING THIS NOTICE.

Dated: _____, 2008 _____
                               The Honorable Phyllis J. Hamilton
                               United States District Judge

<u>CLAIM FORM</u>

<u>AMOCHAEV, ET AL. V. SMITH BARNEY</u>


**IMPORTANT:**  Your Claim Form <u>MUST</u> be returned <u>POSTMARKED</u> by September 12, 2008. Enclosed is a self-addressed envelope for returning a claim form.

A.    INSTRUCTIONS.

    1.    It is important to read and follow these instructions carefully, as well as those contained on the Explanation of Claims Procedure enclosed with this Claim Form.  Failure to follow these instructions may result in your losing benefits to which you might otherwise be entitled.

    2.    If you do not return this Claim Form postmarked by September 12, 2008, your claim will be rejected and you will lose all rights to receive any money from this settlement.  You must mail the Claim Form to

**Amochaev, et al. v. Smith Barney Claims Administrator**
**P.O. Box 10564**
**Tallahassee, FL  32302-2564**

**Telephone: (866) 854-4175**

    3.    If you are a woman who was employed as a Financial Advisor (formerly known as a Financial Consultant) in (i) the United States branches of Smith Barney's retail brokerage division at any time from August 24, 2003 through March 1, 2008 or (ii) the California branches of Smith Barney's retail brokerage division at any time from June 25, 2003 through March 1, 2008, you will qualify to participate in a monetary award if you complete and submit answers to Questions 1-12 in Section B below. The monetary award will be based on your length of service during the applicable time period. If applicable, you may also submit a response to Section C for additional credit, though you are not required to respond to this Section to participate.

    4.    You must sign, under penalty of perjury, and date the Claim Form.

    5.    You may use an additional page or pages of paper to answer these questions, if necessary.

- 1 -

B.     PERSONAL INFORMATION (Required)

1.     _____
       Name  (First, Middle, Last)

2.     _____
       Street Address                          Apartment Number

3.     _____      _____   _____
       City                          State       Zip Code

4.     _____
       Social Security Number

5.     _____
              E-mail Address

6.     _____   _____
              Work Phone Number              Best Time to Call

7.     _____   _____
              Home Phone Number              Best Time to Call

8.     _____   _____
              Cell Phone Number              Best Time to Call

9.     _____
              Phone Number of Relative or Other Contact (Optional)

10.    _____
              Date of Birth

11.    Please list any other name you used while employed at Smith Barney and
       the dates when you used each name:

       _____      _____
       Name                            Date Range

       _____      _____
       Name                            Date Range

12.    I am:

       ___     Female

756269.2

C.     OPTIONAL DESCRIPTION OF TERMINATION/CONSTRUCTIVE
       DISCHARGE CLAIM (If any)

      1.    <u>Termination/Constructive Discharge</u>

          a.    Were you terminated or forced to quit due to your gender?

              €    Yes           €    No

          b.    If you answered yes to question 1a, please add any facts that you
think support your answer:

_____

_____

_____

*If you answered yes to question 1a and provided supporting detail
in question 1b, you may receive up to 50 additional points for your
answers.*

D.     SIGNATURE OF CLAIMANT (Required)

I, _____, declare under penalty of perjury that the
information and facts I have stated in this Claim Form are true and accurate to the best of my
personal knowledge.  I understand that making a knowingly false statement may subject me to
prosecution for perjury.

Date: _____        _____
                                                  Signature of Claimant

Your Claim Form must be postmarked on or before _____.
A self-addressed envelope has been enclosed for returning the Claim Form.  This Claim Form
must be mailed to:

<u>Amochaev, et al. v. Smith Barney Claims Administrator</u>

P.O. Box 10564

Tallahassee, FL  32302-2564

- 3 -

# EXHIBIT B

## RELEASE AND INDEMNIFICATION AGREEMENT
## (CLASS MEMBERS, EXCLUDING NAMED PLAINTIFFS)

In consideration of my receipt of a court-approved monetary distribution from the Settlement Fund in *Amochaev, et al*. v. *Citigroup Global Markets, Inc. d/b/a Smith Barney*, Case No. C-05-1298, I hereby agree to be bound by the terms of this Release and Indemnification Agreement (the "Agreement"), as follows:

## I.      DEFINITIONS

Unless otherwise specified in this Agreement, the terms used herein shall have the same meanings as those set forth in the Settlement Agreement.

## II.     LIMITED RELEASE OF CLAIMS

I hereby waive, release and discharge Citigroup Global Markets Inc., d/b/a Smith Barney ("Smith Barney"), including its officers, directors, subsidiaries, affiliates, predecessors, successors, fiduciaries, insurers, employees, attorneys and agents ("Released Parties"), from any and all claims, known and unknown, that I have or may have arising at any time on or before April 30, 2008, for gender discrimination against the Released Parties, with the exception of claims for non-economic damages (such as emotional pain, distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-economic losses) that arise from sexual harassment (as that term is defined in 29 C.F.R. § 1604.11(a)).  By way of example only, and without any intent to limit the scope of the preceding release, this release would bar a claim for loss of compensation of any type or description (including but not limited to commissions, salary, bonuses, deferred compensation and incentive awards) arising from or relating to any type of sex or gender discrimination (including but not limited to sexual harassment), but would not bar a claim of emotional distress, costs of medical treatment, or other such non-economic compensatory damages arising from or related to sexual harassment.  I understand that my release includes all related claims for monetary damages, injunctive, declaratory or equitable relief, and costs and attorneys' fees, whether arising under Title VII of the Civil Rights Act of 1964, as amended, or any other federal, state, local or common laws or regulations.

I understand that my release does not include other claims of discrimination such as claims of race, age, or national origin discrimination, or claims arising under the Fair Labor Standards Act or the Employment Retirement Income Security Act.

## III.    INDEMNIFICATION

I understand that I am responsible for payment of any and all federal, state or local taxes (excluding the employer share of employment taxes and unemployment taxes and excluding amounts properly withheld from the distributions) resulting from or attributable to the distributions that I receive.  Accordingly, I agree to indemnify and hold harmless the Released Parties, Class Counsel, and the Depository Bank from any tax liability, including penalties and interest and costs of any proceedings.  I further agree to indemnify and hold harmless the Claims Administrator and Trustee of the Settlement

Fund from any tax liability, including penalties and interests and costs of any proceedings, that is attributable to my own acts or omissions.  In the event a tax liability arises with respect to my monetary award that is not attributable to my own acts or omissions, I agree to indemnify and hold harmless the Claims Administrator and Trustee of the Settlement Fund from any tax liability only to the extent of the taxes due and payable, but not with respect to penalties and interest, or the costs of any proceedings related to such tax liability.

## IV.     OTHER AGREEMENTS AND REPRESENTATIONS

A.     <u>Confidentiality</u>.  I agree to keep the amount of any and all distributions I receive from the Settlement Fund strictly confidential to the fullest extent permitted by law, except that I may disclose the same to my attorneys, tax advisors and immediate family members.

B.     <u>Ownership of Claims</u>.  I represent and warrant that I have not assigned or transferred any claim I am purporting to release, nor have I attempted to do so.

C.     <u>Entire Agreement</u>.  This Agreement may not be modified in any manner, except by a writing signed by both me and an authorized Smith Barney attorney.   I acknowledge that Smith Barney has made no representations or promises to me, other than those in or referred to by this Agreement and the Settlement Agreement.

D.     <u>Successors and Assigns</u>.  This release binds my heirs, administrators, representatives, executors, successors, and assigns.

E.     <u>Interpretation</u>.  This Agreement shall be construed as a whole according to its fair meaning.  Unless the context indicates otherwise, the term "or" shall be deemed to include the term "and" and the singular or plural number shall be deemed to include the other.  This Agreement shall be governed by the statutes and common law of the State of California (excluding any that mandate the use of another jurisdiction's laws).

F.     <u>Knowing and Voluntary Waiver and Release of Claims</u>.   I understand and agree that:

1.     I am entering into this Agreement knowingly and voluntarily;

2.     I understand the terms of this Agreement;

3.     I have been advised of my right to consult with an attorney prior to signing this Agreement; and

-2-

756274.2

4.      I have had a sufficient amount of time to consider this Agreement before signing it.


AGREED:


_____

[SIGNATURE]


_____

[PRINT NAME]


_____

DATE

756274.2

# EXHIBIT C

## GENERAL RELEASE AND INDEMNIFICATION AGREEMENT
## (NAMED PLAINTIFFS)

In consideration of my receipt of a court-approved monetary distribution from the Settlement Fund in *Amochaev, et al.* v. *Citigroup Global Markets, Inc. d/b/a Smith Barney*, Case No. C-05-1298 (the "Litigation"), I hereby agree to be bound by the terms of this General Release and Indemnification Agreement (the "Agreement"), as follows:

## I.      DEFINITIONS

Unless otherwise specified in this Agreement, the terms used herein shall have the same meanings as those set forth in the Settlement Agreement.

## II.     COMPLETE GENERAL RELEASE OF CLAIMS

I hereby waive, release, discharge, and covenant not to sue Citigroup Global Markets Inc., d/b/a Smith Barney ("Smith Barney"), including its officers, directors, subsidiaries, affiliates, predecessors, successors, fiduciaries, insurers, employees, attorneys and agents ("Released Parties"), from and with respect to any and all actions, causes of action, suits, liabilities, claims, and demands whatsoever, and each of them, whether known or unknown, from the beginning of time until March 1, 2008, 2008.  I intend this release to be general and comprehensive in nature and to release all claims and potential claims against the Released Parties to the maximum extent permitted by law. Claims I am releasing include specifically, by way of description, but not by way of limitation, any and all claims: (i) arising out of or relating in any way to the alleged facts, circumstances and occurrences underlying the allegations of violations of Title VII and similar state and local laws that were asserted or could have been asserted in the Litigation by me or on my behalf; (ii) arising out of or relating in any way to the alleged facts, circumstances and occurrences underlying the allegations of violations of Title VII and similar state and local laws that were asserted or could have been asserted by me or on my behalf in a charge of discrimination filed against the Released Parties with the EEOC and/or state agencies; (iii) relating to the termination of my employment (if applicable); (iv) arising out of or in any way related to any federal, state, or local law prohibiting discrimination on the basis of age, race, color; religion, disability, sex, national origin, or citizenship, including, without limitation, claims under Title VII, the Employee Retirement Income Security Act, the Age Discrimination in Employment Act, and the Americans With Disabilities Act or any other similar statutes whatever the country of enactment; and (v) arising out of or in any way related to any transactions, occurrences, acts, statements, disclosures, or omissions occurring prior to March 1, 2008. I understand that this release includes all related claims for monetary damages, injunctive, declaratory or equitable relief, and costs and attorneys' fees, whether arising under Title VII or any other federal, state, local or common laws or regulations.

## III.    ADEA WAIVER.

I recognize that in addition to all other claims being released herein, I am releasing claims for age discrimination under the Age Discrimination in Employment

Act.  Accordingly, I have the right to reflect on this Agreement for a period of twenty-one (21) days before executing it, and I have an additional seven (7) days after executing it to revoke it under the terms of the Older Workers Benefit Protection Act.  This Agreement will become effective and enforceable seven (7) days following the execution of this Agreement, unless it is revoked during the seven (7) day period, in which case this Agreement will be ineffective and unenforceable.  By my signature below, I represent and warrant that I have been advised of these rights, that I have been advised that I have a right to consult with an attorney, and that I have discussed them with my attorney to the fullest extent I thought necessary.  I intend this to be a fully binding and enforceable release of all claims, including claims under the Age Discrimination in Employment Act.

## IV.      INDEMNIFICATION

I understand that I am responsible for payment of any and all federal, state or local taxes (excluding the employer share of employment taxes and unemployment taxes and excluding amounts properly withheld from the distributions) resulting from or attributable to the distributions that I receive.  Accordingly, I agree to indemnify and hold harmless the Released Parties, Class Counsel, and the Depository Bank from any tax liability, including penalties and interest and costs of any proceedings.  I further agree to indemnify and hold harmless the Claims Administrator and Trustee of the Settlement Fund from any tax liability, including penalties and interests and costs of any proceedings, that is attributable to my own acts or omissions.  In the event a tax liability arises with respect to my monetary award that is not attributable to my own acts or omissions, I agree to indemnify and hold harmless the Claims Administrator and Trustee of the Settlement Fund from any tax liability only to the extent of the taxes due and payable, but not with respect to penalties and interest, or the costs of any proceedings related to such tax liability.

## V.      OTHER AGREEMENTS AND REPRESENTATIONS

A.      <u>Confidentiality</u>.  I agree to keep the amount of any and all distributions I receive from the Settlement Fund strictly confidential to the fullest extent permitted by law, except that I may disclose the same to my attorneys, tax advisors and immediate family members.

B.      <u>Pursuit of Released Claims</u>.  Except for the Litigation, and any administrative charges filed with respect to the claims asserted therein, I represent and warrant that I have not filed or caused to be filed any lawsuit or complaint with respect to any claim that I am releasing herein, and I promise never to file or prosecute a lawsuit or complaint based on such claims.  I promise never to seek any damages, remedies, or other relief for myself personally (any right to which I hereby waive) by filing or prosecuting a charge with any administrative agency with respect to any such claim.

C.      <u>Ownership of Claims</u>.  I represent and warrant that I have not assigned or transferred any claim I am purporting to release, nor have I attempted to do so.

D.      <u>Entire Agreement</u>.  This Agreement may not be modified in any manner, except by a writing signed by both me and an authorized Smith Barney attorney.  I

acknowledge that Smith Barney has made no representations or promises to me, other than those in or referred to by this Agreement and the Settlement Agreement.

       E.     <u>Successors and Assigns</u>.  This release binds my heirs, administrators, representatives, executors, successors, and assigns.

       F.     <u>Interpretation</u>.  This Agreement shall be construed as a whole according to its fair meaning.  Unless the context indicates otherwise, the term "or" shall be deemed to include the term "and" and the singular or plural number shall be deemed to include the other.  This Agreement shall be governed by the statutes and common law of the State of California (excluding any that mandate the use of another jurisdiction's laws).

AGREED:

_____
[SIGNATURE]


_____
[PRINT NAME]


_____
DATE

# EXHIBIT B

# LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

*Embarcadero Center West*
*275 Battery Street, 30th Floor*
*San Francisco, CA  94111-3339*
*Telephone:  (415) 956-1000*
*Facsimile:  (415) 956-1008*

*780 Third Avenue*
*48th Floor*
*New York, NY  10017-2024*
*Telephone:  (212) 355-9500*
*Facsimile:  (212) 355-9592*

*One Nashville Place*
*150 Fourth Avenue North, Suite 1650*
*Nashville, TN  37219-2415*
*Telephone:  (615) 313-9000*
*Facsimile:  (615) 313-9965*

*E-mail:  mail@lchb.com*
*Website:  www.lieffcabraser.com*

## FIRM PROFILE:

Lieff Cabraser Heimann & Bernstein, LLP, is a fifty-plus attorney, AV-rated law firm founded in 1972 with offices in San Francisco, New York and Nashville.  Lieff Cabraser has a diversified practice, successfully representing plaintiffs in the fields of personal injury and mass torts, securities and investment fraud, employment discrimination and unlawful employment practices, product defect, antitrust, consumer protection, aviation, environmental and toxic exposure, and human rights.  Our clients include individuals, classes or groups of persons, businesses, and public and private entities.

Lieff Cabraser has served as court-appointed Plaintiffs' Lead or Class Counsel in state and federal coordinated, multi-district, and complex litigation throughout the United States. With co-counsel, we have represented clients across the globe in cases filed in American courts. We have litigated and resolved thousands of individual lawsuits and hundreds of class and group actions, including some of the most important civil cases in the United States over the last decade.

Lieff Cabraser is among the largest firms in the United States that only represent plaintiffs.  Described by *The American Lawyer* as "one of the nation's premier plaintiffs' firms," Lieff Cabraser enjoys a national reputation for professional integrity and the successful prosecution of our clients' claims. We possess sophisticated legal skills and the financial resources necessary for the handling of large, complex cases, and for litigating against some of the nation's largest corporations.  We take great pride in the leadership roles our firm plays in many of this country's major cases, including those resulting in landmark decisions and precedent-setting rulings.

In the 2007 edition of its annual list of the plaintiffs' law firms "doing the most to shape the law," *The National Law Journal* selected Lieff Cabraser as one of the nation's top plaintiffs' firms. Lieff Cabraser was also a member of *The National Law Journal*'s Plaintiffs' "Hot List" from 2003 through 2006.  We are one of only two plaintiffs' law firms in the nation to receive this award the last five years.

80577.1

*CASE PROFILES:*

## A.    Personal Injury and Products Liability Litigation

Lieff Cabraser has obtained over $400 million in verdicts, judgments and settlements for our clients in individual personal injury and wrongful death lawsuits.  Since 1995, and working with co-counsel, we have achieved verdicts, judgments and settlements in excess of $10 billion in product liability class action lawsuits.

We only represent plaintiffs.  In many of these cases, we assisted our clients in persuading the corporate defendants to issue recalls or improve their safety procedures for the protection of all consumers and patients.  Currently, we are prosecuting scores of lawsuits involving injuries and deaths from all types of negligent conduct, manufacturing errors and design defects.  Our cases range from vehicle and aviation accidents to faulty medical devices. We also represent  patients prescribed drugs with dangerous, undisclosed side effects and consumers sickened by contaminated food products.

Our successful personal injury and products liability cases, with the exception of aviation cases which are profiled separately, include:

1.    ***Individual Vehicle Injury Lawsuits.***  Lieff Cabraser has an active practice prosecuting claims for clients injured, or the families of loved ones who have died, by the wrongful conduct of other drivers or due to unsafe and defective vehicles, tires and other automotive equipment.  We are representing clients in actions involving fatalities and serious injuries due to rollover accidents of fifteen passenger vans and sports utility vehicles. Plaintiffs allege that the vans and SUVs were defectively designed because they pose an unreasonable risk of rollover during foreseeable driving conditions.

We also represent clients in many other vehicle cases including ones where defective cruise control switches resulted in fires and transmission defects that caused the vehicle to shifted suddenly from park into reverse. In March 2007, in *Mraz v. DaimlerChrysler*, No. BC 332487 (Cal.  Supr. Ct.), we obtained a $54.4 million verdict, including $50 million in punitive damages, against DaimlerChrysler for intentionally failing to cure a known defect in millions of its vehicles that led to the death of Richard Mraz, a young father.  Mr. Mraz suffered fatal head injuries when the 1992 Dodge Dakota pickup truck he had been driving at his work site ran him over after he exited the vehicle believing it was in park.  The jury found that a defect in the Dodge Dakota's automatic transmission, called a park-to-reverse defect, played a substantial factor in Mr. Mraz's death and that DaimlerChrysler was negligent in the design of the vehicle for failing to warn of the defect and then for failing to adequately recall or retrofit the vehicle.

In litigation against Yamaha Motor Company, our clients suffered serious injuries due to an alleged design defect in the Yamaha Rhino.  The complaints charge that the Rhino is dangerously unstable.  Even during turns on flat surfaces at slow speeds, the Rhino has rolled over because it is top heavy, narrow, and the tires are too small.

2.     ***Multi-State Tobacco Litigation***.  Lieff Cabraser represented the Attorneys' General of Massachusetts, Louisiana and Illinois, several additional states, and 18 cities and counties in California, in litigation against Philip Morris, R.J. Reynolds and other cigarette manufacturers. The suits were part of the landmark $206 billion settlement announced in November 1998 between the tobacco industry and the states' attorneys general.  The states, cities and counties sought both to recover the public costs of treating smoking-related diseases and require the tobacco industry to undertake extensive modifications of its marketing and promotion activities in order to reduce teenage smoking.  In California alone, Lieff Cabraser's clients were awarded an estimated $12.5 billion to be paid over the next 25 years.

3.     ***Fen-Phen ("Diet Drugs") Litigation.***  Lieff Cabraser represents individuals pursuing personal injury claims due to injuries from the "Fen-Phen" diet drugs fenfluramine (sold as Pondimin) and/or dexfenfluramine (sold as Redux).  We served as counsel for the plaintiff that filed the first nationwide class action lawsuit against the diet drug manufacturers alleging that they had failed to adequately warn physicians and consumers of risks associated with the drugs.  Since the recall was announced in 1997, Lieff Cabraser has represented over 400 persons in individual actions who have suffered heart and/or lung damage, most often consisting of cardiac valve damage and/or Primary Pulmonary Hypertension, after ingesting Pondimin or Redux.  In *In re Diet Drugs (Phentermine / Fenfluramine / Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D.  Pa.), the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Management Committee which organized and directed the Fen-Phen diet drugs litigation filed across the nation in federal courts.  In August 2000, the Court approved a $4.75 billion settlement offering both medical monitoring relief for persons exposed to the drug and compensation for persons with qualifying damage.  Lieff Cabraser also served on the Plaintiffs' Executive Committee in the California Coordinated Proceedings in California state court, and as class counsel in the State of Washington certified medical monitoring action.

4.     ***In re ConAgra Peanut Butter Products Liability Litigation***, MDL No. 1845 (N.D. Ga.).  In September 2007, the federal court appointed Elizabeth Cabraser as Plaintiffs' Lead Counsel in the litigation arising out of the recall of Peter Pan and Great Value peanut butter.  Tens of thousands of consumers nationwide contracted *Salmonella* poisoning from eating contaminated peanut butter produced at a single ConAgra plant in

Sylvester, Georgia.  In February 2007, the FDA confirmed the presence of *Salmonella* in opened jars of Peter Pan and Great Value peanut butter obtained from inflected persons.

5.     ***In re Vioxx Products Liability Litigation***, MDL No. 1657 (E.D. La.). Lieff Cabraser represents patients that suffered heart attacks or strokes, and the families of loved ones who died, after having being prescribed the arthritis and pain medication Vioxx. In individual personal injury lawsuits against Merck, the manufacturer of Vioxx, our clients allege that Merck falsely promoted the safety of Vioxx and failed to disclose the full range of the drug's dangerous side effects.  In April 2005, in the federal multidistrict litigation, the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Steering Committee, which has the responsibility of conducting all pretrial discovery of Vioxx cases in Federal court and pursuing all settlement options with Merck.  In August 2006, Lieff Cabraser was co-counsel in *Barnett v. Merck*, tried in the federal Court in New Orleans. Lieff Cabraser attorneys Don Arbitblit and Jennifer Gross participated in the trial, working closely with attorneys Mark Robinson and Andy Birchfield. The jury reached a verdict in favor of Mr. Barnett, finding that Vioxx caused his heart attack, and that Merck's conduct justified an award of punitive damages.  In November 2007, Merck announced that it has entered into an agreement with the executive committee of the Plaintiffs' Steering Committee as well as representatives of plaintiffs' counsel in state coordinated proceedings. Merck will pay a fixed amount of $4.85 billion into a settlement fund for qualifying claims already filed against Merck.

6.     ***In re ReNu With MoistureLoc Contact Lens Solution Products Liability Litigation***, MDL No. 1785 (D. S.C.).  Lieff Cabraser partner Wendy R. Fleishman serves on Plaintiffs' Executive Committee in litigation in federal court arising out of Bausch & Lomb's recall in 2006 of its product ReNu with MoistureLoc. Consumers nationwide allege that the contact lens solution caused *Fusarium keratitis*, a rare and dangerous fungal eye infection , as well as other serious eye infections because the solution failed to disinfect and cleanse contact lenses, contrary to its claims.  Many contact lens wearers were forced to undergo painful corneal transplant surgery to save their vision; others have lost all or part of their vision permanently.

7.     ***In re Guidant Implantable Defibrillators Products Liability Litigation***, MDL No. 1708.  Lieff Cabraser serves on the Plaintiffs' Lead Counsel Committee in litigation in federal court arising out of the recall of Guidant cardiac defibrillators implanted in patients because of potential malfunctions in the devices.  At the time of the recall, Guidant admitted it was aware of 43 reports of device failures, and two patient deaths. Guidant subsequently acknowledged that the actual rate of failure may be higher than the reported rate and that the number of associated deaths may be underreported, since implantable cardio-defibrillators are not routinely

evaluated after death.  In 2007, the parties reached a global settlement of the action.  Guidant's settlements of defibrillator-related claims will total $240 million.

8.   ***Fallquist et al. v. Advanced Medical Optics and Allergan,*** No. SC 096041 (Los Angeles Super. Ct.); ***Martin et al v. Advanced Medical Optics and Allergan,*** No. KC 051267H (Los Angeles Super. Ct.). Lieff Cabraser represents 20 consumers nationwide in two separate consolidated personal injury lawsuits filed against Advanced Medical Optics in August and November of 2007. AMO's Complete MoisturePlus Multi Purpose Contact Lens Solution was recalled in May 2007 due to reports of a link between a rare, but serious eye infection, *Acanthamoeba keratitis*, caused by a parasite and use of AMO's contact lens solution.  Plaintiffs charge that though AMO aggressively promoted Complete MoisturePlus Multi Purpose as "effective against the introduction of common ocular microorganisms," the lens solution was ineffective and vastly inferior to other multipurpose solutions on the market.  Plaintiffs were forced to undergo painful corneal transplant surgery to save their vision and some have lost all or part of their vision permanently.

9.   ***Luisi et al. v. Medtronic Inc.***, No. 07 CV 4250 (D. Minn.). Lieff Cabraser currently represents over a hundred heart patients nationwide who were implanted with recalled Sprint Fidelis defibrillator leads manufactured by Medtronic Inc.  Plaintiffs charge that Medtronic has misrepresented the safety of the Sprint Fidelis leads and a defect in the device triggered their receiving massive, unnecessary electrical shocks.

10.   ***In re Bextra/Celebrex Marketing Sales Practices and Products Liability Litigation***, MDL 1699.  Lieff Cabraser serves as Plaintiffs' Liaison Counsel to oversee and direct all personal injury and consumer litigation now pending in Federal courts nationwide arising out of the sale and marketing of the COX-2 inhibitors Bextra, Celebrex, and Parecoxib manufactured by Pfizer, Inc and its predecessor companies Pharmacia Corporation and G.D. Searle, Inc.  In this ongoing litigation, over 2,500 individuals have brought personal injury claims, and hundreds more individuals and institutions allege that Bextra, Celebrex, and Percoxib were marketed deceptively.  In addition to serving as Liaison Counsel, Lieff Cabraser is also directly representing patients injured by Bextra, Celebrex, and Parecoxib.

11.   ***Blood Factor VIII And Factor IX Litigation.***  Working with counsel in Asia, Europe, Central and South America and the Middle East, Lieff Cabraser represents hundreds of hemophiliacs worldwide, or their survivors and estates, who contracted HIV and/or Hepatitis C (HCV), and Americans with hemophilia who contracted HCV, from contaminated and defective blood factor products produced by American pharmaceutical companies.  In 2004, Lieff Cabraser was appointed Plaintiffs' Lead

Counsel of the "second generation" Blood Factor MDL litigation presided over by Judge Grady in the Northern District of Illinois. This groundbreaking litigation follows upon a two-month trial directed by Richard M. Heimann in 2003 in California state court on behalf of a person with hemophilia who is HIV-positive.

12. **Sulzer Hip and Knee Implants Litigation.** In December 2000, Sulzer Orthopedics, Inc., announced the recall of approximately 30,000 units of its Inter-Op Acetabular Shell Hip Implant, followed in May 2001 with a notification of failures of its Natural Knee II Tibial Baseplate Knee Implant. In coordinated litigation in California state court, *In re Hip Replacement Cases*, JCCP 4165, Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Co-Lead Counsel. In the federal litigation, *In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, MDL 1410, Lieff Cabraser played a significant role in negotiating a revised settlement with Sulzer valued at more than $1 billion. In May 2002, the Court granted final approval to the revised settlement. Lieff Cabraser serves as Class Counsel for Subclass V of the settlement (class members with unrevised reprocessed Inter-Op shells).

13. **In re Baycol Products Litigation**, MDL No. 1431 (D. Minn.). Baycol was one of a group of drugs called statins, intended to reduce cholesterol. In August 2001, Bayer A.G. and Bayer Corporation, the manufacturers of Baycol, withdrew the drug from the worldwide market based upon reports that Baycol was associated with serious side effects and linked to the deaths of over 100 patients worldwide. In the federal multi-district litigation, Lieff Cabraser serves as a member of the Plaintiffs' Steering Committee (PSC) and the Executive Committee of the PSC. In addition, Lieff Cabraser represented approximately 200 Baycol patients who have suffered injuries or family members of patients who died allegedly as a result of ingesting Baycol. In these cases, our clients reached confidential favorable settlements with Bayer.

14. **In re Silicone Gel Breast Implants Products Liability Litigation**, MDL No. 926 (N.D. Ala.). Lieff Cabraser serves on the Plaintiffs' Steering Committee and was one of five members of the negotiating committee which achieved a $4.25 billion global settlement with certain defendants of the action. This was renegotiated in 1995, and is referred to as the Revised Settlement Program ("RSP"). Over 100,000 recipients have received initial payments, reimbursement for the explantation expenses and/or long term benefits.

15. **In re Telectronics Pacing Systems Inc., Accufix Atrial "J" Leads Products Liability Litigation**, MDL No. 1057 (S.D. Ohio). Lieff Cabraser served on the court-appointed Plaintiffs' Steering Committee in a nationwide products liability action alleging that defendants placed into the stream of commerce defective pacemaker leads. In April 1997, the

district court re-certified a nationwide class of "J" Lead implantees with subclasses for the claims of medical monitoring, negligence and strict product liability.  A summary jury trial utilizing jury instructions and interrogatories designed by Lieff Cabraser occurred in February 1998.  A partial settlement was approved thereafter by the district court, but reversed by the Court of Appeals.  In March 2001, the district court approved a renewed settlement that included a $58 million fund to satisfy all past, present and future claims by patients for their medical care, injuries, or damages arising from the lead.

16.  ***In re Felbatol Products Liability Litigation,*** MDL No. 1048 (N.D. Cal.). Lieff Cabraser served as Co-Lead Class Counsel and Plaintiffs' Liaison Counsel in this nationwide litigation asserting medical monitoring, compensatory and punitive damages claims on behalf of 100,000 users of the anti-epilepsy drug Felbatol, who alleged present and potential injuries from its serious adverse effects, including liver failure and aplastic anemia.  The nationwide Plaintiff class was certified in 1995; certification was vacated for further findings by the Ninth Circuit in *Valentino v. Carter-Wallace*, 97 F.3d 1277 (9th Cir. 1996), which affirmed the viability of nationwide mass tort class actions.  In 1997, the litigation was settled favorably on behalf of all major injury claimants.

17.  ***In re Cordis Pacemaker Product Liability Litigation***, MDL No. 850 (S.D. Ohio).  Lieff Cabraser represented a certified nationwide class of Cordis pacemaker recipients on personal injury, emotional distress, fraud, equitable relief, and pacemaker explant compensation claims. In 1995, shortly before trial, Lieff Cabraser negotiated and obtained Court approval of a $21 million settlement of the action.

18.  ***In re Copley Pharmaceutical, Inc., "Albuterol" Products Liability Litigation***, MDL  No. 1013 (D. Wyo.).  Lieff Cabraser served on the Plaintiffs' Steering Committee in a class action lawsuit against Copley Pharmaceutical, which manufactured Albuterol, a bronchodilator prescription pharmaceutical.  Albuterol was the subject of a nationwide recall in January 1994 after a microorganism was found to have contaminated the solution, allegedly causing numerous injuries including bronchial infections, pneumonia, respiratory distress and, in some cases, death.  In October 1994, the district court certified a nationwide class on liability issues.  *In re Copley Pharmaceutical*, 161 F.R.D.  456 (D. Wyo. 1995).  In November 1995, the district court approved a $150 million settlement of the litigation.

**B.**   **Securities and Investment Fraud**

1.   ***In re Scorpion Technologies, Inc. Securities Litigation I***, No. C-93-20333-EAI (N.D. Cal.); ***Dietrich v. Bauer***, No. C-95-7051-RWS (S.D.N.Y.); ***Claghorn v. Edsaco***, No. 98-3039-SI (N.D. Cal.).  Lieff

Cabraser served as Co-Lead Counsel in class action suits arising out of an alleged fraudulent scheme by Scorpion Technologies, Inc., certain of its officers, accountants, underwriters and business affiliates to inflate the company's earnings through reporting fictitious sales.  In *Scorpion I*, the Court found plaintiffs had presented sufficient evidence of liability under Federal securities acts against the accounting firm Grant Thornton for the case to proceed to trial.  *In re Scorpion Techs.*, 1996 U.S. Dist. LEXIS 22294 (N.D. Cal. Mar. 27, 1996).  In 1988, the court approved a $5.5 million settlement with Grant Thornton.  In 2000, the Court approved a $950,000 settlement with Credit Suisse First Boston Corporation.  In April 2002, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd.  The jury found that Edsaco aided Scorpion in setting up phony European companies as part of scheme in which Scorpion reported fictitious sales of its software to these companies, thereby inflating its earnings.  Included in the jury verdict, one of the largest verdicts in a securities fraud suit in the U.S. in 2002, was $165 million in punitive damages.  Richard M. Heimann conducted the trial for plaintiffs.

Following the *Edsaco* trial, the parties reached a settlement of the action on favorable monetary terms to the class, which included Edsaco's relinquishment of its right to appeal and the plaintiff's agreement to vacate the jury verdict.  On June 14, 2002, U.S. District Court Judge Susan Illston commented on Lieff Cabraser's representation:  "[C]ounsel for the plaintiffs did a very good job in a very tough situation of achieving an excellent recovery for the class here.  You were opposed by extremely capable lawyers.  It was an uphill battle.  There were some complicated questions, and then there was the tricky issue of actually collecting anything in the end.  I think based on the efforts that were made here that it was an excellent result for the class… [T]he recovery that was achieved for the class in this second trial is remarkable, almost a hundred percent."

2.   ***Merrill Lynch Fundamental Growth Fund and Merrill Lynch Global Value Fund, Inc., v. McKesson HBOC, Inc., et al.,*** No. 02-405792 (Cal. Supr. Ct.).  Lieff Cabraser served as counsel for two Merrill Lynch mutual funds in a private lawsuit filed alleging that a massive accounting fraud occurred at HBOC & Company ("HBOC") before and following its 1999 acquisition by McKesson Corporation ("McKesson").  The funds charged that defendants, including the former CFO of McKesson HBOC, the name McKesson adopted after acquiring HBOC, artificially inflated the price of securities in McKesson HBOC, through misrepresentations and omissions concerning the financial condition of HBOC, resulting in approximately $150 million in losses for plaintiffs.  In a significant discovery ruling in 2004, the California Court of Appeal held that defendants waived the attorney-client and work product privileges in regard to an audit committee report and interview memoranda prepared in anticipation of shareholder lawsuits by disclosing the information to the U.S.  Attorney

and SEC.  *McKesson HBOC, Inc. v. Supr. Court*, 115 Cal. App. 4th 1229 (2004).  In October 2005, the parties entered into a settlement on favorable terms to Merrill Lynch Funds.

3.   ***Alaska State Department of Revenue, et al. v. America Online, Inc., et al.***, No. 1JU-04-503 (Alaska Supr. Ct.).  In December 2006, a $50 million settlement was reached in a securities fraud action brought by the Alaska State Department of Revenue, Alaska State Pension Investment Board and Alaska Permanent Fund Corporation against defendants America Online, Inc. ("AOL"), Time Warner Inc. (formerly known as AOL Time Warner ("AOLTW")), Historic TW Inc.  When the action was filed, the Alaska Attorney General estimated the losses at $70 million.  The lawsuit, filed in 2004 in Alaska State Court, alleged that defendants misrepresented advertising revenues and growth of AOL and AOLTW along with the number of AOL subscribers, all of which was intended to, and did, artificially inflate the stock price of AOL and AOLTW to the detriment of Alaska State funds.

The Alaska Department of Law retained Lieff Cabraser to lead the litigation efforts under its direction.  "We appreciate the diligence and expertise of our counsel in achieving an outstanding resolution of the case," said Mark Morones, spokesperson for the Department of Law, following announcement of the settlement.

4.   ***In re Qwest Communications International, Inc. Securities and "ERISA" Litigation (No. II),*** No. 06-cv-17880-REB-PAC (MDL No.1788) (D. Colo.).  We represent the New York State Common Retirement Fund, Fire and Police Pension Association of Colorado, Denver Employees' Retirement Plan, San Francisco Employees' Retirement System, and over thirty separate mutual funds in individual securities fraud actions filed in federal court against Qwest Communications International, Inc., Philip F.  Anschutz, former co-chairman of the Qwest board of directors and other senior executives at Qwest as well as Arthur Andersen LLP.  In each action, defendants are charged with significantly overstating Qwest's publicly-reported growth, revenues, earnings, and earnings per share from 1999 through 2002. Defendants' unlawful conduct served to maintain Qwest's common share price at artificially high levels and enabled the individual defendants to sell Qwest common shares at inflated values.

5.   ***In re Broadcom Corporation***, No. CV 06-3252-R (C.D. Cal.).  Lieff Cabraser serves as court-appointed Lead Counsel in a stockholders' derivative action against the board of directors of Broadcom Corporation. The suit alleges defendants intentionally manipulated their stock option grant dates between 1997 and at least the end of 2002 in order to enrich themselves at the expense of Broadcom and Broadcom shareholders. Defendants made it appear as if stock options were granted earlier than

they actually were in order to maximize the value of the grant.  By making it seem as if stock option grants occurred on dates when Broadcom stock was trading at a comparatively low per share price, Broadcom executives were able to exercise their stock option grants at exercise prices that were lower than the fair market value of Broadcom stock on the day the options were actually granted.

6.     ***In re Brooks Automation, Inc. Securities Litigation***, No. 06 CA 11068 (D. Mass.).  Lieff Cabraser serves as Court-Appointed Lead Counsel for Lead Plaintiff the Los Angeles County Employees Retirement Association in a class action lawsuit on behalf of all persons who purchased securities of Brooks Automation between July 25, 2001 and May 22, 2006.  Plaintiff charges that Brooks Automation, its senior corporate officers and directors violated federal securities laws by participating in a scheme to backdate Brooks Automation stock options over a six year period for the purpose of increasing the value of the stock options.

7.     ***In re Cablevision Systems Corp. Shareholder Derivative Litig.***, No. 06-cv-4130-DGT-AKT (E.D.N.Y.).  Lieff Cabraser serves as Co-Lead Counsel in a stockholders' derivative action against the board of directors of Cablevision.  The suit alleges defendants intentionally manipulated their stock option grant dates between 1997 and 2002 in order to enrich themselves at the expense of Cableivision and Cablevision shareholders.  Defendants made it appear as if stock options were granted earlier than they actually were in order to maximize the value of the grant.  By making it seem as if stock option grants occurred on dates when Cablevision stock was trading at a comparatively low per share price, Cablevision executives were able to exercise their stock option grants at exercise prices that were lower than the fair market value of Cablevision stock on the day the options were actually granted.

8.     ***BlackRock Global Allocation Fund, Inc., et al. v. Tyco International Ltd., et al.***, Case No. 2:08-cv-519 (D. N.J.); ***Nuveen Balanced Municipal and Stock Fund, et al. v. Tyco International Ltd., et al.***, Case No. 2:08-cv-518 (D. N.J.).  Lieff Cabraser represents multiple funds of the investment firms BlackRock Inc. and Nuveen Asset Management in separate, direct securities fraud actions against Tyco International Ltd., Tyco Electronics Ltd., Covidien Ltd, Covidien (U.S.), L. Dennis Kozlowski, Mark H. Swartz, and Frank E. Walsh, Jr. Plaintiffs allege that defendants engaged in a massive criminal enterprise that combined the theft of corporate assets with fraudulent accounting entries that concealed Tyco's financial condition from investors. As a result, Plaintiffs purchased Tyco common stock and other Tyco securities at artificially inflated prices and suffered losses upon disclosures revealing Tyco's true financial condition and defendants' misconduct.

9.      ***Albert, et al. v. Alex. Brown Management Services, Inc., et al.; Baker , et al. v. Alex. Brown Management Services, Inc., et al.*** (Del. Supr. Ct.). In May 2004, on behalf of investors in two investment funds controlled, managed and operated by Deutsche Bank and advised by DC Investment Partners, Lieff Cabraser filed lawsuits for alleged fraudulent conduct that resulted in an aggregate loss of hundreds of millions of dollars.  The suits name as defendants Deutsche Bank and its subsidiaries Alex Brown Management Services and Deutsche Bank Securities, members of the funds' management committee, as well as DC Investments Partners and two of its principles.  Among the plaintiff-investors are 70 high net worth individuals.

10.     ***Kofuku Bank Ltd.  and Namihaya Bank Ltd. v. Republic New York Securities Corp., et al.***, No. 00 CIV 3298 (S.D.N.Y.); and ***Kita Hyogo Shinyo-Kumiai v. Republic New York Securities Corp., et al.***, No. 00 CIV 4114 (S.D.N.Y.).  Lieff Cabraser represented Kofuku Bank, Namihaya Bank and Kita Hyogo Shinyo-Kumiai (a credit union) in individual lawsuits against, among others, Martin A. Armstrong and HSBC, Inc., the successor-in-interest to Republic New York Corporation, Republic New York Bank and Republic New York Securities Corporation for alleged violations of federal securities and racketeering laws.  Through a group of interconnected companies owned and controlled by Armstrong – the Princeton Companies – Armstrong and the Republic Companies promoted and sold promissory notes, known as the "Princeton Notes," to more than eighty of the largest companies and financial institutions in Japan.  Lieff Cabraser's lawsuits, as well as the lawsuits of dozens of other Princeton Note investors, alleged that the Princeton and Republic Companies made fraudulent misrepresentations and non-disclosures in connection with the promotion and sale of Princeton Notes, and that investors' moneys were commingled and misused to the benefit of Armstrong, the Princeton Companies and the Republic Companies.  In December 2001, the claims of our clients and those of the other Princeton Note investors were settled.  As part of the settlement, our clients recovered more than $50 million, which represented 100% of the value of their principal investments less money they received in interest or other payments.

11.     ***Lehman Brothers/First Alliance Mortgage Litigation***,  No. SA CV 01-971 (C.D. Cal.).  On June 16, 2003, a federal jury in California held Lehman Brothers, Inc., liable for knowingly assisting First Alliance Mortgage Corporation in committing fraud.  First Alliance was accused of misrepresenting the true cost of home loans and of charging borrowers as much as 24% in loan origination and other fees.  The jury found that First Alliance systematically defrauded borrowers, and that Lehman Brothers aided and abetted the fraudulent scheme.  The verdict showed that the community will hold Wall Street responsible for knowingly serving as a

financial backer to abusive lenders.  The Ninth Circuit Court of Appeals affirmed class wide liability against Lehman Brothers.

12.   ***Allocco, et al. v. Gardner, et al.***, No. GIC 806450 (Cal. Supr. Ct.).  Lieff Cabraser represents Lawrence L. Garlick, the co-founder and former Chief Executive Officer of Remedy Corporation and 24 other former senior executives and directors of Remedy Corporation in a private (non-class) securities fraud lawsuit against Stephen P. Gardner, the former Chief Executive Officer of Peregrine Systems, Inc., John J. Moores, Peregrine's former Chairman of the Board, Matthew C. Gless, Peregrine's former Chief Financial Officer, Peregrine's accounting firm Arthur Andersen and certain entities that entered into fraudulent transactions with Peregrine. The lawsuit, filed in California state court, arises out of Peregrine's August 2001 acquisition of Remedy.  Plaintiffs charge that they were induced to exchange their Remedy stock for Peregrine stock on the basis of false and misleading representations made by defendants.  Within months of the Remedy acquisition, Peregrine began to reveal to the public that it had grossly overstated its revenue during the years 2000-2002, and eventually restated more than $500 million in revenues.

13.   ***In re National Century Financial Enterprises, Inc.  Investment Litigation***, MDL 1565 (S.D. Ohio).  Lieff Cabraser serves as Lead Counsel for the New York City Employees' Retirement System, Teachers' Retirement System for the City of New York, New York City Police Pension Fund, and New York City Fire Department Pension Fund in a securities fraud and breach of fiduciary duties lawsuit against Bank One, JPMorgan Chase Bank, Credit Suisse First Boston LLC, and additional defendants.  The complaint charges that plaintiffs suffered $89 million in losses as a result of a massive Ponzi scheme orchestrated and implemented by National Century Financial Enterprises and defendants.  Lieff Cabraser reached settlements with several of the defendants for the benefit of the Funds and continues to prosecute the case against the non-settling defendants.

14.   ***In re Network Associates, Inc. Securities Litigation***, No. C-99-1729-WHA (N.D. Cal.).  Following a competitive bidding process, the Court appointed Lieff Cabraser as Lead Counsel for the Lead Plaintiff and the class of investors.  The complaint alleged that Network Associates improperly accounted for acquisitions in order to inflate its stock price.  In May 2001, the Court granted approval to a $30 million settlement.

In reviewing the *Network Associates* settlement, U.S. District Court Judge William H. Alsup observed, "[T]he class was well served at a good price by excellent counsel .  .  .  We have class counsel who's one of the most foremost law firms in the country in both securities law and class actions. And they have a very excellent reputation for the conduct of these kinds of cases and their experience and views .  .  ."

15.    *In re California Micro Devices Securities Litigation*, No. C-94-2817-
VRW (N.D. Cal.).  Lieff Cabraser served as Liaison Counsel for the
Colorado Public Employees' Retirement Association and the California
State Teachers' Retirement System, and the class they represented.  Prior
to 2001, the Court approved $19 million in settlements.  In May 2001, the
Court approved an additional settlement of $12 million, which, combined
with the earlier settlements, provided class members an almost complete
return on their losses.  The settlement with the company included multi-
million dollar contributions by the former Chairman of the Board and
Chief Executive Officer.

Commenting in 2001 on Lieff Cabraser's work in *Cal Micro Devices*, U.S.
District Court Judge Vaughn R. Walker stated, "It is highly unusual for a
class action in the securities area to recover anywhere close to the
percentage of loss that has been recovered here, and counsel and the lead
plaintiffs have done an admirable job in bringing about this most
satisfactory conclusion of the litigation."  One year later, in a related
proceeding and in response to the statement that the class had received
nearly a 100% recovery, Judge Walker observed, "That's pretty
remarkable.  In these cases, 25 cents on the dollar is considered to be a
magnificent recovery, and this is [almost] a hundred percent."

16.    *In re FPI/Agretech Securities Litigation*, MDL No. 763 (D. Haw.,
Real, J.).  Lieff Cabraser served as Lead Class Counsel on behalf of
multiple classes of investors defrauded in a limited partnership investment
scheme.  The Court approved $15 million in partial pretrial settlements.
At trial, the jury returned a $25 million verdict, which included
$10 million in punitive damages plus costs, interest, and attorneys' fees,
against non-settling defendant Arthur Young & Co. on securities and tort
claims arising from its involvement in the fraud.  Richard M. Heimann
served as Lead Trial Counsel in the class action trial.  On appeal, the
compensatory damages judgment was affirmed and the case was
remanded for retrial on punitive damages.  In 1994, the Court approved a
$17 million class settlement with Ernst & Young.

17.    *Informix/Illustra Securities Litigation*, No. C-97-1289-CRB (N.D. Cal.).
Lieff Cabraser represented Richard H. Williams, the former Chief
Executive Officer and President of Illustra Information Technologies, Inc.
("Illustra"), and a class of Illustra shareholders in a class action suit on
behalf of all former Illustra securities holders who tendered their Illustra
preferred or common stock, stock warrants or stock options in exchange
for securities of Informix Corporation ("Informix") in connection with
Informix's 1996 purchase of Illustra.  Pursuant to that acquisition, Illustra
stockholders received Informix securities representing approximately 10%
of the value of the combined company.  The complaint alleged claims for
common law fraud and violations of Federal securities law arising out of
the acquisition.  In October 1999, U.S. District Judge Charles E. Breyer

approved a global settlement of the litigation for $136 million, constituting one of the largest settlements ever involving a high technology company alleged to have committed securities fraud.  Our clients, the Illustra shareholders, received approximately 30% of the net settlement fund.

18.   ***In re Media Vision Technology Securities Litigation***, No. CV-94-1015 (N.D. Cal.).  Lieff Cabraser serves as Co-Lead Counsel in a class action lawsuit which alleged that certain of Media Vision's officers, outside directors, accountants and underwriters engaged in a fraudulent scheme to inflate the company's earnings, and issued false and misleading public statements about the company's finances, earnings and profits.  By 1998, the Court had approved several partial settlements with many of Media Vision's officers and directors, accountants and underwriters which totaled $31 million.  The settlement proceeds have been distributed to eligible class members.  The evidence that Lieff Cabraser developed in the civil case led prosecutors to commence an investigation and ultimately file criminal charges against Media Vision's former Chief Executive Officer and Chief Financial Officer.  The civil action against Media Vision's CEO and CFO was stayed pending the criminal proceedings against them.  In the criminal proceedings, the CEO pled guilty on several counts, and the CFO was convicted at trial.  In October, 2003, the Court granted Plaintiffs' motions for summary judgment and entered a judgment in favor of the class against these two defendants in the amount of $188 million.

19.   ***Nguyen v. FundAmerica***, No. C-90-2090 MHP (N.D. Cal., Patel, J.), 1990 Fed. Sec. L. Rep. (CCH) ¶¶ 95,497, 95,498 (N.D. Cal. 1990).  Lieff Cabraser served as Plaintiffs' securities/RICO/tort action seeking an injunction against alleged unfair "pyramid" marketing practices and compensation to participants.  The District Court certified a nationwide class for injunctive relief and damages on a mandatory basis and enjoined fraudulent overseas transfers of assets.  The Bankruptcy Court permitted class proof of claims. Lieff Cabraser obtained dual District Court and Bankruptcy Court approval of settlements distributing over $13 million in FundAmerica assets to class members.

20.   ***In re First Capital Holdings Corp.  Financial Products Securities Litigation***, MDL No. 901 (C.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel in a class action brought to recover damages sustained by policyholders of First Capital Life Insurance Company and Fidelity Bankers Life Insurance Company policyholders resulting from the insurance companies' allegedly fraudulent or reckless investment and financial practices, and the manipulation of the companies' financial statements.  This policyholder settlement generated over $1 billion in restored life insurance policies, and was approved by both federal and state courts in parallel proceedings and then affirmed by the Ninth Circuit on appeal.

C.      **Employment Discrimination and Unfair Employment Practices**

1.      ***Butler v. Home Depot***, No. C94-4335 SI (N.D. Cal.).  Lieff Cabraser and
        co-counsel represented a class of approximately 25,000 female employees
        and applicants for employment with Home Depot's West Coast Division
        who alleged gender discrimination in connection with hiring, promotions,
        pay, job assignment, and other terms and conditions of employment.  The
        class was certified in January 1995.  In January 1998, the court approved a
        $87.5 million settlement of the action that included comprehensive
        injunctive relief over the term of a five-year Consent Decree.  Under the
        terms of the settlement, Home modified its hiring, promotion, and
        compensation practices to ensure that interested and qualified women
        were hired for, and promoted to, sales and management positions.

        On January 14, 1998, U.S. District Judge Susan Illston commented that
        the settlement provides "a very significant monetary payment to the class
        members for which I think they should be grateful to their counsel... Even
        more significant is the injunctive relief that's provided for . . ."  By 2003,
        the injunctive relief had created thousands of new job opportunities in
        sales and management positions at Home Depot, generating the equivalent
        of over approximately $100 million per year in wages for female
        employees.

        In 2002, Judge Illston stated that the injunctive relief has been a "win/win
        . . . for everyone, because . . . the way the Decree has been implemented
        has been very successful and it is good for the company as well as the
        company's employees."

2.      ***In Re Farmers Insurance Exchange Claims Representatives' Overtime
        Pay Litigation,*** MDL No. 1439 (D. Or.).  Lieff Cabraser and co-counsel
        represent personal lines claims representatives of Farmers' Insurance
        Exchange seeking unpaid overtime.  In November 2003, after a three-
        week liability phase trial, the court held that Farmers' claims adjusters
        who handle auto and low level property claims are entitled to overtime.
        300 F. Supp. 2d 1020 (2003).  The court further found that Farmers'
        actions were willful and were not taken in good faith, entitling the workers
        to liquidated damages.  In January and May 2005, the court entered
        judgments totaling $52.5 million against Farmers, the largest judgments
        ever entered in as the result of the trial of a Fair Labor Standards Act
        ("FLSA") trial.  In October 2006, the Ninth Circuit Court of Appeals
        reversed the judgment for plaintiffs under the FLSA and certain state laws,
        and remanded the case for further proceedings under the laws of
        Minnesota, Oregon, and Colorado.

3.      ***Rosenburg, et al. v. IBM***, No. C06-0430 JDC (N.D. Cal.).  In July 2007,
        the Court granted final approval to a $65 million settlement of a class
        action suit by current and former technical support workers for IBM

seeking unpaid overtime.  The settlement constitutes a record amount in litigation seeking overtime compensation for employees in the computer industry.  Plaintiffs alleged that IBM illegally misclassified its employees who install or maintain computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

4.     ***Satchell, et al. v. FedEx Express***, No. C 03-2659 SI; C 03-2878 SI (N.D. Cal.).  In 2007, the court approved a $54.9 million settlement of the race discrimination class action lawsuit by African American and Latino employees of FedEx Express.  The settlement requires FedEx to reform its promotion, discipline, and pay practices.  Under the settlement, FedEx will implement multiple steps to promote equal employment opportunities, including making its performance evaluation process less discretionary, discarding use of the "Basic Skills Test" as a prerequisite to promotion into certain desirable positions, and changing employment policies to demonstrate that its revised practices do not continue to foster racial discrimination.  The settlement, covering 20,000 hourly employees and operations managers who have worked in the western region of FedEx Express since October 1999, was approved by the Court in August 2007.

5.     ***Amochaev et al. v. Citigroup Global Markets, Inc., d/b/a Smith Barney***, No. C05-1298 PJH (N.D. Cal.).  Female Financial Advisors allege that Smith Barney discriminated against them in account distributions, business leads, referral business, partnership opportunities, sales support, and other terms of employment.  The suit is brought on behalf of a national class of all female Financial Advisors, employed at Smith Barney since August 30, 2003, and a California subclass of all female Financial Advisors employed at Smith Barney in California since June 25, 2003.  Lieff Cabraser serves as co-counsel for plaintiffs.

6.     ***Gonzalez et al. v. Abercrombie & Fitch Stores, Inc. et al.***, No. C03-2817 SI (N.D. Cal.).  In April 2005, the Court approved a settlement, valued at approximately $50 million, which requires the retail clothing giant Abercrombie & Fitch to provide monetary benefits of $40 million to the class of Latino, African American, Asian American and female applicants and employees who charged the company with discrimination.  The settlement also requires the company to institute a range of policies and programs to promote diversity among its workforce and to prevent discrimination based on race or gender.  Lieff Cabraser serves as Lead Class Counsel and prosecuted the case with a number of co-counsel firms, including the Mexican American Legal Defense and Education Fund, the Asian Pacific American Legal Center and the NAACP Legal Defense and Educational Fund, Inc.  Implementation of the consent decree continues into 2011.

7.     ***Frank v. United Airlines, Inc.***, No. C-92-0692 MJJ (N.D. Cal.).  Lieff Cabraser and co-counsel obtained a $36.5 million settlement in February

2004 for a class of female flight attendants who were required to weigh less than comparable male flight attendants.

Former U.S. District Court Judge Charles B. Renfrew (ret.), who served as a mediator in the case, stated, "As a participant in the settlement negotiations, I am familiar with and know the reputation, experience and skills of lawyers involved. They are dedicated, hardworking and able counsel who have represented their clients very effectively." U.S. District Judge Martin J. Jenkins, in granting final approval to the settlement, found "that the results achieved here could be nothing less than described as exceptional," and that the settlement "was obtained through the efforts of outstanding counsel."

8.  ***Winnett, et al. v. Caterpillar, Inc.***, No. 3:06-cv-00235 (M.D. Tenn.). Lieff Cabraser serves as co-counsel representing retirees in a nationwide class action lawsuit against Caterpillar, Inc. In October 2004 Caterpillar began charging monthly premiums despite longstanding contracts that promise free healthcare to certain participants and their spouses. The lawsuit seeks to end these charges and restore the plaintiffs and similarly situated retirees to the position they would have been but for Caterpillar's contractual violations. In July 2007, the Court granted the plaintiffs' class certification motion.

9.  ***Barnett v. Wal-Mart***, No. 01-2-24553-SNKT (Wash.); ***Gamble v. Wal-Mart***, No. 7121-01 (N.Y.). Lieff Cabraser and co-counsel represent proposed classes of hourly wage earners at Wal-Mart in Washington and New York who allegedly have been forced to work "off-the-clock" (without pay). Plaintiffs, current and former Wal Mart employees, allege that, in violation of state wage and hour laws, Wal-Mart forces employees to work through breaks and to work without pay after they have clocked out. In October 2004, in the Washington Wal-Mart action, the Court certified a class of approximately 40,000 current and former Wal-Mart employees.

10. ***Holloway, et al. v. Best Buy,*** No. C05-5036 PJH (N.D. Cal.). Lieff Cabraser, with co-counsel, represents a proposed class of current and former employees of Best Buy in a federal class action civil rights lawsuit. Plaintiffs allege that Best Buy stores nationwide discriminate against women and minorities, specifically African Americans and Latinos. These employees charge that they are paid less than white males, denied promotions, and assigned to less desirable positions. The suit also alleges that Best Buy discriminates against women and minorities in hiring decisions.

11. ***Giannetto v. Computer Sciences Corporation***, 03-CV-8201 (C.D. Cal.). In one of the largest overtime pay dispute settlements ever in the information technology industry, the Court in July 2005 granted final

approval to a $24 million settlement with Computer Sciences Corporation. Plaintiffs charged that the global conglomerate had a common practice of refusing to pay overtime compensation to its technical support workers involved in the installation and maintenance of computer hardware and software in violation of the Fair Labor Standards Act, California's Unfair Competition Law, and the wage and hour laws of 13 states.

12.     ***Foster v. The Great Atlantic & Pacific Tea Company, Inc.  ("A&P")***, No. 99 Civ. 3860 (CM) (S.D.N.Y.).  Lieff Cabraser, along with co-counsel, represented approximately 870 current and former employees of New York area supermarkets suing under the Fair Labor Standards Act. The Opt-In Plaintiffs in the certified collective action sought unpaid overtime compensation resulting from Defendants' alleged failure to compensate employees for work performed "off-the-clock."  In May 2004, the Court approved a settlement providing $3.11 million to the Opt-In Plaintiffs.  In June 2004, current and former full-time hourly employees of The Great Atlantic & Pacific Tea Company filed a new lawsuit against defendants in New York state court.  The plaintiffs allege that defendants systematically failed to pay overtime wages and deleted hours worked from time records in violation of New York labor law.  In July 2007, the Court certified the class of thousands of cashiers, clerks, bakers, deli and other hourly-paid workers.

13.     ***Goddard, et al. v. Longs Drug Stores Corporation, et al.***, No. RG04141291 (Cal. Supr. Ct.).  Store managers and assistant store managers of Longs Drugs charged that the company misclassified them as exempt from overtime wages.  Managers regularly worked in excess of 8 hours per day and 40 hours per week without compensation for their overtime hours.  Following mediation, in 2005, Longs Drugs agreed to settle the claims for a total of $11 million.  Over 1,000 current and former Longs Drugs managers and assistant managers were eligible for compensation under the settlement, over 98% of the class submitted claims.

14.     ***Zuckman v. Allied Group***, No. 02-5800 SI (N.D. Cal.).  In September 2004, the Court approved a settlement with Allied Group and Nationwide Mutual Insurance Company of $8 million plus Allied/Nationwide's share of payroll taxes on amounts treated as wages, providing plaintiffs a 100% recovery on their claims. Plaintiffs, claims representatives of Allied / Nationwide, alleged that the company misclassified them as exempt employees and failed to pay them and other claims representatives in California overtime wages for hours they worked in excess of eight hours or forty hours per week.  In approving the settlement, U.S. District Court Judge Susan Illston commended counsel for their "really good lawyering" and stated that they did "a splendid job on this" case.

15.     ***Trotter v. Perdue Farms, Inc.***, No. C 99-893-RRM (JJF) (MPT) (D. Del.). Lieff Cabraser represented a class of chicken processing employees of Perdue Farms, Inc., one of the nation's largest poultry processors, for wage and hour violations.  The suit challenged Perdue's failure to compensate its assembly line employees for putting on, taking off, and cleaning protective and sanitary equipment in violation of the Fair Labor Standards Act, various state wage and hour laws, and the Employee Retirement Income Security Act.  Under a settlement approved by the Court in 2002, Perdue paid $10 million for wages lost by its chicken processing employees and attorneys' fees and costs.  The settlement was in addition to a $10 million settlement of a suit brought by the Department of Labor in the wake of Lieff Cabraser's lawsuit.

16.     ***Sandoval v. Mountain Center, Inc., et al.***  No. 03CC00280 (Cal. Supr. Ct.).  Cable installers in California charged that defendants owed them overtime wages, as well as damages for missed meal and rest breaks and reimbursement for expenses incurred on the job.  In 2005, the Court approved a $7.2 million settlement of the litigation, which was distributed to the cable installers who submitted claims.

17.     ***Gottlieb v. SBC Communications***, No. CV-00-04139 AHM (MANx) (C.D. Cal.).  With co-counsel, Lieff Cabraser represented current and former employees of SBC and Pacific Telesis Group ("PTG") who participated in AirTouch Stock Funds, which were at one time part of PTG's salaried and non-salaried savings plans.  After acquiring  PTG, SBC sold AirTouch, which PTG had owned, and caused the AirTouch Stock Funds that were included in the PTG employees' savings plans to be liquidated.  Plaintiffs alleged that in eliminating the AirTouch Stock Funds, and in allegedly failing to adequately communicate with employees about the liquidation, SBC breached its duties to 401k plan participants under the Employee Retirement Income Security Act.  In 2002, the Court granted final approval to a $10 million settlement.

18.     ***Thomas v. California State Automobile Association***, No. CH217752 (Cal. Supr. Ct.).  With co-counsel, Lieff Cabraser represented 1,200 current and former field claims adjusters who worked for the California State Automobile Association ("CSAA").  Plaintiffs alleged that CSAA improperly classified their employees as exempt, therefore denying them overtime pay for overtime worked.  In May 2002, the Court approved an $8 million settlement of the case.

19.     ***Church v. Consolidated Freightways***, No. C90-2290 DLJ (N.D. Cal.). Lieff Cabraser was the Lead Court-appointed Class Counsel in this class action on behalf of the exempt employees of Emery Air Freight, a freight forwarding company acquired by Consolidated Freightways in 1989.  On behalf of the employee class, Lieff Cabraser prosecuted claims for violation of the Employee Retirement Income Security Act, the securities

laws, and the Age Discrimination in Employment Act.  The case settled in 1993 for $13.5 million.

20. **Buttram v. UPS, Inc.**, No. C-97-01590 MJJ (N.D. Cal.).  Lieff Cabraser and several co-counsel represented a class of approximately 14,000 African-American part-time hourly employees of UPS's Pacific and Northwest Regions alleging race discrimination in promotions and job advancement.  In 1999, the Court approved a $12.14 million settlement of the action.  Under the injunctive relief portion of the settlement, among other things, Class Counsel continues to monitor the promotions of African-American part-time hourly employees to part-time supervisor and full-time package car driver.

21. **Lyon v. TMP Worldwide, Inc.**, No. 993096 (Cal. Supr. Ct.).  Lieff Cabraser served as Class Counsel for a class of certain non-supervisory employees in an advertising firm.  The settlement, approved in 2000, provided almost a 100% recovery to class members.  The suit alleged that TMP failed to pay overtime wages to these employees.

22. **Kahn v. Denny's**, No. BC177254 (Cal. Supr. Ct.).  Lieff Cabraser brought a lawsuit alleging that Denny's failed to pay overtime wages to its General Managers and Managers who worked at company-owned restaurants in California.  The Court approved a $4 million settlement of the case in 2000.

23. **Giles v. Allstate**, JCCP Nos.  2984 and 2985.  Lieff Cabraser represented a class of Allstate insurance agents seeking reimbursement of out-of-pocket costs.  The action settled for approximately $40 million.

24. **Bogan v. Fleetwood Enterprises, Inc.**, No. CIV 00-0440-S-BLW (D. Idaho).  Lieff Cabraser, along with co-counsel, represents a nationwide class of women production associates who allegedly have been discriminated against on the basis of sex with respect to promotions and compensation, and who allegedly have been subjected to rampant sexual harassment.  In 2002, the Court approved a settlement that included comprehensive injunctive relief.

Lieff Cabraser attorneys have also had experience working on several other employment cases, including cases involving race, gender, and age discrimination, ERISA, breach of contract claims, and wage/hour claims. Lieff Cabraser attorneys frequently write amici briefs on cutting-edge legal issues involving employment law.  Lieff Cabraser is currently investigating charges of race, gender and/or age discrimination, and wage/hour violations against several companies.

In 2004, Kelly M. Dermody, who oversees the firm's employment law practice, was included by *The Recorder* in a list of the best employment lawyers in the San Francisco Bay Area, and has also been selected as a *Northern California Super Lawyer*.  In 2007, the Daily Journal recognized Ms. Dermody as one of the "Top Women Litigators in California," and she

also received a California Lawyer Attorney of the Year (CLAY) Award from *California Lawyer* magazine.

### D.   Consumer Protection

1.   ***Sutter Health Uninsured Pricing Cases***, J.C.C.P. No. 4388.  Plaintiffs alleged that they and a Class of uninsured patients treated at Sutter hospitals were charged substantially more than patients with private or public insurance, and many times above the cost of providing their treatment.  In December 2006, the Court granted final approval to a comprehensive and groundbreaking settlement of the action.  As part of the settlement, Class members will be entitled to make a claim for refunds or deductions of between 25% to 45% from their prior hospital bills, at an estimated total value of $276 million.  For the next three years, Sutter will maintain discounted pricing policies for uninsureds that will make Sutter's pricing for uninsureds comparable to or better than the pricing for patients with private insurance.  In addition, Sutter agreed to maintain more compassionate collections policies that will protect uninsureds who fall behind in their payments.  Lieff Cabraser served as Lead Counsel in the coordinated action.

2.   ***Catholic Healthcare West Cases***, J.C.C.P. No. 4453.  Plaintiff alleged that Catholic Healthcare West ("CHW") charged uninsured patients excessive fees for treatment and services, at rates far higher than the rates charged to patients with private insurance or on Medicare.  In January 2007, the Court approved a settlement that provides discounts, refunds and other benefits for CHW patients valued at $423 million.  The settlement requires that CHW lower its charges and end price discrimination against all uninsured patients, maintain generous charity case policies allowing low-income uninsureds to receive free or heavily discounted care, and protect uninsured patients from unfair collections practices.  Lieff Cabraser served as Lead Counsel in the coordinated action.

3.   ***Ricci v. Ameriquest Mortgage Company***, No. 27-CV-05-2546 (Minn. District Court).  Lieff Cabraser serves as Plaintiffs' Lead Counsel for a certified class of Minnesota property owners who obtained mortgage loans from Ameriquest Mortgage Company.  Plaintiffs charge that Ameriquest has engaged in a deceptive and unlawful business practices in violation of Minnesota law.  Plaintiffs allege that Ameriquest trains its sales force to target economically vulnerable persons in a predatory lending scheme based on the sale of loans with illegal and undisclosed fees and terms.

4.   ***R.M. Galicia v. Franklin; Franklin v. Scripps Health***, Case No. IC 859468 (San Diego Supr. Ct.).  Lieff Cabraser serves as Lead Class Counsel in a certified class action lawsuit against the Scripps Health hospital system for overcharging uninsured patients for medical treatment.  The class action originated in July 2006, when uninsured patient Phillip

Franklin filed a class action cross-complaint against Scripps Health after Scripps sued Mr. Franklin through a collection agency.  Mr. Franklin alleged that he, like all other uninsured patients of Scripps Health, was charged unreasonable and unconscionable rates for his medical treatment. In June 2007, the Court granted class certification on behalf of over 50,000 uninsured patients who were treated in Scripps' emergency department since 2002 and who challenge excessive prices for medical services.

5. ***Brazil v. Dell***, No. C-07-01700 RMW (N.D. Cal.).  Lieff Cabraser serves as counsel for consumers that charge Dell has engaged in a scheme to deliberately cheat large numbers of consumers.  The complaint charges that Dell advertises "limited time" specific-dollar discounts from expressly referenced former prices, but that the discounts are false because the reference prices are inflated beyond Dell's true regular prices.  On August 3, 2007, U.S. District Court Judge Ronald M. Whyte Dell's motions to enforce a class action waiver clause and to compel arbitration.  The Court found that the provisions in Dell's purchase agreement requiring disputes to be resolved through individual arbitration proceedings and prohibiting class actions are unconscionable under California law.

6. ***Schaffer v. Litton Loan Servicing, LP***, No. CV 05-07673 (C.D. Cal.). Plaintiffs, all homeowners with a mortgage loan serviced by Litton Loan Servicing, charge that Litton has engaged in a scheme by which it fails to accurately service its borrowers' loans, including misapplying or failing to apply payments made.  In July 2007, the Court certified a nationwide class of borrowers who have claims against Litton for violation of 12 U.S.C. § 2605(d), a provision of the Real Estate Settlement Procedures Act. This provision creates a 60-day grace period following the transfer of servicing of a mortgage loan, and prohibits loan servicers from imposing late fees or otherwise treating as late any payment that was "received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment." 12 U.S.C. § 2605(d).

7. ***In re Tri-State Crematory Litigation***, MDL No. 1467 (N.D. Ga.).  In March 2004, Lieff Cabraser delivered opening statements and began testimony in a class action by families whose loved ones were improperly cremated and desecrated by Tri-State Crematory in Noble, Georgia.  The families also asserted claims against the funeral homes that delivered the decedents to Tri-State Crematory for failing to ensure that the crematory performed cremations in the manner required under the law and by human decency.  One week into trial, settlements with the remaining funeral home defendants were reached and brought the settlement total to approximately $37 million.  Trial on the class members' claims against the operators of crematory began in August 2004.  Soon thereafter, these defendants entered into a $80 million settlement with plaintiffs.  As part of

the settlement, all buildings on the Tri-State property were razed. The property will remain in a trust so that it will be preserved in peace and dignity as a secluded memorial to those whose remains were mistreated, and to prevent crematory operations or other inappropriate activities from ever taking place there. Earlier in the litigation, the Court granted plaintiffs' motion for class certification in a published order. 215 F.R.D. 660 (2003).

8.      ***Morris v. AT&T Wireless Services***, No. C-04-1997-MJP (W.D. Wash.). Lieff Cabraser served as class counsel for a nationwide settlement class of cell phone customers subjected to an end of billing cycle cancellation policy implemented by AT&T Wireless in 2003 and alleged to have breached customers' service agreements. In May 2006, the New Jersey Superior Court granted final approval to a class settlement that guarantees delivery to the class of $40 million in benefits. Class members received cash-equivalent calling cards automatically, and had the option of redeeming them for cash. Lieff Cabraser had been prosecuting the class claims in the Western District of Washington when a settlement in New Jersey state court was announced. Lieff Cabraser objected to that settlement as inadequate because it would have only provided $1.5 million in benefits without a cash option, and the court agreed, declining to approve it. Thereafter, Lieff Cabraser negotiated the new settlement providing $40 million to the class, and the settlement was approved.

9.      ***Estate of Holman, et al. v. Noble Energy, Inc.***, No. 03 CV 9 (Dist. Ct., Weld County, Colorado). Lieff Cabraser served as Co-Lead Counsel for a class of royalty owners with mineral interests in Colorado. Plaintiffs alleged that Noble Energy and Patina, its predecessor company, underpaid Class members for natural gas production royalties in violation of state law. In June 2007, the Court granted preliminary approval to a $53 million settlement of the action. The settlement also provided for a significant improvement in the calculation of future royalty payments, which were estimated to benefit the Class an additional $50 million.

10.     ***Strugano v. Nextel Communications, Inc.,*** No. BC 288359 (Los Angeles Supr. Crt). In May 2006, the Los Angeles Superior Court granted final approval to a class action settlement on behalf of all California customers of Nextel from January 1, 1999 through December 31, 2002, for compensation for the harm caused by Nextel's alleged unilateral (1) addition of a $1.15 monthly service fee and/or (2) change from second-by-second billing to minute-by-minute billing, which caused "overage" charges (*i.e.*, for exceeding their allotted cellular plan minutes). The total benefit conferred by the Settlement directly to Class Members was between approximately $13.5 million and $55.5 million, depending on which benefit Class Members selected. Class Counsel secured these benefits for a Class of approximately 308,000 customers with 1.1 million cell phone plans.

11.   ***Thompson, et al. v. WFS Financial, Inc.***, No. 3-02-0570 (M.D. Tenn.); ***Pakeman, et al. v. American Honda Finance Corporation***, No. 3-02-0490 (M.D. Tenn.); ***Herra v. Toyota Motor Credit Corporation***, No. CGC 03-419 230 (San Francisco Supr. Ct.).  For the past five years, Lieff Cabraser with co-counsel litigated against several of the largest automobile finance companies in the country to compensate victims of – and stop future instances of – racial discrimination in the setting of interest rates in automobile finance contracts.  The litigation led to substantial changes in the way Toyota Motor Credit Corporation ("TMCC"), American Honda Finance Corporation ("American Honda") and WFS Financial, Inc., sell automobile finance contracts, limiting the discrimination that can occur.

TMCC, American Honda and WFS Financial allow independent automobile dealers to add a discretionary markup (often several percentage points) to the objective, credit-based interest rates determined by the finance company.  Plaintiffs charged that African-American and Latino customers paid more in finance charges than similarly situated non-minority customers due to the practice by TMCC, American Honda and WFS Financial of allowing dealers to increase, or "mark up," a customer's Annual Percentage Rate ("APR") on contracts.  The discretionary markup amounts were not based on objective credit-worthiness information, but were wholly subjective.  Statistical analyses showed that the discretionary markups had a disparate impact on African American and Latino customers.

In the nationwide class action litigation against TMCC, American Honda and WFS Financial, the respective parties entered into landmark settlements for African American and Latino consumers which collectively provided:

- Cash or credit payments of up to $400 per class member.

- Broad refinancing programs reducing rates charged to existing African-American and Latino customers whose markups were 1% or more.  These benefits were valued at $1 billion in the WFS Financial case alone.

- New pre-approved offers of credit (that cannot be marked up) to 1.5 million African American and Latino consumers.

- Limits on discretionary markups on new loans of 1.75% to 2.50% (depending on the length of the loan).  This compression of the discretionary range substantially reduced the likelihood that any markups in the future will occur as the result of racial discrimination.

- New disclosures on all contracts explaining that the interest rate may be negotiable.

- Donations of $1.9 million to non-profit organizations involved in consumer education and assistance.

In approving the settlement in *Thompson v. WFS Financial,* the Court recognized the "innovative" and "remarkable settlement" achieved on behalf of the nationwide class.  In 2006 in *Herra v. Toyota Motor Credit Corporation,* the Court granted final approval to a nationwide class action settlement on behalf of all African-American and Hispanic customers of TMCC who entered into retail installment contracts that were assigned to TMCC from 1999 to 2006.  The monetary benefit to the class was estimated to be between $159 and $174 million.

12.     ***Providian Credit Card Cases***, No. JCCP 4085 (San Francisco Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel for a certified national Settlement Class of Providian credit cardholders who alleged that Providian had engaged in widespread misconduct by charging cardholders unlawful, excessive interest and late charges, and by promoting and selling to cardholders "add-on products" promising illusory benefits and services.  In November 2001, the Court granted final approval to a $105 million settlement of the case, which also required Providian to implement substantial changes in its business practices.  The $105 million settlement, combined with an earlier settlement by Providian with Federal and state agencies, represents the largest settlement ever by a U.S. credit card company in a consumer protection case.

13.     ***California Title Insurance Industry Litigation.***  Lieff Cabraser, in coordination with parallel litigation brought by the Attorney General, reached settlements in 2003 and 2004 with the leading title insurance companies in California, resulting in historic industry-wide changes to the practice of providing escrow services in real estate closings.  The settlements brought a total of $50 million in restitution to California consumers, including cash payments.  In the lawsuits, plaintiffs alleged, among other things, that the title companies received interest payments on customer escrow funds that were never reimbursed to their customers.  The defendant companies include Lawyers' Title, Commonwealth Land Title, Stewart Title of California, First American Title, Fidelity National Title, and Chicago Title.

14.     ***Kline v. The Progressive Corporation***, Circuit No. 02-L-6 (Circuit Court of the First Judicial Circuit, Johnson County, Illinois).  Lieff Cabraser served as settlement class counsel in a nationwide consumer class action challenging Progressive Corporation's private passenger automobile insurance sales practices.  Plaintiffs alleged that the Progressive Corporation wrongfully concealed from class members the availability of

lower priced insurance for which they qualified.  In 2002, the Court approved a settlement valued at approximately $450 million, which included both cash and equitable relief.  The claims program, implemented upon a nationwide mail and publication notice program, was completed in 2003.

15.   ***Citigroup Loan Cases***, JCCP No. 4197 (San Francisco Supr. Ct.).  In 2003, the Court approved a settlement that provided approximately $240 million in relief to former Associates' customers across America.  Prior to its acquisition in November 2000, Associates First Financial, referred to as The Associates, was one of the nation's largest "subprime" lenders.  Lieff Cabraser represented former customers of The Associates charging that the company added on mortgage loans unwanted and unnecessary insurance products and engaged in improper loan refinancing practices.  Lieff Cabraser served as nationwide Plaintiffs' Co-Liaison Counsel.

16.   ***In re Ocwen Federal Bank FSB Mortgage Servicing Litigation***, MDL No. 1604 (Northern District of Illinois).  Lieff Cabraser serves as Co-Lead Plaintiffs' Counsel in a nationwide class action against Ocwen Financial Corporation, Ocwen Federal Bank FSB, and their affiliates ("Ocwen").  This lawsuit arises out of charges against Ocwen of misconduct in servicing its customers' mortgage loans and in its provision of certain related services, including debt collection and foreclosure services.

17.   ***Curry v. Fairbanks Capital Corporation***, No. 03-10895-DPW (D. Mass.).  In 2004, the Court approved a $55 million settlement of a class action lawsuit against Fairbanks Capital Corporation arising out of charges against Fairbanks of misconduct in servicing its customers' mortgage loans.  The settlement also required substantial changes in Fairbanks' business practices and established a default resolution program to limit the imposition of fees and foreclosure proceedings against Fairbanks' customers.  Lieff Cabraser served as nationwide Co-Lead Counsel for the homeowners.

18.   ***In re Synthroid Marketing Litigation***, MDL No. 1182 (N.D. Ill.).  Lieff Cabraser served as Co-Lead Counsel for the purchasers of the thyroid medication Synthroid in litigation against Knoll Pharmaceutical, the manufacturer of Synthroid.  The lawsuits charged that Knoll misled physicians and patients into keeping patients on Synthroid despite knowing that less costly, but equally effective drugs, were available.  In 2000, the District Court gave final approval to a $87.4 million settlement with Knoll and its parent company, BASF Corporation, on behalf of a class of all consumers who purchased Synthroid at any time from 1990 to 1999.  In 2001, the Court of Appeals upheld the order approving the settlement and remanded the case for further proceedings.  264 F. 3d 712 (7th Circ. 2001).  The settlement proceeds were distributed in 2003.

19. ***Reverse Mortgage Cases***, JCCP No. 4061 (San Mateo County Supr Ct., Cal.).  Transamerica Corporation, through its subsidiary Transamerica Homefirst, Inc., sold "reverse mortgages" marketed under the trade name "Lifetime." The Lifetime reverse mortgages were sold exclusively to seniors, *i.e.*, persons 65 years or older.  Lieff Cabraser, with co-counsel, filed suit on behalf of seniors alleging that the terms of the reverse mortgages were unfair, and that borrowers were misled as to the loan terms, including the existence and amount of certain charges and fees.  In 2003, the Court granted final approval to an $8 million settlement of the action.

20. ***In re American Family Enterprises***, MDL No. 1235 (D.N.J.).  Lieff Cabraser served as co-lead counsel for a nationwide class of persons who received any sweepstakes materials sent under the name "American Family Publishers."  The class action lawsuit alleged that defendants deceived consumers into purchasing magazine subscriptions and merchandise in the belief that such purchases were necessary to win an American Family Publishers' sweepstakes prize or enhanced their chances of winning a sweepstakes prize.  In September 2000, the Court granted final approval of a $33 million settlement of the class action.  In April 2001, over 63,000 class members received refunds averaging over $500 each, representing 92% of their eligible purchases.  In addition, American Family Publishers agreed to make significant changes to the way it conducts the sweepstakes.

21. ***In re Sears Automotive Center Consumer Litigation***, Civ. No. C-92-2227 RHS (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel for a certified nationwide class of Sears auto center customers for purposes of approval of a combined injunctive relief/refund settlement.  As part of the  settlement, Sears distributed to class members merchandise coupons valued at $25 million.

22. ***Roberts v. Bausch & Lomb***, Civ. No. 94-C-1144-W (N.D. Ala.).  Lieff Cabraser was designated as one of several Class Counsel in November 1994 in this nationwide consumer fraud class action involving deceptive marketing of contact lenses.  In 1996, the Court approved a settlement valued at $68 million ($34 million cash and $34 million in eye care products).

23. ***In re Miracle Ear Consumer Litigation***, Civ. No. 94-1696 (4th Jud. Dist. Minn.).  Lieff Cabraser served as Co-Lead Class Counsel in a nationwide class action certified in late 1994 involving claims arising from misrepresentations regarding performance of a hearing aid device.  State courts in Minnesota and Alabama granted final approval to the nationwide settlement.

E.     **Antitrust/Trade Regulation/Intellectual Property**

1.     ***Microsoft Private Antitrust Litigation.***  Representing businesses and consumers, Lieff Cabraser prosecuted multiple private antitrust cases against Microsoft Corporation in state courts across the country, including Florida, New York, North Carolina, and Tennessee.  Plaintiffs alleged that Microsoft engaged in anticompetitive conduct and/or violated state deceptive and unfair business practices statutes to harm competition and monopolize the markets for Intel-compatible, personal computer operating system software, as well as word processing and spreadsheet software.  In August 2006, the New York Supreme Court granted final approval to a settlement that makes available up to $350 million in benefits for New York businesses and consumers.  In August 2004, the Court in the North Carolina action granted final approval to a settlement valued at over $89 million.  In June 2004, the Court in the Tennessee action granted final approval to a $64 million settlement.  In November 2003, in the Florida Microsoft litigation, the Court granted final approval to a $202 million settlement, one of the largest antitrust settlements in Florida history.  Lieff Cabraser served as Co-Lead Counsel in the New York, North Carolina and Tennessee cases, and held leadership roles in the Florida case.

2.     ***Natural Gas Antitrust Cases***, J.C.C.P. Nos. 4221, 4224, 4226 & 4228 (Cal. Supr. Ct.). In June 2007, the Court granted final approval to a $67.39 million settlement of a series of class action lawsuits brought by California business and residential consumers of natural gas against a group of natural gas suppliers, Reliant Energy Services, Inc., Duke Energy Trading and Marketing LLC, CMS Energy Resources Management Company, and Aquila Merchant Services, Inc.

Plaintiffs charged defendants with manipulating the price of natural gas in California during the California energy crisis of 2000-2001 by a variety of means, including falsely reporting the prices and quantities of natural gas transactions to trade publications, which compiled daily and monthly natural gas price indices; prearranged wash trading; and, in the case of Reliant, "churning" on the Enron Online electronic trading platform, which was facilitated by a secret netting agreement between Reliant and Enron.

The 2007 settlement followed a settlement reach in 2006 for $92 million partial settlement with Coral Energy Resources, L.P.; Dynegy Inc. and affiliates; EnCana Corporation; WD Energy Services, Inc.; and The Williams Companies, Inc. and affiliates.

Earlier, in 2003, the Court approved a landmark of $1.1 billion settlement in class action litigation against El Paso Natural Gas Co. for manipulating the market for natural gas pipeline transmission capacity into California.

Lieff Cabraser has served as Plaintiffs' Co-Lead Counsel in the *Natural Gas Antitrust Cases I-IV.*

3. ***Wholesale Electricity Antitrust Cases I & II****,* J.C.C.P. Nos. 4204 & 4205 (Cal. Supr. Ct.).  Lieff Cabraser served as co-lead counsel in the private class action litigation against Duke Energy Trading & Marketing Reliant Energy, and The Williams Companies for claims that the companies manipulated California's wholesale electricity markets during the California energy crisis of 2000-2001.  Extending the landmark victories for California residential and business consumers of electricity, in September 2004, plaintiffs reached  a $206 million settlement with Duke Energy Trading & Marketing, and in August 2005, plaintiffs reached a $460 million settlement with Reliant Energy, settling claims that the companies manipulated California's wholesale electricity markets during the California energy crisis of 2000-01.  Lieff Cabraser earlier entered into a settlement for over $400 million with The Williams Companies.

4. ***In re TFT-LCD (Flat Panel) Antitrust Litigation****,* MDL No. 1827 (N.D. Cal.).  Representing direct purchasers of flat-panel TV screens and other products incorporating liquid crystal displays, Lieff Cabraser serves as one of two Interim Lead Counsel in nationwide class action litigation against the world's leading manufacturers of Thin Film Transistor Liquid Crystal Displays.  TFT-LCDs are used in flat-panel televisions as well as computer monitors, laptop computers, mobile phones, personal digital assistants and other devices.  The plaintiffs allege that from at least January 1, 1998 through December 31, 2005 defendants conspired to raise, fix and stabilize the prices of TFT-LCDs.

5. ***Azizian v. Federated Department Stores****,* 3:03 CV 03359 SBA (N.D. Cal.).  In March 2005, the Court granted final approval to a settlement that Lieff Cabraser and co-counsel reached with numerous department store cosmetics manufacturers and retailers.  The settlement is valued at $175 million and includes significant injunctive relief, for the benefit of a nationwide class of consumers of department store cosmetics.  The complaint alleged the manufacturers and retailers violated antitrust law by engaging in anticompetitive practices to prevent discounting of department store cosmetics.

6. ***In re ATM Antitrust Litigation****,* No. C-04-2676 (N.D. Cal.).  Lieff Cabraser represents a putative class of ATM users against a number of banks comprising the Star ATM Network, alleging that those banks conspired to fix the price of ATM interchange fees, thereby unlawfully inflating fees paid by ATM users in the network.

7. ***In re Static Random Access Memory (SRAM) Antitrust Litigation****,* MDL No. 1819 (N.D. Cal.).  Lieff Cabraser serves as one of four members of the Steering Committee for indirect purchasers of SRAM, which is used

for a variety of applications, including on the motherboards of computers, as well as in cellular telephones, other handheld devices, and game consoles.  In the nationwide class action, the plaintiffs allege that defendant manufacturers of SRAM conspired in restraint of trade to artificially raise, fix, maintain, and stabilize prices for SRAM, allocate markets for SRAM, and allocate production of SRAM.

8.  ***In re Flash Memory Antitrust Litigation,*** MDL No. 1852.  Lieff Cabraser is class counsel for purchasers of flash memory, which is commonly used in a variety of applications, including circuit boards, memory cards, digital cameras, USB storage devices, portable music players, mobile wireless technology, game consoles and personal computers.  Plaintiffs allege that they have been deprived of free and open competition, and that prices for flash memory sold by defendants have been fixed, raised, maintained and stabilized at artificially high levels throughout the United States.

9.  ***In re Publication Paper Antitrust Litigation***, MDL No. 1631 (D. Conn.).  Lieff Cabraser serve as class counsel in this nationwide antitrust class action on behalf of printing companies.  Plaintiffs allege that the defendants, who are among the world's largest paper manufacturers, conspired illegally to fix the price of publication paper that is used to print magazines.

10.  ***Spectrum Stores, Inc., et al.  v. Citgo Petroleum Corp.,*** H-06-3569 (S.D. Tex.).  Lieff Cabraser serves as class counsel on behalf of direct purchasers of gasoline and other oil-based products from Citgo.  The plaintiffs allege antitrust damages for Citgo's participation in OPEC's oil cartel.

11.  ***In re High Pressure Laminates Antitrust Litigation***, MDL No. 1368 (S.D.N.Y.).  Lieff Cabraser served as Trial Counsel on behalf of a class of direct purchasers of high pressure laminates.  The case in 2006 was tried to a jury verdict.  The case settled for over $40 million.

12.  ***In re Buspirone Antitrust Litigation***, MDL No. 1413 (S.D.N.Y.).  In November 2003, Lieff Cabraser obtained a $90 million cash settlement for individual consumers, consumer organizations, and third party payors that purchased BuSpar, a drug prescribed to alleviate symptoms of anxiety.  Plaintiffs alleged that Bristol-Myers Squibb Co. (BMS), Danbury Pharmacal, Inc., Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. entered into an unlawful agreement in restraint of trade under which BMS paid a potential generic manufacturer of BuSpar to drop its challenge to BMS' patent and refrain from entering the market.  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel.

13.  ***Sullivan v. DB Investments***, No. 04-02819 (D. N.J.).  Lieff Cabraser served as class counsel for consumers who purchased diamonds from 1994

through March 21, 2006, in a class action lawsuit against the De Beers group of companies. Plaintiffs charged that De Beers monopolized the sale of rough diamonds. In November 2005, the Court granted preliminary approval of a settlement that provides $272.5 million will be distributed to the indirect purchaser class. The settlement prevents De Beers from continuing its illegal business practices and requires De Beers to submit to the jurisdiction of the Court to enforce the settlement.

14. ***In re Lupron Marketing and Sales Practices Litigation***, MDL No. 1430 (D. Mass.). In May 2005, the Court granted final approval to a settlement of a class action lawsuit by patients, insurance companies and health and welfare benefit plans that paid for Lupron, a prescription drug used to treat prostate cancer, endometriosis and precocious puberty. The settlement requires the defendants, Abbott Laboratories, Takeda Pharmaceutical Company Limited, and TAP Pharmaceuticals, to pay $150 million, inclusive of costs and fees, to persons or entities who paid for Lupron from January 1, 1985 through March 31, 2005. Plaintiffs charged that the defendants conspired to overstate the drug's average wholesale price ("AWP"), which resulted in plaintiffs paying more for Lupron than they should have paid. Lieff Cabraser served as Co-Lead Plaintiffs' Counsel.

15. ***California Vitamin Cases***, J.C.C.P. No. 4076 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Liaison Counsel and Co-Chairman of the Plaintiffs' Executive Committee on behalf of a class of California indirect vitamin purchasers in every level of the chain of distribution. In January 2002, the Court granted final approval of a $96 million settlement with certain vitamin manufacturers in a class action alleging that these and other manufacturers engaged in price fixing of particular vitamins. In December 2006, the Court granted final approval to over $8.8 million in additional settlements.

16. ***Ciprofloxacin Federal and State Antitrust Litigation***, MDL No. 1383 (E.D.N.Y.). Lieff Cabraser serves as Co-Lead Counsel for consumers who purchased Cipro, the top selling antibiotic in the world. Plaintiffs allege that Bayer Corporation, Barr Laboratories, two other generic drug companies, and other defendants entered into an unlawful agreement to keep a generic version of the drug off the market that allowed Bayer to sell Cipro at inflated prices. Lieff Cabraser also represents purchasers of Cipro in a class action lawsuit filed in California state court. In July 2004, the California Court of Appeal upheld the trial court's grant of class certification of an antitrust and unfair competition action against defendants.

17. ***Pharmaceutical Cases I, II, and III***, J.C.C.P. Nos. 2969, 2971 & 2972 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Lead and Co-Liaison Counsel representing a certified class of indirect purchasers (consumers) on claims against the major pharmaceutical manufacturers for violations

of the Cartwright Act and the Unfair Competition Act. The class alleged that defendants unlawfully fixed discriminatory prices on prescription drugs to retail pharmacists in comparison with the prices charged to certain favored purchasers, including HMOs and mail order houses. In April 1999, the Court approved a settlement providing $148 million in free, brand-name prescription drugs to health agencies that serve California's poor and uninsured. In October 2001, the Court approved a settlement with the remaining defendants in the case, which provided an additional $23 million in free, brand-name prescription drugs to these agencies.

18. ***Coalition for Elders' Independence, Inc. v. Biovail Corporation,*** No. CV023320 (Cal. Supr. Ct.). Lieff Cabraser serves as Co-Lead Counsel for class of consumers who purchased the drug Adalat, also known as Nifedipine. Plaintiffs allege that two generic manufacturers of Adalat entered into an agreement to allocate the dosages markets for generic Adalat, thereby substantially reducing competition and unlawfully inflating prices on both generic and brand-name Adalat, in violation of state antitrust laws.

19. ***In re Electrical Carbon Products Antitrust Litigation***, MDL No. 1514 (D.N.J.). Lieff Cabraser represents the City and County of San Francisco and a class of direct purchasers of carbon brushes and carbon collectors on claims that producers fixed the price of carbon brushes and carbon collectors in violation of the Sherman Act.

20. ***Electrical Carbon Products Cases***, J.C.C.P. No. 4294 (San Francisco Supr. Court). Lieff Cabraser represents the City and County of San Francisco and a class of indirect purchasers of carbon brushes and carbon collectors on claims that producers fixed the price of carbon brushes and carbon collectors in violation of the Cartwright Act and the Unfair Competition Law. Lieff Cabraser also represents the People of the State of California in claims arising from the Unfair Competition Law.

21. ***In re Compact Disc Antitrust Litigation***, MDL No. 1216 (C.D. Cal.). Lieff Cabraser served as Co-Lead Counsel for the direct purchasers of compact discs on claims that the producers fixed the price of CDs in violation of the federal antitrust laws.

22. ***In re Carpet Antitrust Litigation***, MDL No. 1075 (N.D. Ga.). Lieff Cabraser served as Class Counsel and a member of the trial team for a class of direct purchasers of twenty-ounce level loop polypropylene carpet. Plaintiffs, distributors of polypropylene carpet, alleged that Defendants, seven manufacturers of polypropylene carpet, conspired to fix the prices of polypropylene carpet by agreeing to eliminate discounts and charge inflated prices on the carpet. In 2001, the Court approved a $50 million settlement of the case.

23.     *In re Lasik/PRK Antitrust Litigation*, No. CV 772894 (Cal. Supr. Ct.). Lieff Cabraser served as a member of Plaintiffs' Executive Committee in class actions brought on behalf of persons who underwent Lasik/PRK eye surgery. Plaintiffs alleged that defendants, the manufacturers of the laser system used for the laser vision correction surgery, manipulated fees charged to ophthalmologists and others who performed the surgery, and that the overcharges were passed onto consumers who paid for laser vision correction surgery. In December 2001, the Court approved a $12.5 million settlement of the litigation.

24.     *In re Toys 'R' Us Antitrust Litigation*, MDL No. 1211 (E.D.N.Y.). Lieff Cabraser served as Co-Lead Counsel representing a class of direct purchasers (consumers) who alleged that Toys 'R' Us conspired with the major toy manufacturers to boycott certain discount retailers in order to restrict competition and inflate toy prices. In February 2000, the Court approved a settlement of cash and product of over $56 million.

25.     *In re Travel Agency Commission Antitrust Litigation*, MDL No. 1058 (D. Minn.). Lieff Cabraser served as Co-Lead Counsel for a certified class of U.S. travel agents on claims against the major U.S. air carriers, who allegedly violated the federal antitrust laws by fixing the commissions paid to travel agents. In 1997, the Court approved an $82 million settlement.

26.     *Sanitary Paper Cases I & II*, J.C.C.P. Nos. 4019 & 4027 (Cal. Supr. Ct.). Lieff Cabraser served as Liaison Counsel on behalf of indirect purchasers of commercial paper products. Plaintiffs alleged that from 1993 to 2000 Defendants fixed the price of commercial tissue, toilet paper, toilet seat covers, and other commercial paper products in violation of the Cartwright Act and Unfair Competition Act. In February 2001, the Court approved a $3 million settlement of the case.

27.     *Schwartz v. National Football League*, No. 97-CV-5184 (E.D. Pa.). Lieff Cabraser served as counsel for individuals who purchased the "NFL Sunday Ticket" package of private satellite transmissions in litigation against the National Football League for allegedly violating the Sherman Act by limiting the distribution of television broadcasts of NFL games by satellite transmission to one package. In August 2001, the Court approved of a class action settlement that included: (1) the requirement that defendants provide an additional weekly satellite television package known as Single Sunday Ticket for the 2001 NFL football season, under certain circumstances for one more season, and at the defendants' discretion thereafter; (2) a $7.5 million settlement fund to be distributed to class members; (3) merchandise coupons entitling class members to discounts at the NFL's Internet store which the parties value at approximately $3 million; and (4) $2.3 million to pay for administering the settlement fund and notifying class members.

28.     ***In re Commercial Explosives Antitrust Litigation***, MDL No. 1093 (D. Utah).  Lieff Cabraser served as Class Counsel on behalf of direct purchasers of explosives used in mining operations.  In 1998, the Court approved a $77 million settlement of the litigation.

29.     ***In re California Indirect-Purchaser X-Ray Antitrust Litigation***, No. 960886 (Cal. Supr. Ct.).  Lieff Cabraser served as Class Counsel on behalf of indirect purchasers (consumers) of medical x-ray film who alleged violations of the Cartwright and Unfair Competition Acts.  In 1998, the Court approved a $3.75 million settlement of the litigation.

30.     ***In re Brand Name Prescription Drugs***, MDL No. 997 (N.D. Ill.).  Lieff Cabraser served as Class Counsel for a class of tens of thousands of retail pharmacies against the leading pharmaceutical manufacturers and wholesalers of brand name prescription drugs for alleged price-fixing from 1989 to 1995 in violation of the federal antitrust laws.  Class Plaintiffs charged that defendants engaged in price discrimination against retail pharmacies by denying them discounts provided to hospitals, health maintenance organizations, and nursing homes.  In 1996 and 1998, the Court approved settlements with certain manufacturers totaling $723 million.

31.     ***In re K-Dur Prescription Drug Antitrust Litigation***, MDL No. 1419.  Lieff Cabraser serves as Class Counsel on behalf of indirect purchasers of K-Dur, a potassium supplement often prescribed in conjunction with high blood pressure medication.  K-Dur is the fourth most frequently prescribed drug to seniors.  The complaint alleges the defendants, The lawsuits allege that Schering-Plough, privately held Upsher-Smith Laboratories and American Home Products Corporation (now Wyeth) entered into illegal agreements aimed at blocking the introduction of low-cost generic forms of K-Dur to the market.  Plaintiffs' motion for class certification is pending.

32.     ***In re Flat Glass Antitrust Litigation***, MDL 1200 (W.D. Pa.).  Lieff Cabraser served as Class Counsel on behalf of a class of direct purchasers of flat glass.

33.     ***In re Linerboard Antitrust Litigation***, MDL 1261 (E.D. Pa.).  Lieff Cabraser served as Class Counsel on behalf of a class of direct purchasers of linerboard.  The court recently approved a settlement totaling $202 million.

34.     ***Carbon Fiber Cases I, II, III***, J.C.C.P. Nos. 4212, 4216 & 4222 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel on behalf of indirect purchasers of carbon fiber.  Plaintiffs alleged that defendants illegally conspired to raise prices of carbon fiber.  Settlements have been reached with all of the defendants.

35.     ***Methionine Cases I and II***, J.C.C.P. Nos. 4090 & 4096 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of methionine, an amino acid used primarily as a poultry and swine feed additive to enhance growth and production.  Plaintiffs alleged that the companies illegally conspired to raise methionine prices to super-competitive levels.  The case settled.

36.     ***McIntosh v. Monsanto***, No. 4:01CV65RSW (E.D. Mo.).  Lieff Cabraser served as Co-Lead Counsel in a class action lawsuit against Monsanto Company and others alleging that a conspiracy to fix prices on genetically modified Roundup Ready soybean seeds and Yieldgard corn seeds.  The case settled.

37.     ***Tortola Restaurants, L.P. v. Minnesota Mining and Manufacturing***, No. 314281 (Cal. Supr. Ct)  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of Scotch-brand invisible and transparent tape.  Plaintiffs alleged that defendant 3M conspired with certain retailers to monopolize the sale of Scotch-brand tape in California.  This case has been resolved as part of a nationwide settlement that Lieff Cabraser negotiated, along with co-counsel.

## F.     <u>Non-Personal Injury Defective Products</u>

1.      ***Richison v. American Cemwood Corp.***, No. 005532 (San Joaquin Supr. Ct., Cal.).  Lieff Cabraser served as Co-lead Class Counsel for an estimated nationwide class of 30,000 owners of homes and other structures on which defective Cemwood Shakes were installed.  In November 2003, the Court granted final approval to a $75 million Phase 2 settlement in the American Cemwood roofing shakes national class action litigation.  This amount was in addition to a $65 million partial settlement approved by the Court in May 2000, and brought the litigation to a conclusion.  The claims period runs through 2015.

2.      ***Williams v. Weyerhaeuser***, No. 995787 (San Francisco Supr. Ct.).  Lieff Cabraser served as Class Counsel on behalf of a nationwide class of hundreds of thousands or millions of owners of homes and other structures with defective Weyerhaeuser hardboard siding.  A California-wide class was certified for all purposes in February 1999, and withstood writ review by both the California Court of Appeal and Supreme Court of California. In 2000, the Court granted final approval to a nationwide settlement of the case which provides class members with compensation for their damaged siding, based on the cost of replacing or, in some instances, repairing, damaged siding.  The settlement has no cap, and requires Weyerhaeuser to pay all timely, qualified claims over a nine year period.  The claims program is underway and paying claims.

3.   ***Foothill/DeAnza Community College District v. Northwest Pipe Company***, No. C-00-20749 (N.D. Cal.).  In June 2004, the court approved the creation of a settlement fund of up to $14.5 million for property owners nationwide with Poz-Lok fire sprinkler piping that fails.  Since 1990, Poz-Lok pipes and pipe fittings were sold in the U.S. as part of fire suppression systems for use in residential and commercial buildings.  After leaks in Poz-Lok pipes caused damage to its DeAnza Campus Center building, Foothill/DeAnza Community College District in California retained Lieff Cabraser to file a class action lawsuit against the manufacturers of Poz-Lok.  The college district charged that Poz-Lok pipe had manufacturing and design defects that resulted in the premature corrosion and failure of the product.  Under the settlement, owners whose Poz-Lok pipes are leaking today, or over the next 15 years, may file a claim for compensation.

4.   ***Toshiba Laptop Screen Flicker Settlement.***  Lieff Cabraser negotiated a settlement with Toshiba America Information Systems, Inc. ("TAIS") to provide relief for owners of certain Toshiba Satellite 1800 Series, Satellite Pro 4600 and Tecra 8100 personal notebook computers whose screens flickered, dimmed or went blank due to an issue with the FL Inverter Board component.  Under the terms of the Settlement, owners of affected computers who paid to have the FL Inverter issue repaired by either TAIS or an authorized TAIS service provider recovered the cost of that repair, up to $300 for the Satellite 1800 Series and the Satellite Pro 4600 personal computers, or $400 for the Tecra 8100 personal computers.  TAIS also agreed to extend the affected computers' warranties for the FL Inverter issue by 18 months.

5.   ***ABS Pipe Litigation***, JCCP No. 3126 (Contra Costa County Supr. Ct., Cal.).  Lieff Cabraser served as Lead Class Counsel on behalf of property owners whose ABS plumbing pipe was allegedly defective and caused property damage by leaking.  Six separate class actions were filed in California against five different ABS pipe manufacturers, numerous developers of homes containing the ABS pipe, as well as the resin supplier and the entity charged with ensuring the integrity of the product.  Between 1998 and 2001, we achieved 12 separate settlements in the class actions and related individual lawsuits for approximately $78 million.

Commenting on the work of Lieff Cabraser and co-counsel in the case, California Superior Court (now appellate) Judge Mark B. Simons stated on May 14, 1998: "The attorneys who were involved in the resolution of the case certainly entered the case with impressive reputations and did nothing in the course of their work on this case to diminish these reputations, but underlined, in my opinion, how well deserved those reputations are."

6.     ***McManus, et al. v. Fleetwood Enterprises, Inc.***, No. SA-99-CA-464-FB (W.D. Tex.).  Lieff Cabraser served as Class Counsel on behalf of original owners of 1994-2000 model year Fleetwood Class A and Class C motor homes.  In 2003, the Court approved a settlement that resolved lawsuits pending in Texas and California about braking while towing with 1994 Fleetwood Class A and Class C motor homes.  The lawsuits alleged that Fleetwood misrepresented the towing capabilities of new motor homes it sold, and claimed that Fleetwood should have told buyers that a supplemental braking system is needed to stop safely while towing heavy items, such as a vehicle or trailer.  The settlement paid $250 to people who bought a supplemental braking system for Fleetwood motor homes that they bought new.

7.     ***Cox v. Shell***, No. 18,844 (Obion County Chancery Ct., Tenn.).  Lieff Cabraser served as Class Counsel on behalf of a nationwide class of approximately 6 million owners of property equipped with defective polybutylene plumbing systems and yard service lines.  In November 1995, the Court approved a settlement involving an initial commitment by Defendants of $950 million in compensation for past and future expenses incurred as a result of pipe leaks, and to provide replacement pipes to eligible claimants.  The settlement claims program will continue past 2010, under the continuing supervision of the trial court.

8.     ***Naef v. Masonite***, No. CV-94-4033 (Mobile County Circuit Ct., Ala.).  Lieff Cabraser Heimann & Bernstein served as Class Counsel on behalf of a nationwide Class of an estimated 4 million homeowners with allegedly defective hardboard siding manufactured and sold by Masonite Corporation, a subsidiary of International Paper, on their homes.  The Class was certified in November 1995, and the Alabama Supreme Court twice denied extraordinary writs seeking to decertify the Class, including in *Ex Parte Masonite*, 681 So. 2d 1068 (Ala. 1996).  A month-long jury trial in 1996 established the factual predicate that Masonite hardboard siding was defective under the laws of most states.  The case settled on the eve of a second Class-wide trial, and in January 1998, the Court approved a Class Settlement.  Under the Settlement, Class members with failing Masonite hardboard siding installed and incorporated in their property between January 1, 1980 and January 15, 1998 can make claims through 2008 and have their homes evaluated by independent inspectors.  Class members with qualifying damage to their siding recover damages associated with the siding.  To date, the Settlement has paid out over $750 million to homeowners across the country, and claims continue to be made and paid.

9.     ***Lundell v. Dell***, No. C05-03970 (N.D. Cal.).  Lieff Cabraser served as Lead Class Counsel for consumers who experienced power problems with the Dell Inspiron 5150 notebook.  In December 2006, the Court granted final approval to a settlement of the class action which extended the one-

year limited warranty on the notebook for a set of repairs related to the power system.  In addition, class members that paid Dell or a third party for repair of the power system of their notebook were entitled to a 100% cash refund from Dell.

10.     ***Kan v. Toshiba American Information Systems***, No. BC327273 (Los Angeles Super. Ct.).  Lieff Cabraser served as Co-Lead Counsel for a class of all end-user persons or entities who purchased or otherwise acquired in the United States, for their own use and not for resale, a new Toshiba Satellite Pro 6100 Series notebook.  Consumers alleged a series of defects were present in the notebook.  In 2006, the Court approved a settlement that extended the warranty for all Satellite Pro 6100 notebooks, provided cash compensation for certain repairs, and reimbursed class members for certain out-of-warranty repair expenses.

11.     ***In re Louisiana-Pacific Inner-Seal Siding Litigation***, No. C-95-879-JO (D. Or.).  Lieff Cabraser served as Co-Lead Class Counsel on behalf of a nationwide class of homeowners with defective exterior siding on their homes.  Plaintiffs asserted claims for breach of warranty, fraud, negligence, and violation of consumer protection statutes.  On April 26, 1996, U.S. District Judge Robert E. Jones entered an Order, Final Judgment and Decree granting final approval to a nationwide settlement requiring Louisiana-Pacific to provide funding up to $475 million to pay for inspection of homes and repair and replacement of failing siding over the next seven years.

12.     ***In re Intel Pentium Processor Litigation***, No. CV 745729 (Santa Clara Supr. Ct., Cal.).  Lieff Cabraser served as one of two court appointed Co-Lead Class Counsel, and negotiated a settlement, approved by the Court in June 1995, involving both injunctive relief and damages having an economic value of approximately $1 billion.  The chip replacement program has been implemented, and is ongoing.

13.     ***Gross v. Mobil***, No. C 95-1237-SI (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Class Counsel in this nationwide action involving an estimated 2,500 aircraft engine owners whose engines were affected by Mobil AV-1, an aircraft engine oil.  Plaintiffs alleged claims for strict liability, negligence, misrepresentation, violation of consumer protection statutes, and for injunctive relief.  Plaintiffs obtained a preliminary injunction requiring Defendant Mobil Corporation to provide notice to all potential class members of the risks associated with past use of Defendants' aircraft engine oil.  In addition, Plaintiffs negotiated a proposed Settlement, granted final approval by the Court in November 1995, valued at over $12.5 million, under which all Class Members were eligible to participate in an engine inspection and repair program, and receive compensation for past repairs and for the loss of use of their aircraft associated with damage caused by Mobil AV-1.

14. ***In re General Motors Corp. Pick-Up Fuel Tank Products Liability Litigation***, MDL No. 961 (E.D. PA). Lieff Cabraser served as court-appointed Co-Lead Counsel representing a class of 4.7 million plaintiffs who owned 1973-1987 GM C/K pickup trucks with allegedly defective gas tanks. The Consolidated Complaint asserted claims under the Lanham Act, the Magnuson-Moss Act, state consumer protection statutes, and common law. In 1995, the Third Circuit vacated the District Court settlement approval order and remanded the matter to the District Court for further proceedings. In July 1996, a new nationwide class action was certified for purposes of an enhanced settlement program valued at a minimum of $600 million, plus funding for independent fuel system safety research projects. Final approval was granted in November 1996.

15. ***Hanlon v. Chrysler Corp.***, No. C-95-2010-CAL (N.D. Cal.). In 1995, the district court approved a $200+ million settlement enforcing Chrysler's comprehensive minivan rear latch replacement program, and to correct alleged safety problems with Chrysler's pre-1995 designs. As part of the settlement, Chrysler agreed to replace the rear latches with redesigned latches. The settlement was affirmed on appeal by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (1998).

## G.   <u>Environmental and Toxic Exposures</u>

1. ***In re Unocal Refinery Litigation***, No. C 94-04141 (Cal. Supr. Ct.). Lieff Cabraser served as one of two Co-Lead Class Counsel and on the Plaintiffs' Steering Committee in this action against Union Oil Company of California ("Unocal") arising from a series of toxic releases from Unocal's San Francisco refinery in Rodeo, California. The action was settled in 1997 on behalf of approximately 10,000 individuals for $80 million.

2. ***Kentucky Coal Sludge Litigation.*** On October 11, 2000, near Inez, Kentucky, a coal waste storage facility ruptured, spilling 300 million gallons of coal sludge (a wet mixture produced by the treatment and cleaning of coal) into waterways in the region and contaminating hundreds of properties. This was one of the worst environmental disasters in the Southeastern United States. With co-counsel, Lieff Cabraser represented over 400 clients in property damage claims, including claims for diminution in the value of their homes and properties. In April 2003, the parties reached a confidential settlement agreement on favorable terms to the plaintiffs.

3. ***Toms River Childhood Cancer Incidents***. With co-counsel, Lieff Cabraser represented 69 families in Toms River, New Jersey, each with a child having cancer, that claimed the cancers were caused by environmental contamination in the Toms River area. Commencing in 1998, the parties – the 69 families, Ciba Specialty Chemicals, Union

Carbide and United Water Resources, Inc., a water distributor in the area – participated in an unique alternative dispute resolution process, which lead to a fair and efficient consideration of the factual and scientific issues in the matter.  In December 2001, under the supervision of a mediator, a confidential settlement favorable to the families was reached.

4.    ***In re Exxon Valdez Oil Spill Litigation*** (District of Alaska/Alaska Supr. Ct.).  The Exxon Valdez ran aground in March of 1989, spilling 11 million gallons of oil into Prince William Sound.  Lieff Cabraser served as one of the court-appointed Plaintiffs' Class Counsel.  The class consisted of 32,000 fisherman, Alaska natives, landowners and others whose livelihoods were gravely affected by the disaster.  In addition, Lieff served on the Class Trial Team in 1994.  A class action jury trial was held in federal court in 1994.  That jury awarded $5 billion in punitive damages to the plaintiff class.  The punitive damages award has been on repeated appeal by the Exxon Corporation ever since.  In 2001, the Ninth Circuit Court of Appeals ruled that the original $5 billion punitive damages verdict was excessive.  In 2002, U.S. District Court Judge H. Russell Holland reinstated the award at $4 billion.  Judge Holland stated that, "Exxon officials knew that carrying huge volumes of crude oil through Prince William sound was a dangerous business, yet they knowingly permitted a relapsed alcoholic to direct the operation of the Exxon Valdez through Prince William Sound."  In 2003, the Ninth Circuit again directed Judge Holland to reconsider the punitive damages award under United States Supreme Court punitive damages guidelines.  In January 2004, Judge Holland issued his order finding that Supreme Court authority did not change the Court's earlier analysis.  In December 2006, the Ninth Circuit Court of Appeals issued its ruling, setting the punitive damages award at $2.5 billion.  The case remains on appeal.

5.    ***West v. G&H Seed Co., Aventis CropSciences USA, LLP, et al.***, No. 99-C-4984-A (La. State Ct).  With co-counsel, Lieff Cabraser represented a class of 1,500 Louisiana crawfish farmers.  The farmers sued Bayer CropScience LP claiming the pesticide ICON killed their crawfish and caused economic ruin.  In 2004, the Court granted approved a $45 million settlement.  The settlement was reached after the parties had presented nearly a month's worth of evidence at trial, and were on the verge of making closing arguments to the jury.

6.    ***Craft v. Vanderbilt University***, Civ. No. 3-94-0090 (M.D. Tenn.).  Lieff Cabraser served as Lead Counsel of a certified class of over 800 pregnant women and their children who were intentionally fed radioactive iron without their consent while receiving prenatal care at defendant Vanderbilt's hospital in the 1940's.  The facts surrounding the administration of radioactive iron to the pregnant women and their children *in utero* came to light as a result of Energy Secretary Hazel O'Leary's 1993 disclosures of government sponsored human radiation

experimentation during the Cold War.  Defendants' attempts to dismiss the claims and decertify the class were unsuccessful.  The case was settled in July 1998 for a total of $10.3 million and a formal apology from Vanderbilt.

7.   ***In re GCC Richmond Works Cases***, J.C.C.P. No. 2906.  Lieff Cabraser served as Co-Liaison Counsel and Lead Class Counsel in coordinated litigation arising out of the release of a massive toxic sulfuric acid cloud which injured an estimated 50,000 residents of Richmond, California on July 26, 1993.  The Coordination Trial Court granted final approval to a $180 million class settlement for exposed residents.

8.   ***In re Sacramento River Spill Cases I and II***, J.C.C.P. Nos. 2617 & 2620 (Cal. Supr. Ct.).  Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel, Lead Class Counsel, and chaired the Plaintiffs' Litigation Committee in an action arising out of a July 14, 1991 Southern Pacific train derailment and toxic spill near Dunsmuir, California.  Settlement proceeds of approximately $16 million were distributed pursuant to Court approval of a plan of allocation to four certified plaintiff classes:  personal injury, business loss, property damage/diminution, and evacuation.

**H.   Aviation Law**

1.   ***In re Air Crash near Athens, Greece on August 14, 2005,*** MDL No. 1773.  On August 14, 2005, a Boeing 737 operating as Helios Airways flight 522 crashed north of Athens, Greece, resulting in the deaths of all passengers and crew.  The aircraft was heading from Larnaca, Cyprus to Athens International Airport when ground controllers lost contact with the pilots, who had radioed in to report problems with the air conditioning system.  Press reports about the official investigation indicate that a single switch for the pressurization system on the plane was not properly set by the pilots, and eventually both were rendered unconscious, along with most of the passengers and cabin crew.  Lieff Cabraser represents the families of several victims, and filed complaints alleging that a series of design defects in the Boeing 737-300 contributed to the pilots' failure to understand the nature of the problems they were facing.  Foremost among those defects was a confusing pressurization warning "horn" which uses the same sound that alerts pilots to improper takeoff and landing configurations.  The Judicial Panel on Multidistrict Litigation granted Lieff Cabraser's motion to consolidate all Helios cases before the U.S. District Court for the Northern District of Illinois in Chicago, where the headquarters of The Boeing Company are located and where Lieff Cabraser filed its clients' cases.

2.   ***Barbosa Garcia et al. v. Excelaire Service, Inc., and Honeywell International, Inc.***, No. CV 06-5964 (E.D. N.Y.).  Lieff Cabraser, with

co-counsel, represents over twenty families whose loved ones died in the Gol Airlines Flight 1907 crash.  On September 29, 2006, a brand-new Boeing 737-800 operated by Brazilian air carrier Gol plunged into the Amazon jungle after colliding with a smaller plane owned by the American company Excelaire Service, Inc.  None of the 149 passengers and six crew members on board the Gol flight survived the accident.  The complaint charges that the pilots of the ExcelAire jet were flying at an incorrect altitude at the time of the collision, failed to operate the jet's transponder and radio equipment properly, and failed to maintain communication with Brazilian air traffic control in violation of international civil aviation standards. If the pilots of the ExcelAire aircraft had followed these standards, plaintiffs charge that the collision would not have occurred.  At the time of the collision, the ExcelAire aircraft's transponder manufactured by Honeywell was not functioning. A transponder transmits a plane's altitude and operates its automatic anti-collision system.  The complaint charges that Honeywell shares responsibility for the tragedy because it defectively designed the transponder on the ExcelAire jet, and failed to warn of dangers resulting from foreseeable uses of the transponder.

3.  ***In re Air Crash at Lexington, Kentucky, August 27, 2006***, No. 07 CV 006 (E.D. Ky.).  A Bombardier CRJ-100 commuter plane operated by Comair, Inc., a subsidiary of Delta Air Lines, crashed on August 27, 2006 shortly after takeoff at Blue Grass Airport in Lexington, Kentucky, killing 47 passengers and two crew members.  The aircraft attempted to take off from the wrong runway.  Lieff Cabraser and co-counsel represent families of passengers who died on the flight.

4.  ***Crash of West Caribbean Airways Flight 708.***  On August 16, 2005, a McDonnell Douglas MD-82 operated by West Caribbean Airways lost engine power and crashed near La Cucharita, Venezuela, during a flight from Panama City to Fort de France, Martinique.  Martinique is a province of France.  A large number of the victims' families retained French attorneys to represent them.  In light of Lieff Cabraser's work on the Flash Air case (see below), those French attorneys asked Lieff Cabraser to advise them on the substance of U.S.  laws which may be applicable to a claim against The Boeing Company (successor to McDonnell Douglas) or Pratty & Whitney, the manufacturer of the aircraft's engines.  Lieff Cabraser now serves in that advisory capacity.

5.  ***Crash of Manhattan Tourist Helicopter.***  On June 14, 2005 a Bell 206 helicopter operated by Helicopter Flight Services, Inc. fell into the East River shortly after taking off for a tourist flight over New York City.  The pilot and six passengers were immersed upside-down in the water as the helicopter overturned.  Lieff Cabraser represents a passenger on the helicopter.

6.      ***Crash of "Legend" Aircraft in Tucson, AZ.***  On November 19, 2005, a single engine "Turbine Legend" kit plane operated by its owner crashed shortly after takeoff from a private airstrip in Tucson, Arizona, killing both the owner/pilot and a passenger.  Lieff Cabraser represents the widow of the passenger.  Witnesses report that the aircraft left the narrow runway during the takeoff roll and although the pilot managed to get the plane airborne, it rolled to the left and crashed.  Lieff Cabraser is investigating the liability of the pilot and others, including the manufacturer of the kit and the operator of the airport from which the plane took off.  The runway was 16 feet narrower than the minimum width recommended by the Federal Aviation Administration.

7.      ***Crash of Air Algerie Boeing 737.***  Together with French co-counsel, Lieff Cabraser represents the families of several passengers who died in the March 6, 2003 crash of a Boeing 737 airplane operated by Air Algerie. The aircraft crashed soon after takeoff from the Algerian city of Tamanrasset, after one of the engines failed.  All but one of the 97 passengers were killed, along with six crew members.

8.      ***Crash of Flash Air Boeing 737***.  On January 3, 2004, all 148 passengers and crew were killed when a Flash Airlines Boeing 737 plunged into the Red Sea off the coast of Egypt, after the pilots encountered a malfunction in the flight control system.  Most of the passengers were from France and were vacationing at the seaside resort of Sharm el Sheikh.  After the families retained French attorneys to represent them, those French attorneys conducted several rounds of interviews of U.S. law firms with the intention of engaging one of those firms to file an action in the United States against Boeing, which manufactured the aircraft in the United States.  Lieff Cabraser was selected to be that firm, and filed complaints in federal court in Los Angeles on behalf of the families of more than 120 victims. Although the U.S. District Court ruled that the case could be more conveniently tried in France, the plaintiffs have contested the jurisdiction of the French court over the case against Boeing.  If the French courts rule against jurisdiction, the case in the United States will be reactivated. Otherwise, Lieff Cabraser will act as consultants to the French attorneys on technical issues and questions of U.S.  law.

9.      ***Tower Collision of U.S. Army Blackhawk Helicopter.***  Lieff Cabraser represents the family of a pilot who died in the November 29, 2004 crash of a U.S. Army Black Hawk Helicopter.  The Black Hawk was flying during the early morning hours at an altitude of approximately 500 feet when it hit cables supporting a 1,700 foot-tall television tower, and subsequently crashed 30 miles south of Waco, Texas, killing both pilots and five passengers, all in active Army service.  The tower warning lights required by FCC regulations were inoperative, and the aviation and weather experts retained by Lieff Cabraser will testify that had the lights been operating as they should have, the helicopter's pilots would have

been warned away from the tower before they hit the cable.  LCHB will be filing an action shortly.

10.   ***Crash of China Eastern Airlines Bombardier CRJ200.***  Lieff Cabraser represents families of over 30 passengers who died in the November 21, 2004, crash of China Yunnan Airlines Flight 5210.  The plane, a Bombardier CRJ-200 built in Canada with engines from a General Electric plant in Massachusetts, was headed for Shanghai with 47 passengers and six crew members when it crashed into a lake, seconds after taking off from Baotou, Inner Mongolia.  The lawsuit filed by Lieff Cabraser in the Los Angeles Superior Court alleges that the crash was the result of a combination of pilot error and defects in the aircraft and its engines.  The defendants' attempt to transfer the case to the federal court failed when Lieff Cabraser's motion to remand was granted by that court.  The case is now pending in the Los Angeles Superior Court.

11.   ***Crash of Macedonian Presidential Aircraft.***  Lieff Cabraser represents the families of 8 victims of the February 26, 2004 crash of a Beech King Air 200 in Bosnia-Herzegovina.  The crash killed the President of Macedonia, Boris Trajkovski, and a number of his advisors and cabinet members.

12.   ***Crash of Mandala Airlines Flight 91***.  On September 5, 2005, a Boeing 737 operating as Mandala Flight 091 crashed immediately after takeoff form the airport in Medan, Indonesia, killing 101 of the 117 people on board, as well as 44 people on the ground.  Lieff Cabraser represents a number of injured persons and families of deceased victims.

13.   ***Aeroflot-Russian International Airlines Airbus Disaster***.  Lieff Cabraser represented the families of passengers who were on Aeroflot-Russian International Airlines Flight SU593 that crashed in Siberia on March 23, 1994.  The plane was in route from Moscow to Hong Kong.  All passengers on board died.  According to a transcript of the cockpit voice recorder, the pilot's two children entered the cockpit during the flight and took turns flying the plane.  The autopilot apparently was inadvertently turned off during this time, and the pilot was unable to remove his son from the captain's seat in time to avert the plane's fatal dive.  Lieff Cabraser, alongside French co-counsel, filed suit in France, where Airbus, the plane's manufacturer, was headquartered.  All the families Lieff Cabraser represented obtained substantial economic recoveries in settlement of the action.

14.   ***United Airlines Boeing 747 Disaster***, MDL No. 807 (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Liaison Counsel on behalf of the passengers and families of passengers injured and killed in the United Airlines Boeing 747 cargo door catastrophe near Honolulu, Hawaii on February 24, 1989.  Lieff Cabraser organized the litigation of the case, which included claims

brought against United Airlines and The Boeing Company.  Among our
work, we developed a statistical system for settling the passengers' and
families' damages claims with certain defendants, and coordinated the
prosecution of successful individual damages trials for wrongful death
against the non-settling defendants.

15.     ***German Air Force Lockheed F-104 Star Fighter Litigation:***  In the late
1960s and extending into the early 1970s, the United States sold F-104
Star Fighter jets to the German Air Force that were manufactured by
Lockheed Aircraft Corporation in California.  Although the F-104 Star
Fighter was designed for high-altitude fighter combat, it was used in
Germany and other European countries for low-level bombing and attack
training missions.  Consequently, the aircraft had an extremely high crash
rate, with over 300 pilots killed.  Commencing in 1971, the law firm of
Belli Ashe Ellison Choulos & Lieff filed hundreds of lawsuits for
wrongful death and other claims on behalf of the widows and surviving
children of the pilots.  Robert Lieff continued to prosecute the cases after
the formation of our firm.  In 1974, the lawsuits were settled with
Lockheed on terms favorable to the plaintiffs.  This litigation helped
establish the principle that citizens of foreign countries could assert claims
in United States courts, and obtain substantial recoveries, against an
American manufacturer based upon airplane accidents or crashes
occurring outside of the United States.

## I.     International and Human Rights Litigation

1.      ***Holocaust Cases***.  Lieff Cabraser is one of the leading firms that
prosecuted claims by Holocaust survivors and the heirs of Holocaust
survivors and victims against banks and private manufacturers and other
corporations who enslaved and/or looted the assets of Jews and other
minority groups persecuted by the Nazi Regime during the Second World
War era.  We serve as Settlement Class Counsel in the case against the
Swiss banks that the Court approved a U.S. $1.25 billion settlement in
July 2000.  Lieff Cabraser donated its attorneys' fees in the Swiss Banks
case, in the amount of $1.5 million, to endow a Human Rights clinical
chair at Columbia University Law School.  We were also active in slave
labor and property litigation against German and Austrian defendants, and
Nazi-era banking litigation against French banks.  In connection therewith,
Lieff Cabraser participated in multi-national negotiations that led to
Executive Agreements establishing an additional approximately U.S. $5
billion in funds for survivors and victims of Nazi persecution.  Our
website provides links to the websites of settlement and claims
administrators in these cases.

Commenting on the work of Lieff Cabraser and co-counsel in the
litigation against private German corporations, entitled *In re Holocaust
Era German Industry, Bank & Insurance Litigation* (MDL No. 1337),

U.S. District Court Judge William G. Bassler stated on November 13, 2002:

> Up until this litigation, as far as I can tell, perhaps with some minor exceptions, the claims of slave and forced labor fell on deaf ears. You can say what you want to say about class actions and about attorneys, but the fact of the matter is, there was no attention to this very, very large group of people by Germany, or by German industry until these cases were filed. . . . What has been accomplished here with the efforts of the plaintiffs' attorneys and defense counsel is quite incredible. . . I want to thank counsel for the assistance in bringing us to where we are today. Cases don't get settled just by litigants. It can only be settled by competent, patient attorneys.

2.   ***Cruz v. U.S., Estados Unidos Mexicanos, Wells Fargo Bank, et al.***, No. 01-0892-CRB (N.D. Cal.). In April 2001, Lieff Cabraser filed a class action on behalf of contract workers (known as "Braceros") who came from Mexico to the United States pursuant to bilateral agreements from 1942 through 1949 to aid American farms and industries hurt by employee shortages. The agreements provided that ten percent of the Braceros' wages would be withheld from them and transferred via United States and Mexican banks to savings accounts for each Bracero. Plaintiffs claim they were never reimbursed for the portion of their wages placed in the forced savings accounts. In June 2005, U.S. District Court Judge Charles Breyer denied motions to dismiss filed by Mexico and the Mexican banks charged with illegally withholding the savings funds from the Braceros in an extensive opinion, permitting the case to go forward against the Mexican defendants. The case is pending on appeal in the Ninth Circuit Court.

3.   ***The Presbyterian Church of Sudan v. Talisman Energy and Republic of Sudan***, No. 01 CV 9882 (S.D. N.Y.). With co-counsel, Lieff Cabraser represents the Presbyterian Church of Sudan and current and former residents of southern Sudan who allege that that they were victims of genocide, crimes against humanity and other violations of international law by Talisman Energy, Inc. ("Talisman"), the largest independent Canadian oil producer, and the Sudanese government. Plaintiffs charge that in the late 1990s through 2003, Talisman and Sudan participated in a joint military strategy of ethnic cleansing against non-Muslim in order to create a buffer zone for the exploitation of oil reserves in the Western Upper Nile region of the nation. In meetings with government officials, plaintiffs charge that Talisman mapped out areas it intended to explore, and the parties would then discuss how to "dispose of" the civilians living in those areas. Talisman allegedly was aware that the result of these

decisions was to cause genocide and war crimes as government military forces destroyed villages and killed, maimed, raped and tortured civilians of ethnic and religious minority backgrounds. The case is presently on appeal.

4.    ***Ali, et al. v. Rumsfeld,*** No. 05-C-1201 (N.D. Ill.) On March 1, 2005, Lieff Cabraser joined the ACLU and Human Rights First in representing seven individuals who claim that they were tortured by American military forces when they were held in U.S. Army detention facilities in Iraq and Afghanistan. Numerous Defense Department reports have found that torture was "widespread." The suit alleges that Defense Secretary Donald Rumsfeld and high-ranking military commanders were responsible for authorizing torture or failing to stop torture after they learned of it. A former Rear Admiral and former Brigadier General also serve as co-counsel. The consolidated case is pending in the U.S. District Court in Washington, D.C.

**FIRM BIOGRAPHY:**

   **PARTNERS**

   ***ELIZABETH J. CABRASER***, born Oakland, California, June 23, 1952. Admitted to practice in California, 1978; U.S. Supreme Court, 1996; U.S. Tax Court, 1979; California Supreme Court, 1978; U.S. District Court, Northern District of California, 1978; Eastern District of California, 1979; Central District of California and Southern District of California, 1992; U.S. Court of Appeals, Second Circuit, 2000; Third Circuit, 1994; Fifth Circuit, 1992; Sixth Circuit, 1992; Seventh Circuit, 2001; Ninth Circuit, 1979; Tenth Circuit, 1992; Eleventh Circuit, 1992; U.S. District Court, District of Hawaii, 1986. *Education*: Boalt Hall School of Law, University of California (J.D., 1978); University of California at Berkeley (A.B., 1975). *Awards and Honors*: "Lawdragon 500 Leading Lawyers in America," *Lawdragon*, December 2007; "Award For Public Interest Excellence," University of San Francisco School of Law Public Interest Law Foundation, 2007; "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, February 2007; "Top Women Litigators in California," *The San Francisco* and *Los Angeles Daily Journal,* 2007; *Distinguished Leadership Award*, Legal Community Against Violence, 2006; "One Hundred Most Influential Lawyers in America," *The National Law Journal*, 2006, 2000 and 1997; "Top 75 Women Litigators," *California Daily Journal*, 2005-2006; Women of Achievement, Legal Momentum (formerly the NOW Legal Defense & Education Fund), 2006; "Best Lawyer," *Best Lawyers in America*, 2006; "Top 100 Lawyers," *California Daily Journal*, 2002-2007; "Top 30 Securities Litigator," *California Daily Journal*, 2005; "Top 100 and Top 50 Female Northern California Super Lawyer," *Law & Politics*, 2005-2006; "Northern California Super Lawyer," *Law & Politics*, 2004-2007; "Top 50 Women Litigators," *California Daily Journal*, 2004; *Citation Award*, University of California, Berkeley Boalt Hall, 2003; "Top 30 Women Litigators," *California Daily Journal*, 2002; *Distinguished Jurisprudence Award*, Anti-Defamation League, 2002; "Top Ten Women Litigators," *The National Law Journal,* 2001; "California Law Business Top 100 Lawyers," *California Daily Journal*, 2000-1998; *Matthew O.*

*Tobriner Public Service Award*, Legal Aid Society, 2000; *Presidential Award of Merit*, Consumer Attorneys of California, 1998; "Fifty Most Influential Women Lawyers," *The National Law Journal,* 1998; "Lawyers of the Year," *California Lawyer*, 1998; *Public Justice Achievement Award*, Trial Lawyers for Public Justice, 1997.  *Publications & Presentations*: "The Manageable Nationwide Class: A Choice-of-Law Legacy of *Phillips Petroleum Co. v. Shutts,*" *University of Missouri- Kansas City Law Review,* Volume 74, Number 3, Spring 2006; Co-Author with Fabrice N. Vincent, "Class Actions Fairness Act of 2005," *California Litigation,* Vol. 18, No. 3 (2005); Editor in Chief, *California Class Actions Practice and Procedures* (2003); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law*, updated and re-published in 5 *Newberg on Class Actions* (ABA 2001- 2004); Co-Author, "Mass But Not (Necessarily) Class: Emerging Aggregation Alternatives Under the Federal Rules," ABA 8th Annual National Institute on Class Actions, New York (Oct. 15, 2004), New Orleans (Oct. 29, 2004); Co-Author, "2004 ABA Toxicology Monograph- California State Law," (January 2004); "Current Issues Involving Rule 12(b)(6) and Rule 9(b)," in *Civil Practice and Litigation Techniques in Federal and State Courts* (ALI-ABA Course of Study 2004); "New Developments in Mass Torts and Class Actions: 'Issues' Certification The Mass Torts Top Ten of 2003; Rule 23's New Provision and Action Trial Plans; And the FJC 'New Plain Language' Class Notice," in *Civil Practice and Litigation Techniques in Federal and State Courts* (ALI-ABA Course of Study, February 2004); "Human Rights Violations as Mass Torts: Compensation as a Proxy for Justice in the United States Civil Litigation System"; Coordinating Editor and Co-Author of California section of the ABA State Class Action Survey (2001-02); "Unfinished Business:  Reaching the Due Process Limits of Punitive Damages in Tobacco Litigation Through Unitary Classwide Adjudication," 36 *Wake Forest Law Review* 979 (Winter 2001); "Symposium: Enforcing the Social Contract through Representative Litigation," 33 *Connecticut Law Review* 1239 (Summer 2001); "Equity for the Victims, Equity for the Transgressor: The Classwide Treatment of Punitive Damages Claims," 74 *Tulane Law Review* 2005 (June 2000); "Class Action Trends and Developments After *Amchem* and *Ortiz*," in *Civil Practice and Litigation Techniques in Federal and State Courts* (ALI-ABA Course of Study 1999); Contributor/Editor, *Moore's Federal Practice* (1999); "Life After *Amchem*:  The Class Struggle Continues," 31 *Loyola Law Review* 373 (1998); "Recent Developments in Nationwide Products Liability Litigation:  The Phenomenon of Non-Injury Products Cases, the Impact of *Amchem* and the Trend Toward State Court Adjudication," *Products Liability* (ABA February 1998); Contributor/Editor, *California Causes of Action* (1998); "Beyond Bifurcation:  Multi- Phase Structure in Mass Tort Class Actions," *Class Actions & Derivative Suits* (Spring 1997); "The Road Not Taken:  Thoughts on the Fifth Circuit's Decertification of the *Castano* Class," SB24 ALI-ABA 433 (1996); "Getting the Word Out:  Pre-Certification Notice to Class Members Under Rule 23(d)(2)," *Class Actions & Derivative Suits Newsletter* (October 1995); "Mass Tort Class Action Settlements," 24 *CTLA Forum* 11 (Jan./Feb. 1994); "Do You Know the Way from San Jose?  The Evolution of Environmental and Toxic Nuisance Class Actions," *Class Actions & Derivative Suits* (Spring 1994); "An *Oracle* of Change? Realizing the Potential of Emerging Fee Award Methodologies for Enhancing The Role and Control of Investors in Derivative and Class Action Suits," *Principles of Corporate Governance* (ALI October 1994); "How To Streamline Complex Litigation:  Tailor a Case Management Order to Your Controversy," 21 *The Brief* 12 (ABA/TIPS Summer 1992); "The Applicability of the Fraud-On-The-Market Theory to 'Undeveloped' Markets:  When Fraud Creates the Market, 12 *Class Action Reports* 402 (1989); "The Applicability of the Fraud-On-The-Market-Theory to 'Undeveloped' Markets:  When

Fraud Creates the Market," 12 *Class Action Reports* 402 (1989); "Mandatory Certification of Settlement Classes," 10 *Class Action Reports* 151 (1987); Co-author with Alexandra L. Foote and Fabrice N. Vincent, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions," *Mealey's December Emerging Drugs Reporter* (December 2002); Co-author with Fabrice N. Vincent, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002). *Member*: American Law Institute, Council; American Bar Association (Past Co-Chair, Committee on Mass Torts; Committee on Class Actions and Derivative Suits; Tort and Insurance Practice Section (TIPS); Past Vice-Chair, Rules & Procedures Committee, Contributor, Civil Procedure & Evidence News Letter; Business Law Section, Corporate & Litigation Group); Federal Bar Association, Northern District of California Chapter; Bar Association of San Francisco (Past President, Securities Litigation Section; Board of Directors, 1997-1998; Past Member, Judiciary Committee); Advisor, American Law Institute International Jurisdiction and Judgments and Aggregate Litigation Projects; California Constitution Revision Commission, 1993-1996; National Center for State Courts Mass Tort Conference Planning Committee; Northern District of California Civil Justice Reform Act (CJRA) Advisory Committee, and Advisory Committee on Professional Conduct; Lawyer-Delegate, Ninth Circuit Judicial Conference, 1992-1995; American Bar Association (Litigation Section and Committee on Class Actions and Derivative Suits; Co-Chair, Committee on Mass Torts); Consumer Attorneys of California (CAOC); Trial Lawyers for Public Justice (TLPJ); Bar Association of the Fifth Federal Circuit; Fight for Justice Campaign; (California State Liaison, Women Trial Lawyers Caucus); California Women Lawyers; Lawyers Club of San Francisco; Queen's Bench; Association of Business Trial Lawyers; Bay Area Lawyers for Individual Freedom; ABA National Institute on Class Actions (Organizer/ Participant, 1997-2000).

**RICHARD M. HEIMANN**, born Miami, Florida, August 23, 1948. Admitted to practice in Pennsylvania, 1972; District of Columbia, 1974; California, U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1975; U.S. Supreme Court, 1980; U.S. Court of Appeals, Second Circuit, 1980; U.S. District Court, District of Hawaii, 1986. *Education*: Georgetown University (J.D., 1972); *Georgetown Law Journal*, 1971-72; University of Florida (B.S.B.A., with honors, 1969). *Employment*: Mr. Heimann served as Deputy District Attorney and Acting Assistant District Attorney for Tulare County, California, and as an Assistant Public Defender in Philadelphia, Pennsylvania, 1972-74. As a private civil law attorney, Mr. Heimann has tried over 30 civil jury cases, including complex cases such as the successful *FPI/Agretech* and *Edsaco* securities class action trials. In April 2002 in the *Edsaco* case, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd., which included $165 million in punitive damages. *Awards & Honors*: "Northern California Super Lawyers," *Law & Politics*, 2004 – 2007. *Member*: State Bar of California; Bar Association of San Francisco.

**WILLIAM BERNSTEIN**, born York, Pennsylvania, July 5, 1950. Admitted to practice in 1975; U.S. Court of Appeals, Ninth Circuit, 1975; U.S. District Court, Northern District of California, 1975; New York and U.S. Supreme Court, 1985; U.S. District Court, Central and Eastern Districts of California, 1991; U.S. District Court, Southern District of California, 1992. *Education*: University of San Francisco (J.D., 1975); *San Francisco Law*

*Review*, 1974-75; University of Pennsylvania (B.A., general honors, 1972). *Community Service*: Adjunct Professor of Law, University of San Francisco, Settlement Law (2006-Present); Judge Pro Tem for San Francisco Superior Court, 2000-present; Marin Municipal Court, 1984; Discovery Referee for the Marin Superior Court, 1984-89; Arbitrator for the Superior Court of Marin, 1984-1990. *Awards & Honors*: *Who's Who Legal*, 2007; Northern California Super Lawyers, *Law & Politics, 2004 – 2007*; Princeton Premier Registry, Business Leaders and Professionals, 2008-09; *Unsung Hero* Award, Appleseed, 2006. *Publications & Presentations*: "The Rise and Fall of Enron's One-To-Many Trading Platform" (American Bar Association Antitrust Law Section, Annual Spring Meeting, 2005); Co-author with Donald C. Arbitblit, "Effective Use of Class Action Procedures in California Toxic Tort Litigation", 3 *Hastings West-Northwest Journal of Environmental Law and Policy*, No. 3 (Spring 1996). *Member*:  State Bar of California; State Bar of New York; Marin County Bar Association (Admin. of Justice Committee, 1988); Bar Association of San Francisco.

*JOSEPH R. SAVERI*, born San Francisco, California, August 18, 1962.  Admitted to practice in California, 1987; U.S. District Court, Northern District of California; U.S. District Court, Central District of California; U.S. District Court, Southern District of California; U.S. Court of Appeals, First Circuit; U.S. Court of  Appeals, Second Circuit; U.S. Court of Appeals, Seventh Circuit; U.S. Court of Appeals, Eighth Circuit; U.S. Court of Appeals, Ninth Circuit; U.S. Court of Appeals, Federal Circuit; U.S. Supreme Court. *Education*:  University of Virginia (J.D., 1987); University of California at Berkeley (B.A., 1984). *Awards and Honors*: "Northern California Super Lawyers," *Law & Politics*, 2006 & 2007; AV® Peer Review Rated, *Martindale-Hubbell*. *Publications & Presentations*: "Dagher: An Admirable Exercise in Restraint," Competition: The Journal of the Antitrust and Unfair Competition Law Section of the State Bar of California, Vol. 15, No. 2 (Fall/Winter 2006); Panelist, *Soaring Prices for Prescription Drugs: Just Rewards for Innovations or Antitrust Violations?*, University of San Francisco Law Review (November 13, 2004); *California Antitrust & Unfair Competition Law 3d* (Antitrust and Unfair Competition Law Section of the State Bar of California 2003); Panelist, Fordham Conference on Electronic Discovery, Discovery Subcommittee of Advisory Committee on the Rules of Civil Procedure; Contributing Author, *California Class Actions Practice and Procedure (*Elizabeth J. Cabraser editor in chief, 2003); "RICO Update," 22 *Review of Securities and Commodities Regulation*, No. 18 (Oct. 25, 1989). *Member*:  Faculty Member, Sedona Conference on Antitrust Law and Litigation, 2006; Northern District of California's Civil Rules and Practice Committee; Bar Association of San Francisco; State Bar of California; Italian American Bar Association; Lawyers Club of San Francisco.

*DONALD C. ARBITBLIT*, born Jersey City, New Jersey, May 5, 1951.  Admitted to practice in Vermont, 1979; California and U.S. District Court, Northern District of California, 1986. *Education*:  Boalt Hall School of Law, University of California (J.D., 1979); Order of the Coif; Tufts University (B.S., *magna cum laude*, 1974). *Awards and Honors*: "Northern California Super Lawyers," *Law & Politics*, 2004-07. *Publications & Presentations*:  Co-Author with Wendy Fleishman, "The Risky Business of Off-Label Use," *Trial* (March 2005); "Comment on *Joiner*:  Decision on the *Daubert* Test of Admissibility of Expert Testimony," 6 *Mealey's Emerging Toxic Torts*, No. 18 (December 1997); Co-author with William Bernstein, "Effective Use of Class Action Procedures in California Toxic Tort Litigation," 3 *Hastings West-Northwest Journal of Environmental Law and Policy*, No. 3 (Spring 1996); "The Plight of American Citizens Injured by Transboundary River Pollution," 8 *Ecology Law Quarterly*, No. 2 (1979).

*Appointments*:  Member of the Federal Court-appointed Science Executive Committee, and Chair of the Epidemiology/Clinical Trials Subcommittee, In re Vioxx Products Liability Litigation, MDL No. 1657 (E.D. La.); Member of the Federal Court-appointed Science and Expert Witness Committees in *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D. Pa.), *In re Baycol Products Litigation,* MDL No. 1431 (D. Minn.) and *Rezulin Products Liability Litigation*, MDL No. 1348 (S.D.N.Y.).  *Member*: Bar Association of San Francisco; State Bar of California.

**STEVEN E. FINEMAN,** born Los Angeles, California, February 13, 1963.  Managing Partner.  Admitted to practice in California, 1989; U.S. District Court, Northern, Eastern and Central Districts of California and U.S. Court of Appeals, Ninth Circuit, 1995; U.S. Court of Appeals, Fifth Circuit, 1996; New York, U.S. District Court, Eastern and Southern Districts of New York, U.S. Court of Appeals, Second Circuit and U.S. Supreme Court, 1997; District of Columbia, 1997. *Education*:  University of California, Hastings College of the Law (J.D., 1988); University of California, San Diego (B.A., 1985); Stirling University, Scotland (English Literature and Political Science, 1983-84).  *Honors/Appointments*:  "New York Super Lawyers," *Law & Politics*, 2006-2007; "The New York Area's Best Lawyers," *Best Lawyers in America* (published by *American Lawyer Media*), 2005-2008; "40 under 40", *The National Law Journal*, 2002, selected as one of the country's most successful litigators under the age of 40; Editorial Board, "Bill of Particulars, A Review of Developments in New York State Trial Law," New York State Trial Lawyers Institute, Quarterly (June 2005-present); Trial Lawyers for Public Justice, Executive Committee Member (July 2006-present), Board of Directors (July 2002-present); Board of Trustees, Civil Justice Foundation (January 2004-present), Executive Committee (July 2006-present), Co-Chair & Class Action Preservation Project (July 2005-present); Board of Directors, New York State Trial Lawyers Association (July 2001-July 2004); Plaintiff Toxic Tort Advisory Council, Lexis/Nexis, Mealey's Publications and Conferences Group (January 2002-2005).  *Publications & Presentations*:  Stanford University Law School and The Centre for Socio-Legal Studies, Oxford University, conference on The Globalization of Class Actions, Panel Member, *Resolution of Class and Mass Actions* (December 13 and 14, 2007, Oxford, England); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, *Foreign Claimants in U.S. Courts* (April 17, 2007, Stanford, California); "Bill of Particulars, A Review of Developments in New York State Trial Law," *Federal Court Jurisdiction: Getting to Federal Court By Choice or Removal* (Winter 2007); "Bill of Particulars, A Review of Developments in New York State Trial Law," *Initiating Litigation and Electronic Filing in Federal Court* (Spring 2007); American Constitution Society for Law and Policy, 2006 National Convention, Panel Member, *Finding the Balance: Federal Preemption of State Law* (June 16, 2006, Washington, D.C.); Lieff, Cabraser, Heimann & Bernstein, LLP, Global Justice Forum, Conference Moderator and Panel Member on securities litigation (May 19, 2006, Paris, France); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, *Foreign Claimants in U.S. Court* (April 25, 2006, Stanford, California); Lieff, Cabraser, Heimann & Bernstein, LLP, Global Justice Forum, Conference Moderator and Speaker and Papers, *The Basics of Federal Multidistrict Litigation: How Disbursed Claims are Centralized in U.S.  Practice and Basic Principles of Securities Actions for Institutional Investors* (May 20, 2005, London, England); New York State Trial Lawyers Institute, Federal Practice for State Practioners, Speaker and Paper, *Federal Multidistrict Litigation Practice*, (March 30, 2005, New York, New York), published in "Bill of Particulars, A Review of Developments in New York State Trial Law"

(Spring 2005); Stanford University Law School, The Stanford Center on Conflict and Negotiation, Interdisciplinary Seminar on Conflict and Dispute Resolution, Guest Lecturer, *In Search of "Global Settlements": Resolving Class Actions and Mass Torts with Finality* (March 16, 2004, Stanford, California); Lexis/Nexis, Mealey's Publications and Conferences Group, Wall Street Forum: Mass Tort Litigation, Co-Chair of Event (July 15, 2003, New York, New York); Northstar Conferences, The Class Action Litigation Summit, Panel Member on Class Actions in the Securities Industry, and Paper, *Practical Considerations for Investors' Counsel - Getting the Case* (June 27, 2003, Washington, D.C.); The Manhattan Institute, Center for Legal Policy, Forum Commentator on Presentation by John H. Beisner, "Magnet Courts: If You Build Them, Claims Will Come" (April 22, 2003, New York, New York); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's Courses on Complex Litigation ("Selecting The Forum For a Complex Case -- Strategic Choices Between Federal And State Jurisdictions") and Alternative Dispute Resolution ("ADR In Mass Tort Litigation") (March 4, 2003, Stanford, California); American Bar Association, Tort and Insurance Practice Section, Emerging Issues Committee, Member of Focus Group on Emerging Issues in Tort and Insurance Practice (coordinated event with New York University Law School and University of Connecticut Law School, August 27, 2002, New York, New York); Duke University and University of Geneva, *Debates Over Group Litigation in Comparative Perspective*, Panel Member on Mass Torts and Products Liability (July 21-22, 2000, Geneva, Switzerland); *New York Law Journal*, Article, *Consumer Protection Class Actions Have Important Position, Applying New York's Statutory Scheme* (November 23, 1998); Leader Publications, *Litigation Strategist*, "Fen-Phen" Articles, *The Admissibility of Scientific Evidence in Fen-Phen Litigation* and *Daubert Developments: Something for Plaintiffs, Defense Counsel* (June 1998, New York, New York); The Defense Research Institute and Trial Lawyer Association, Toxic Torts and Environmental Law Seminar, Article and Lecture, *A Plaintiffs' Counsels' Perspective: What's the Next Horizon?* (April 30, 1998, New York, New York); Lexis/Nexis, Mealey's Publications and Conference Group, Mealey's Tobacco Conference: Settlement and Beyond 1998, Article and Lecture, *The Expanding Litigation* (February 21, 1998, Washington, D.C.); New York State Bar Association, Expert Testimony in Federal Court After Daubert and New Federal Rule 26, Article and Lecture, *Breast Implant Litigation: Plaintiffs' Perspective on the Daubert Principles* (May 23, 1997, New York, New York). *Member*: American Bar Association; New York Bar Association; California Bar Association; District of Columbia Bar Association; Public Justice Foundation, Board of Directors (July 2002-present); Executive Committee (July 2006-present); Co-Chair, Class Action Preservation Project ( July 2005-present); Secretary (July 2007-present); Association of the Bar of the City of New York; Fight for Justice Campaign; New York State Trial Lawyers Association; Trial Lawyers For Public Justice; Association of Trial Lawyers of America; Human Rights First; American Constitution Society for Law and Policy; Supreme Court Historical Society.

**ROBERT J. NELSON**, born New York, New York, October 20, 1960; admitted practice in California, 1987; U.S. District Court, Central District of California, 1987; U.S. District Court, Northern District of California, 1988; U.S. Court of Appeals, Ninth Circuit, 1988; U.S. Court of Appeals, Sixth Circuit, 1995; District of Columbia, 1998; New York, 1999; U.S. District Court, Eastern District of New York, Southern District of New York, 2001. *Education*: New York University School of Law (J.D., 1987); Order of the Coif, Articles Editor, *New York University Law Review*; Root-Tilden Scholarship Program; Cornell University (A.B., *cum laude* 1982);

Member, Phi Beta Kappa, College Scholar Honors Program; London School of Economics (General Course, 1980-81): Graded First. *Employment:* Law Clerk to Judge Stephen Reinhardt, U.S. Court of Appeals, Ninth Circuit, 1987-88; Assistant Federal Public Defender, Northern District of California, 1988-93; Legal Research and Writing Instructor, University of California-Hastings College of the Law, 1989-91 (Part-time position). *Awards & Honors*: Consumer Attorney of the Year Finalist, 2007; San Francisco Trial Lawyer of the Year Finalist, 2007; California Lawyer Attorney of the Year (CLAY) Award, 2008; "Northern California Super Lawyers," *Law & Politics*, 2004 - 2008. *Publications & Presentations:* Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003); "The Importance of Privilege Logs," *The Practical Litigator*, Vol. II, No. 2 (March 2000)(ALI-ABA Publication); "To Infer or Not to Infer a Discriminatory Purpose: Rethinking Equal Protection Doctrine," 61 *New York University Law Review* 334 (1986). *Member*: State Bar of California; Bar of the District of Columbia; State Bar of New York; Bar Association of San Francisco; Fight for Justice Campaign; American Bar Association.

**KELLY M. DERMODY**, born Ithaca, New York, June 16, 1967. Admitted to practice in California, 1994; U.S. District Court, Northern District of California, 1995; U.S. Court of Appeals for the Third Circuit (2001); U.S. Court of Appeals for the Seventh Circuit (2006); U.S. Court of Appeals for the Ninth Circuit (2007); U.S. Court of Appeals for the Sixth Circuit (2008); U.S. District Court of Colorado (2007). *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D. 1993); Moot Court Executive Board (1992-1993); Articles Editor, *Industrial Relations Law Journal/Berkeley Journal of Employment and Labor Law* (1991-1992); Harvard University (A.B. *magna cum laude*, 1990), Senior Class Ames Memorial Public Service Award. *Employment*: Law Clerk to Chief Judge John T. Nixon, U.S. District Court, Middle District of Tennessee, 1993-1994; Adjunct Professor of Law, Golden Gate University School of Law, Employment Law (Spring 2001). *Awards & Honors*: "Community Service Award," Bay Area Lawyers for Individual Freedom, 2008; "California Lawyer Attorney of the Year (CLAY) Award," *California Lawyer*, 2007; "Trial Lawyer of the Year Finalist," Public Justice Foundation, 2007; "Award of Merit," Bar Association of San Francisco, 2007; Consumer Attorney of the Year Finalist, Consumer Attorneys of California, 2006; "Living the Dream Partner," Lawyers' Committee for Civil Rights of the San Francisco Bay Area, 2005; "Top Women Litigators in California," San Francisco and Los Angeles *Daily Journal*, 2007; California's "Top 20 Lawyers Under 40," *Daily Journal*, 2006; "Northern California Super Lawyer," *Law & Politics*, 2004-2008; "Top 100 Super Lawyers" and "Top 50 Female Super Lawyers" Awards, *Law & Politics Magazine*, 2007; "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, February 2007. *Publications & Presentations*: "Class Actions: Latest Developments in Litigating and Settling Employment Discrimination Class Actions" (American Bar Association Labor and Employment Section Equal Opportunity Committee, Mid-Year Meeting, 2001); Co-Author with James M. Finberg, "A Road Map to Discovery in Employment Discrimination and Wage/Hour Class Actions" (Glasser Legal Works Seminar, 2000); "Employment Discrimination Class Actions in the Wake of *Allison v. Citgo Petroleum Corp.*" (American Bar Association Litigation Section Annual Meeting, 2000); "Employment Discrimination Class Actions in the Wake of *Allison v. Citgo Petroleum Corp.* and Fed. R. Civ. P. 23(f)" (Federal Bar Association Convention, 1999); Co-Author with James M. Finberg, "Discovery in Employment Discrimination Class Actions," in *Litigation and Settlement of Complex Class Actions* (Glasser Legal Works 1998). *Member*: Northern District of

California Lawyer Representative to the Ninth Circuit Judicial Conference (2007-present); American Bar Association, Labor and Employment Law Section Annual Conference (Vice-Chair, 2007-present), Committee on Equal Opportunity in the Legal Profession (Co-Chair, 2006-2007); American Bar Association Labor and Employment Law Section Equal Employment Opportunity Committee (Co-Chair, 2003-present; Midwinter Meeting Planning Committee, 2000-2006); ABA Labor and Employment Law Section Katrina Task Force (Member, 2005-2007); Bar Association of San Francisco (Board of Directors, 2005-present; Litigation Section, Executive Committee, 2002-2005); National Association of Women Judges (Resource Board, 2005-present); Lawyers' Committee for Civil Rights of the San Francisco Bay Area (Board of Directors, 1998-2005; Secretary, 1999-2003; Co-Chair, 2003-2005); National Center for Lesbian Rights (Board of Directors, 2002-2008; Board Co-Chair, 2005-2006); Pride Law Fund (Board of Directors, 1995-2002; Secretary, 1995-1997; Chairperson, 1997-2002); Equal Rights Advocates (Litigation Committee, 2000-2002); State Bar of California; Consumer Attorneys of California; National Employment Lawyers' Association; Bay Area Lawyers for Individual Freedom.

**JONATHAN D. SELBIN**, born Baton Rouge, Louisiana, May 11, 1967.  Admitted to practice in California, 1994; New York, 2001; District of Columbia, 1999; U.S. Court of Appeals, Fifth Circuit, 1994; U.S. District Court, Northern District of California, 1995; U.S. District Court, Central District of California, 1997; U.S. District Court, Southern District of New York, 2001.  *Education*:  Harvard Law School (J.D., *magna cum laude*, 1993); University of Michigan (B.A., *summa cum laude*, 1989).  *Employment*:  Law Clerk to Judge Marilyn Hall Patel, U.S. District Court, Northern District of California, 1993-95.  *Awards & Honors*: "New York Super Lawyers," *Law & Politics*, 2006.  *Publications & Presentations*:  Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor-in-chief, 2003); "Bashers Beware:  The Continuing Constitutionality of Hate Crimes Statutes After R.A.V.," 72 *Oregon Law Review* 157 (Spring, 1993).  *Member*: State Bar of California; State Bar of New York; Bar of the District of Columbia; American Bar Association; New York State Trial Lawyers Association.

**BARRY R. HIMMELSTEIN**, born Philadelphia, Pennsylvania, March 14, 1958.  Admitted to bar, 1992, California; U.S. District Court, Northern District of California, 1992.  *Education*:  Hastings College of the Law (J.D., *magna cum laude*, 1991); Note and Articles Editor, *Hastings Law Journal* (1990-91); University of Michigan at Ann Arbor (B.G.S., with distinction, 1982).  *Employment*: Law Clerk to Judge Charles A. Legge, U.S. District Court, Northern District of California, 1991-92.  *Publications & Presentations*: Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003).  *Member*: State Bar of California; Bar Association of San Francisco.

**MICHELE C. JACKSON**, born Redwood City, California, January 17, 1954.  Admitted to bar, 1979, California; U.S. District Court, Northern District of California, 1979; United States Supreme Court, 1988; U.S. Court of Appeals, Ninth Circuit, 1981; U.S. District Court, Central District of California, 1985; U.S. Court of Appeals, Fifth Circuit, 1989.  *Education*:  University of San Francisco School of Law (J.D., *cum laude*, 1979); Stanford University (B.A., with honors, 1976).  *Employment*:  Judicial Extern to Justice Wiley W. Manuel, California Supreme Court, Summer 1977.  *Awards & Honors*: Northern California Super Lawyer, *Law & Politics*, 2007; Recipient of State Bar Board of Governors Award.  *Publications & Presentations*: Panelist, "Antitrust Dispute Resolution in Complex Business Torts and Antitrust Cases:  Is There Really a

Class Arbitration?" (April 2007), American Bar Association Antitrust Law Spring Meeting; Panelist, "Settlement and Mediation of Unfair Competition Disputes" (May, 2006) and other panels, State Bar of California Antitrust and Unfair Competition Section; Author, *Recent Judicial Opinions On Class And Multi-Party Arbitration In Antitrust And Consumer Cases, And Principles Underlying Those Opinions* (February 2007), American Bar Association; Chapter Co-Author with Marc Seltzer*, "*State Antitrust Law and Intellectual Property*" in *California Antitrust & Unfair Competition Law* (Third), Vol. 1: Antitrust*; Author, *Asserted Defenses to a §17200 Class Action Based on Korea Supply -- The Interplay With Indirect Purchaser Litigation* (2005) American Bar Association; Contributing Author, *California Class Actions Practice and Procedure (*2003). *Appointments*: Officer, Advisor and Executive Committee Member, State Bar of California Antitrust and Unfair Competition Section (terms September, 2001-2007). *Member*: American Bar Association; State Bar of California; Bar Association of San Francisco; McAuliffe Law Honor Society.

**MICHAEL W. SOBOL**, born Mt. Kisco, New York, October 5, 1961. Admitted to practice in Massachusetts, 1989; California, 1998; United States District Court, District of Massachusetts, 1990; U.S. District Court, Northern District of California, 2001. *Education*: Boston University (J.D., 1989); Hobart College (B.A., *cum laude*, 1983). *Employment*: Lecturer in Law, Boston University School of Law, 1995-1997. *Member*: State Bar of California; Bar Association of San Francisco; Consumer Attorneys of California (Board of Governors, 2008); National Association of Consume Advocates.

**FABRICE N. VINCENT**, born Paris, France, June 15, 1966. Admitted to practice in California, 1992; U.S. District Court, Northern District of California, Central District of California, Eastern District of California, Ninth Circuit Court of Appeals, 1992. *Education*: Cornell Law School (J.D., *cum laude*, 1992); University of California at Berkeley (B.A., 1989). *Awards & Honors:* Northern California Super Lawyer, *Law & Politics*, 2006 – 2007. *Publications & Presentations:* Co-Author with Elizabeth J. Cabraser, "Class Actions Fairness Act of 2005," *California Litigation,* Vol. 18, No. 3 (2005); Co-Editor, *California Class Actions Practice and Procedures* (2003-06); Co-Author, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions," *Mealey's December Emerging Drugs Reporter* (December 2002); Co-author, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law* (ABA 2000-06), updated and re-published in 5 *Newberg on Class Actions* (2001-06); Coordinating Editor and Co-Author of California section of the ABA State Class Action Survey (2001-06); Co-Editor-In-Chief, *Fen-Phen Litigation Strategist* (Leader Publications 1998-2000) and author of "Off-Label Drug Promotion Permitted" (Oct. 1999); Co-Author, "The Future of Prescription Drug Products Liability Litigation in a Changing Marketplace," and "Six Courts Certify Medical Monitoring Claims for Class Treatment," 29 *Forum* 4 (Consumer Attorneys of California 1999); Co-Author, *Class Certification of Medical Monitoring Claims in Mass Tort Product Liability Litigation* (ALI-ABA Course of Study 1999); Co-Author, "How Class Proofs of Claim in Bankruptcy Can Help in Medical Monitoring Cases," (Leader Publications 1999); Co-Author, Introduction, "Sanctioning Discovery Abuses in the Federal Court," (LRP Publications 2000); "With Final Approval, Diet Drug Class Action Settlement Avoids Problems That Doomed Asbestos Pact," (Leader

Publications 2000).  *Member*:  State Bar of California; Bar Association of San Francisco; American Bar Association; Fight for Justice Campaign; Association of Business Trial Lawyers.

**DAVID S. STELLINGS**, born New Jersey, April 23, 1968.  Admitted to practice in New York, 1994; New Jersey; 1994; U.S. District Court, Southern District of New York, 1994. *Education*: New York University School of Law (J.D., 1993); Editor, *Journal of International Law and Politics;* Cornell University (B.A., *cum laude*, 1990).  *Member*:  State Bar of New York; State Bar of New Jersey; Bar Association of the City of New York; New York State Bar Association; American Bar Association.

**ERIC B. FASTIFF,** born San Francisco, California.  Admitted to practice in California, 1996; District of Columbia, 1997; U.S. Courts of Appeals for the Ninth Circuit and the Federal Circuit, 2007; U.S. District Courts for the Northern, Southern, Eastern, and Central Districts of California, District of Columbia.  *Education*: Cornell Law School (J.D., 1995); Editor-in-Chief, *Cornell International Law Journal;* London School of Economics (M.Sc.(Econ.), 1991); Tufts University (B.A., *cum laude, magno cum honore in thesi*, 1990).  *Employment*:  Law Clerk to Hon. James T. Turner, U.S. Court of Federal Claims, 1995-1996.  *Publications & Presentations*: Co-Editor, *California Class Actions Practice and Procedures* (Elizabeth J. Cabraser, Editor-in-Chief, 2003-2007); Coordinating Editor and Co-Author of California section of the *ABA State Class Action Survey* (2003-07); Author, "US Generic Drug Litigation Update," 1 *Journal of Generic Medicines* 212 (2004);  Author, "The Proposed Hague Convention on the Recognition and Enforcement of Civil and Commercial Judgments:  A Solution to Butch Reynolds's Jurisdiction and Enforcement Problems," 28 *Cornell International Law Journal* 469 (1995). *Member*: State Bar of California; District of Columbia Bar Association; Bar Association of San Francisco; Bar of the U.S. Court of Federal Claims; Editorial Board Member, *Journal of Generic Medicines*, 2003-present.

**WENDY FLEISHMAN**, born Philadelphia, Pennsylvania, 1954.  Admitted to practice in Pennsylvania, 1977; New York, 1992.  *Education*: University of Pennsylvania (Post-Baccalaureate Pre-Med, 1982); Temple University (J.D., 1977); Sarah Lawrence College (B.A., 1974).  *Employment*:  Skadden, Arps, Slate, Meagher & Flom LLP in New York (Counsel in the Mass Torts and Complex Litigation Department), 1993-2001; Fox, Rothschild O'Brien & Frankel (partner), 1988-93 (tried more than thirty civil, criminal, employment and jury trials, and AAA arbitrations, including toxic tort, medical malpractice and serious injury and wrongful death cases); Ballard Spahr Andrews & Ingersoll (associate), 1984-88 (tried more than thirty jury trials on behalf of the defense and the plaintiffs in civil personal injury and tort actions as well as employment- and construction-related matters); Assistant District Attorney in Philadelphia, 1977-84 (in charge of and tried major homicide and sex crime cases).  *Awards and Honors*: "New York Super Lawyers," *Law & Politics*, 2006-2007.  *Publications & Presentations*: Editor, Brown & Fleishman, "Proving and Defending Damage Claims: A Fifty-State Guide," (2007); Co-Author with Donald C. Arbitblit, "The Risky Business of Off-Label Use," *Trial* (March 2005); Co-Author, "From the Defense Perspective," in *Scientific Evidence*, Chapter 6, (Aspen Law Pub, 1999); American Bar Association, Editor, *Trial Techniques Newsletter*, Tort and Insurance Practices Section, 1995-96; and 1993-94.  *Appointments:*  Mealey's Drug & Medical Device Litigation Conference, Co-Chair (2007); Executive Committee *In re ReNu MoistureLoc Product Liability Litigation, MDL*; *In re Guidant Product Liability Litigation, Discovery*; *In re Baycol MDL Litigation* – Co Chair Science Committee; *In re Vioxx MDL Litigation* – Pricing

Committee.  *Member*: New York State Trial Lawyers Association (Board of Directors, 2004-Present); Association of the Bar of the City of New York (Judiciary Committee, 2004-Present); American Bar Association (2000, Affair Chair, ABA Annual Meeting, Torts & Insurance Practices Section, NYC; 1997, Chair, Trial Techniques Committee, Tort & Insurance Practices; 1996, Chair Elect, Trial Techniques Committee, Tort & Insurance Practices); Pennsylvania Bar Association (Committee on Legal Ethics and Professionalism, 1993-Present; Committee on Attorney Advertising, 1993-Present; Vice-Chair, Task Force on Attorney Advertising, 1991-92); State Bar of New York, Federal Bar Association; Member, Gender and Race Bias Task Force of the Second Circuit, 1994-present; Deputy Counsel, Governor Cuomo's Screening Committee for New York State Judicial Candidates, 1993-94; New York State Trial Lawyers Association; New York Women's Bar Association; Association of the Bar of the City of New York (Product Liability Committee, 2007-present); New York County Lawyers; Fight for Justice Campaign; NYTLA; PATLA; Philadelphia Bar Association (Member of Committee on Professionalism 1991-92).

   **PAULINA DO AMARAL**, born New York, New York, February 1966.  Admitted to practice in New York, 1997; California, 1998; U.S. Court of Appeals, Ninth Circuit, 1999; U.S. District Court, Southern District of New York, 2004; U.S. District Court, Western District of Michigan, 2004; U.S. District Court, Eastern District of Michigan, 2007.  *Education*:  University of California Hastings College of Law (J.D., 1996); Executive Editor, *Hastings Constitutional Law Quarterly*; National Moot Court Competition Team, 1995; Moot Court Executive Board; University of Rochester (B.A., 1988).  *Employment*: Law Clerk to Chief Judge Richard Alan Enslen, U.S. District Court, Western District of Michigan, 1996-98.  *Member*: Association of the Bar of the City of New York, (2007-2010, Committee on the Judiciary); American Bar Association; State Bar of New York; State Bar of California; Bar Association of San Francisco; American Trial Lawyers Association; New York State Trial Lawyers Association.

   **KATHRYN E. BARNETT**, born Chapel Hill, North Carolina, October 23, 1967. Admitted to practice in Tennessee, 1992; U.S. District Court, Middle District of Tennessee, 1997; U.S.  6th Circuit, 2000; U.S. District Court, Western District of Tennessee, 2001; U.S. 11th Circuit, 2003; U.S. District Court, Eastern District of Tennessee, 2005.  *Education*: Vanderbilt University School of Law (J.D., 1992); American Jurisprudence Awards: Torts I and Jurisprudence; Davidson College (B.A., with Honors in Philosophy, 1989), Dean Rusk Grant for International Studies.   *Litigation Experience*: Ms. Barnett has tried over 15 civil and criminal trials, including complex and class action cases, as well as catastrophic personal injury cases.  In 2000, Ms. Barnett obtained a verdict of nearly $6 million on behalf of parents whose unborn fetus died tragically due to medical malpractice.  In March, 2004 and in August, 2004 Ms. Barnett served as co-lead trial counsel in the class action lawsuit of *In re Tri-State Crematory Litigation*, Multi-District Litigation Docket No. 1467.  The case was settled during the second week of trial.  The settlements in the Tri-State litigation exceed $40 million.  *Employment*: Judicial Intern to Judge John T. Nixon, U.S. District Court, Middle District of Tennessee, Fall 1990; Assistant Public Defender, Davidson County, Tennessee, Sept. 1991-Dec.  1995.  *Awards & Honors*: "Best of the Bar," *Nashville Business Journal* (2003, 2005-2007); Mid-South Super Lawyer, *Law & Politics*, 2006-2007; "Best Lawyers in Tennessee," *Business Tennessee*, (2006-2007).  *Publications & Presentations*: "Civil Procedure and Evidence Update," Tennessee Trial Lawyers (Oct. and Nov. 2006); "Pre-Trial Skills: Thinking on Your Feet," National Business Institute (Nov. 2006), "Trial Practice Institute," Nashville Bar Association (Sept. 2005); "State

Law Class Actions," American Bar Association, Business Law Section (April 2005); "Power Windows Can Kill," *Trial* (April 2005); "Auto Defect Cases," Tennessee Trial Lawyers (Feb. 2005); "Limiting the Harmful Testimony of Experts on the Law," *Trial* (Jan. 2001); "Letting Focus Groups Work for You," *Trial* (April 1999); "Knocking Out Opposing Experts," Tennessee Trial Lawyers (October and November, 2004), Nashville Bar Association (July, 2004); "Trial Practice Tips: Powerful Trial Strategies for the Absolute Litigator," Nashville Bar Association (April, 2004); "Damages," Tennessee Trial Lawyers (Oct. and Nov. 2003); "Trying the Wrongful Death Case in Tennessee," National Business Institute (Aug. 2003); "Advanced Personal Injury," National Business Institute (July 2003); "Mass Torts," Tennessee Bar Association (July 2002); "Superior Depositions Strategies in Civil Trial Practice," National Business Institute (Jan. 2002, Dec.  1999); "Lawsuits Against the Nursing Home Industry," Tennessee Trial Lawyers (Feb. 2000); "How to Prepare for Mediation and other Practice Tips," Nashville Bar Association (Oct. 2000); "Tennessee Expert Witness," Lorman Education Services (July 2000); "Using Focus Groups to Get the Settlement or Verdict Your Client Deserves," Tennessee Trial Lawyers (Feb. 1999). *Member*: Tennessee Association for Justice (Secretary, 2007-08, Chair Continuing Education Committee, 2004-2006, Board of Governors, 2002-2008); Nashville Bar Association (Board, 2005-2008); Nashville Bar Foundation (Fellow); Tennessee Justice Center, Inc. (Board of Directors, 2002-05, Secretary-Treasurer, 2003-04); Nashville Lawyer's Association for Women (President, 2004-2005; President-elect, 2003-2004; Director, 2002-03; Treasurer, 2000-02; Board, 1998-present); Harry Phillips American Inn of Courts, Executive Committee, 2004-05, Member, 2004-2008, 1997-99; Davidson County, Tennessee Metropolitan Board of Equalization, 2000-04; Tennessee Bar Association; American Association of Trial Lawyers.

**JOY A. KRUSE**, born Buffalo, New York, February 24, 1955.  Admitted to practice in Washington, D.C., 1984; California; U.S. Supreme Court; U.S. Courts of Appeals for the District of Columbia, Ninth, and Federal Circuits; U.S. District Courts for the Northern and Eastern Districts of California, 1989. *Education*:  Harvard Law School (J.D., 1984); Wellesley College (B.A., 1977). *Employment*:  Assistant Federal Public Defender, Northern District of California, 1992-96; Public Defender Service, Washington D.C., 1984-89. *Member*: Phi Beta Kappa; State Bar of California; Bar Association of San Francisco.

**STEPHEN H. CASSIDY**, born Pittsburgh, Pennsylvania, May 14, 1964.  Admitted to practice in California, 1989; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1997. *Education*: Hastings College of the Law (J.D., *magna cum laude*, 1989); Associate Managing Editor, *Hastings International and Comparative Law Review*, 1988-89; Order of the Coif; Member, Thurston Society; Recipient, American Jurisprudence Awards for Real Property, Evidence and American Legal History; Georgetown University (B.S.F.S., 1986). *Employment*: Law Clerk to Magistrate-Judge Joan S. Brennan, U.S. District, Northern District of California, 1989-90; Motions Attorney, U.S. Court of Appeals, Ninth Circuit, 1992-94, 1996-97. *Publications & Presentations*:  "Internet Marketing for Plaintiffs' Firms," CAOC Conference (May 2004); "Enhancing the Role of Law Firm Marketing Departments," LexisNexis Law Firm Marketers' Roundtable (November 2003); Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," in *Survey of State Class Action Law* (ABA 2001); "The Newest Member of the Nuclear Club: Pakistan's Drive for a Nuclear Weapon's Capability," 12 *Hastings Int'l & Comp. L. Rev.* 679

(1989).  *Member*:  State Bar of California; Bar Association of San Francisco; American Bar Association (Litigation Section); Trial Lawyers for Public Justice; Fight for Justice Campaign; Consumer Attorneys of California.

*RACHEL GEMAN*, born Northampton, Massachusetts, August 7, 1971.  Admitted to practice in New York, 1998; Southern and Eastern Districts of New York, 1999; U.S. District Court, Eastern District of Michigan, 2005; U.S. District Court of Colorado, 2007.  *Education*: Columbia University School of Law (J.D. 1997); Stone Scholar; Equal Justice America Fellow; Human Rights Fellow; Editor, *Columbia Journal of Law and Social Problems*; Harvard University (A.B. *cum laude* 1993).  *Employment*: Adjunct Professor, New York Law School; Special Advisor, United States Mission to the United Nations, 2000; Law Clerk to Judge Constance Baker Motley, U.S. District Court, Southern District of New York, 1997-98.  *Awards & Honors*:  *Distinguished Honor Award*, United States Department of State, 2001.  *Publications & Presentations*: "The New York Employee Advocate," Co-Editor, 2005-Present (Volumes 12 and forward); "Evidence and Jury Instructions in FLSA Actions," Georgetown Law Center/ACL-ABA (2007); "Crucial Events in the 'Life' of an FLSA Collective Action: Filing Considerations and the Two-step 'Similarly-Situated' Analysis," National Employment Lawyers Association, Annual Convention (2006) (Author & Panelist); "Time is Money, Except When It's Not: Compensable Time and the FLSA,"  National Employment Lawyers Association, Impact Litigation Conference (2005) (Author & Panelist); "Electronic Discovery," Federal Judicial Center & Institute of Judicial Administration, Workshop on Employment Law for Federal Judges (2005) (Panelist); "Image-Based Discrimination and the BFOQ Defense," *EEO Today* (Vol. 9, Issue 1, Fall 2004) (Author); "Fair Labor Standards Act Overtime Exemptions: Proposed Regulatory Changes," *New York State Bar Association Labor and Employment Newsletter* (Spring 2004) (Author);  "Current Topics in Fair Labor Standards Act Litigation," Conference, Association of the Bar of the City of New York (2003, Chair & Panelist); "Workforce Without Borders," ABA Section of Labor & Employment Law, EEOC 2003 Midwinter Meeting (Moderator).  *Member*: Board Member, National Employment Lawyers' Association/New York; American Bar Association, Sections of Labor and Employment Law, EEO Committee (Plaintiffs' Vice Chair).

*SCOTT P. NEALEY*, born Champaign, Illinois, July 28, 1966.  Admitted to practice in California, 1997; U.S. District Court, Northern District of California, 1998; U.S. District Court, Eastern District of California, 1998; U.S. Court of Appeals, Ninth Circuit, 1999; U.S. District Court, Central District of California, 2000.  *Education*: Boalt Hall School of Law, University of California (J.D., 1996); University of California at Berkeley (B.A., 1988).  *Honors & Awards*: California Lawyer Attorneys of the Year (CLAY) Award, 2008; Finalist, San Francisco Trial Lawyer of the Year, 2008.  *Employment*: Law Clerk to Chief Justice Joseph R. Weisberger, Supreme Court of Rhode Island, 1996-97.  *Publications & Presentations*: Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003). *Member*: Bar Association of San Francisco; State Bar of California.

*ELIZABETH A. ALEXANDER,* born Morristown, Tennessee, October 4, 1971. Admitted to practice in Tennessee, 1998; U.S. Court of Appeals, Sixth Circuit, 2001; U.S. District Court, Middle District of Tennessee, 2000; U.S. District Court, Eastern District of Tennessee, 2002.  *Education*: Vanderbilt University Law School (J.D., 1998); President, Criminal Law Association; Moot Court Board Member; Vanderbilt University Honor

Committee; Hollins College (B.A., 1993). *Honors & Awards*: "Lawdragon 500 New Stars" and "Lawdragon 3000 Leading Plaintiffs' Lawyers in America," *Lawdragon* magazine, 2006-2007. *Publications & Presentations*: *ABA Survey of State Class Action Law* (2003-2007), Tennessee section; "Consumer Class Actions Against Financial Institutions," Lorman Education Services, July 2004. *Prior Employment*: Associate, Dodson, Parker, Dinkins & Behm (2002-03); Associate, Wyatt, Tarrant & Combs (2000-2002); Law Clerk, Honorable Thomas A. Higgins, U.S. District Court for the Middle District of Tennessee (1998-2000). *Member*: State Bar of Tennessee; Tennessee Bar Association; Nashville Bar Association (Board of Directors, Young Lawyers Division); American Bar Association; Lawyers' Association for Women (2003-2005); American Bar Association Labor and Employment Law Section Equal Employment Opportunity Committee, Co-Chair, Basics Committee (2005-2006); Chair of Internal Marketing and Mentoring Committee (2006-2007); National Employment Lawyers' Association.

**DANIEL P. CHIPLOCK**, born Albany, New York. Admitted to practice in New York, 2001; U.S. District Court, Southern District of New York, 2001; U.S. District Court, Eastern District of New York, 2001. *Education*: Stanford Law School (J.D., 2000); Article Review Board, *Stanford Environmental Law Journal*; Recipient, Keck Award for Public Service; Columbia University (B.A., *summa cum laude*, 1994); Phi Beta Kappa. *Member*: State Bar of New York; American Association for Justice; Fight for Justice Campaign; Public Justice; National Association of Public Pension Attorneys (NAPPA).

**MARK P. CHALOS**, born New York, New York, September 3, 1973. Admitted to practice in Tennessee, 1998; U.S. Court of Appeals, Sixth Circuit, 1998; U.S. District Court, Middle District of Tennessee, 2000; U.S. District Court, Western District of Tennessee, 2002; U.S. District Court, Eastern District of Tennessee, 2006; U.S. District Court, Northern District of Florida, 2006; U.S. District Court, Northern District of California, 2007. *Education*: Emory University School of Law (J.D., 1998); Dean's List; Award for Highest Grade, Admiralty Law; Research Editor, *Emory International Law Review*; Phi Delta Phi Legal Fraternity; Vanderbilt University (B.A., 1995). *Publications & Presentations*: "The End of Meaningful Punitive Damages," *Nashville Bar Journal*, November 2001; "Is Civility Dead?" *Nashville Bar Journal*, October 2003; "The FCC: The Constitution, Censorship, and a Celebrity Breast," Nashville Bar Journal, April 2005. *Member*: American Bar Association; Fight for Justice Campaign; Tennessee Bar Association; Board of Directors, Tennessee Trial Lawyers Association; Nashville Bar Association; Past-Chair, ABA YLD Criminal & Juvenile Justice Committee; American Bar Association Tort Trial and Insurance Practice Section Professionalism Committee YLD liaison; Board of Directors, Nashville Bar Association YLD; Chair, Nashville Bar Association YLD Continuing Legal Education; *Nashville Bar Journal*, Editorial Board; Member, Harry Phillips American Inn of Court (2002-2004); Grant Review Panelist, Metropolitan Nashville Arts Commission; Founding Member, Young Professionals Program, Frist Center for the Visual Arts; President, Kappa Chapter of Kappa Sigma Fraternity Alumni Association.

**NICHOLAS R. DIAMAND**, born London, England. Admitted to practice in New York, 2003; U.S. District Court, Southern, Eastern, Northern, and Western Districts of New York; US. Court of Appeals, Seventh Circuit. *Education*: Columbia University School of Law (LL.M., Stone Scholar, 2002); College of Law, London, England (C.P.E.; L.P.C.; Commendation, 1997); Columbia University (B.A., *magna cum laude,* 1992). *Employment*: Solicitor, Herbert Smith, London (1999-2001); Law Clerk to the Honorable Edward R. Korman, Chief Judge, U.S. District

Court, Eastern District of New York (2002-03).  *Publications & Presentations*:  Contributing Author, *California Class Actions Practice and Procedure* (Elizabeth J. Cabraser, Editor-in-Chief), 2006; Panelist, "Obstacles to Access to Justice in Pharmaceutical Cases," *Pharmaceutical Regulation and Product Liability*, British Institute of International and Comparative Law, April 21, 2006; Panelist, "Pre-Trial Discovery in the United States," Union Internationale des Avocats, Winter Seminar, February 2006; Columnist, *The New York Employee Advocate*, NELA/NY, February 2006-present.  *Member*:  New York City Bar Association, Trial Lawyers for Public Justice, American Society of International Law, Law Society of England and Wales.

**KRISTEN E. LAW**, born Parkersburg, West Virginia, April 3, 1974.  Admitted to practice in California, 2002.  *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D. 2002); Executive Editor, *Ecology Law Quarterly*; Moot Court Advocacy Award; Moot Court Board; Hopi Appellate Clinic; Ohio Wesleyan University (B.A., *summa cum laude,* 1995); Presidential Scholar. *Member*: Phi Beta Kappa; State Bar of California.

**JAHAN C. SAGAFI**, born Philadelphia, Pennsylvania, December 26, 1971.  Admitted to practice in California, 2003.  *Education*:  Harvard Law School (J.D., 2001); Senior Editor, *Harvard Civil Rights-Civil Liberties Law Review*, (1999-2001); President, Board of Student Advisers; Harvard College (B.A., *magna cum laude*, 1994).  *Employment*: Law Clerk to Judge William W. Schwarzer, U.S. District Court, Northern District of California, 2001-02.  *Member*: State Bar of California (Litigation Section Executive Committee); National Employment Lawyers' Association; Association of Trial Lawyers of America; Consumer Attorneys of California; American Bar Association; Bar Association of San Francisco; Fight for Justice Campaign.

**OF COUNSEL**

**ROBERT L. LIEFF**, born Bridgeport, Connecticut, September 29, 1936.  Admitted to practice in California, 1966; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1969; U.S. Supreme Court, 1969; U.S. Court of Appeals, Seventh Circuit, 1972; U.S. Tax Court, 1974; U.S. District Court, District of Hawaii, 1986.  *Education*: Columbia University (M.B.A., 1962; J.D., 1962); Cornell University; University of Bridgeport (B.A., 1958).  Member, Columbia Law School Dean's Council; Member, Columbia Law School Board of Visitors (1992-present); Member, Columbia Law School Center on Corporate Governance Advisory Board (2004).  *Awards & Honors*:  "Northern California Super Lawyers," *Law & Politics*, 2005 - 2007.  *Member*: Bar Association of San Francisco; State Bar of California (Member: Committee on Rules of Court, 1971-74; Special Committee on Multiple Litigation and Class Actions, 1972-73); American Bar Association (Section on Corporation, Banking and Business Law); Lawyers Club of San Francisco; San Francisco Trial Lawyers Association; California Trial Lawyers Association; Consumer Attorneys of California; Fight for Justice Campaign.

**MORRIS A. RATNER**, born San Jose, California, November 13, 1966.  Admitted to practice in California, 1991; District of Columbia, 1999; New York, 2000; U.S. District Court, Northern, Central and Southern Districts of California; and U.S. Court of Appeals, Second, Third, Sixth and Ninth Circuits.  *Education*:  Harvard University (J.D., 1991); Stanford

University (B.A., with distinction, 1988); Phi Beta Kappa.  *Publications & Presentations*:
Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser
editor in chief, 2003);  "Factors Impacting the Selection and Positioning of Human Rights Class
Actions in United States Courts:  A Practical Overview," 58 *New York University Annual Survey
of American Law* 623 (2003); "The Settlement of Nazi-Era Litigation Through the Executive and
Judicial Branches,"  20 *Berkeley Journal of International Law* 212 (No. 1, March 2002).
*Member*: State Bar of California; State Bar of New York; Bar of the District of Columbia; Bar
Association of San Francisco.

**WILLIAM B. HIRSCH**, born Los Angeles, California, May 19, 1951.  Admitted to
practice in California, 1983; U.S. District Court, Northern District of California; U.S. District
Court, District of Hawaii, 1991.  *Education*: Harvard University ( J.D., 1983); Princeton
University (M.A., 1975); University of California at Santa Cruz (B.A., with highest honors,
1973).  *Awards & Honors*: Trial Lawyer of the Year, Trial Lawyers for Public Justice, 1995.
*Publications & Presentations*: "Justice Delayed: Seven Years Later & No End In Sight," in The
Exxon Valdez Disaster: Readings on a Modern Social Problem (Kendall & Hunt Pub. Co. 1996).
*Member*: Bar Association of San Francisco; State Bar of California; Trial Lawyers for Public
Justice; The Association of Trial Lawyers of America; ACLU of Northern California (Steering
Committee, 1993-94).

### ASSOCIATES

**REBECCA BEDWELL-COLL**, born Ridgewood, New Jersey, May 27, 1971.
Admitted to practice in California, 1996; Ninth Circuit Court of Appeals, 1996; U.S. District
Court, Northern District of California, 1996; U.S. District Court, Central District of California,
1996; District of Columbia, 2007.  *Education*: Boalt Hall School of Law, University of
California, Berkeley, (J.D., 1996); University of Michigan, Ann Arbor, (B.A. 1993).

**NANCY CHUNG**, born Los Angeles, February 21, 1972.  Admitted to practice in
California, 2003; U.S. Court of Appeals for the Ninth Circuit, 2003; U.S. District Court,
Northern and Central Districts of California (2007, 2008).  *Education*: Hasting College of Law
(J.D., 2002); University of California, Santa Cruz (B.A., Language Studies, 1995).  *Employment*:
International Labor Organization, Geneva, Switzerland (2000-2001); Peace Corps Volunteer,
Romania (1995-1997).  *Member*: Bar Association of San Francisco.  *Languages*: French,
Romanian and Korean.

**CHRISTOPHER E. COLEMAN**, born Mobile, Alabama, March 30, 1971.  Admitted to
practice in Georgia, 2005.  *Education*:  Northwestern University School of Law (J.D., *cum laude*,
2003); Order of the Coif; Associate Editor, *Northwestern University Law Review* (2002-2003);
John Paul Stevens Public Interest Fellowship (2002); Northwestern University (M.A., History,
2000); University of Virginia (M.A., English, 1995); Vanderbilt University (B.A., *magna cum
laude*, 1993).  *Employment*: Judicial Clerkship, Honorable Joan Humphrey Lefkow, U.S. District
Court, Northern District of Illinois, 2003-2005.  Leadership Council for Metropolitan Open
Communities (Chicago, Illinois, 2002); Central Alabama Fair Housing Center (Montgomery,
Alabama, 1997-1998).  *Publications & Presentations*: Contributing Author, "California Class
Actions Practice and Procedures" (Elizabeth J. Cabraser, Editor-in-Chief, 2006-2007); "Decades-
Old Murder Case Needs Review," Op-Ed, *Chicago Sun-Times*, February 2, 2003; Co-Author,

"Social Movements and Social Change Litigation: Synergy in the Montgomery Bus Protest," *Law and Social Inquiry* (Fall 2005); "Fingerprints and False Confessions: The William Heirens Case," Conference Presentation, Conference on False Confessions, Center on Wrongful Convictions, Northwestern University, Chicago, Illinois, March 2002. *Member*: American Bar Association; Tennessee Bar Association; Tennessee Trial Lawyers Association; Lawyers Association for Women; Nashville Bar Association YLD (Board of Directors); American Constitution Society, Nashville Lawyers' Chapter (Board of Directors).

**NIMISH R. DESAI**, born Coventry, England, June 25, 1980.  Admitted to practice in California, 2006; US District Court; Northern District of California, 2007.  *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D., 2006), Finalist and Best Brief, McBaine Moot Court Competition (2006), Moot Court Best Brief Award (2004); University of Texas, Austin, (B.S.  & B.A., High Honors, 2002).  *Employment*: Extern, Sierra Club Environmental Law Program, 2004; Researcher, Public Citizen, 2003; Center for Energy and Environmental Resources, 2001-2002.  *Publications & Presentations*: "American Chemistry Council v. Johnson: Community Right to Know, But About What? D.C. Circuit Takes Restrictive View of EPCRA," 33 *Ecology L.Q.* 583 (Winter 2006); "Lessons Learned and Unlearned: A Case Study of Medical Malpractice Award Caps in Texas," *The Subcontinental*, (Winter 2004, Vol. 1, Issue 4, pp. 81-87); "Separation of Fine Particulate Matter Emitted from Gasoline and Diesel Vehicles Using Chemical Mass Balancing Techniques", *Environmental Science Technology*, (2003; 37(17) pp. 3904-3909); "Analysis of Motor Vehicle Emissions in a Houston Tunnel during Texas Air Quality Study 2000," *Atmospheric Environment*, 38, 3363-3372 (2004).  *Member*: State Bar of California; Bar Association of San Francisco; Consumer Attorneys of California; American Bar Association; American Constitution Society.  *Languages*: Gujarati (conversational).

**ALLISON S. ELGART**, born Manhasset, New York, January 27, 1978.  Admitted to practice in California, 2006; New York, 2007; U.S. Court of Appeals for the Sixth Circuit (2008).  *Education*: Harvard Law School (J.D., 2005), Editor-in-Chief, *Harvard Civil Rights-Civil Liberties Law Review*, Vol.  40; Student Attorney, Harvard Legal Aid Bureau, (2003-2005); Brown University (B.A., *magna cum laude* 2000).  *Employment*:  Law Clerk to Judge Robert P. Patterson, Jr., U.S. District Court, Southern District of N.Y., 2005-2006; Health Advocacy Fellow, Medicare Rights Center, (2000-2002).  *Publications & Presentations*: "Hamdi v. Rumsfeld: Due Process Requires That Detainees Receive Notice and Opportunity to Contest Basis for Detention," 40 Harv. C.R-C.L. L. Rev. 239 (2005).  *Member*: American Bar Association; Bar Association of San Francisco; Consumer Attorneys of California; State Bar of California.

**HEATHER A. FOSTER**, born Washington, D.C., October 2, 1970.  Admitted to practice in California in 1996; U.S. District Court, Northern District of California, 1996.  *Education*: University of the Pacific, McGeorge School of Law (J.D., 1996); Moot Court Honors Board, 1995-96; Trial Advocacy Honors 1996; Boston College (B.A., 1992).  *Employment*: Adjunct Professor, San Francisco State University – College of Extended Learning, Paralegal and LNC program (Fall 2000 – Spring 2001).  *Publications & Presentations*: Co-Author, *Class Certification of Medical Monitoring Claims in Mass Tort Product Liability Litigation* (ALI-ABA Course of Study, 1999).  *Member*: American Association for Justice; American Bar Association (Litigation Section); Association of Legal Administrators; Bar Association of San Francisco;

Legal Assistant Management Association; Phi Alpha Delta; State Bar of California (Volunteer Legal Services Program: Liaison for the Summer Associate Public Service Program – Homeless Advocacy Program, 2002; Teachers in the Schools Program, 2002; Pro Bono Attorney – Family Law Clinic, 1999); Trail Lawyers for Public Justice.

**BRENDAN P. GLACKIN**, born Sacramento, California, July 23, 1973.   Admitted to practice in California, 1998; U.S. District Court, Northern, Central, Eastern and Southern Districts of California, 2001; U.S. Court of Appeals for the Ninth Circuit, 2004; New York, 2000; U.S. District Court, Southern District of New York, 2001; U.S. District Court, District of Colorado, 2001. *Education*: Harvard Law School (J.D., *cum laude*, 1998); University of Chicago (A.B.,Phi Beta Kappa, 1995). *Employment*: Contra Costa Public Defender, 2005-2007; Boies, Schiller & Flexner, 2000-2005; Willkie Farr & Gallagher, 1999-2000; Law Clerk to Honorable William B. Shubb, U.S. Districts Court, Eastern District of California, 1998-1999. *Member*: State Bar of California.

**DAVID P. GOLD**, born New York, New York, December 29, 1967.  Admitted to practice in New York, 2004; District of Colorado, 2006; Court of Appeals, Second Circuit, 2007. *Education*:  Columbia Law School (J.D., 2002), James Kent Scholar, Articles Editor, *Columbia Law Review*; University of Pennsylvania (Ph.D., 2002), William Penn Fellow; Brown University (A.B., *magna cum laude,* 1990). *Employment*: Law Clerk to Honorable Stephen Reinhardt, U.S. Court of Appeals, Ninth Circuit, 2002-03. *Publications & Presentations*: "Wildlife Protection and Public Welfare Doctrine," 27 *Colum. J. Envtl. L.* 633 (2002); "A Hitherto Unknown Sanskrit Work Concerning Mādhava's Power Series for Sine and Cosine," 42 *Historia Scientiarum* 49 (1991). *Member*: American Bar Association; New York State Bar Association; Association of the bar of the City of New York; New York County Lawyers Association; Public Justice Foundation.

**JENNIFER GROSS**, born Sleepy Hollow, New York, July 1, 1969.  Admitted to practice in California, 1994; U.S. District Court, Central District of California, 1994. *Education*: RAND Graduate School (M.  Phil., 1997); University of Southern California (J.D., 1994); Emory University (B.A., 1991). *Publications & Presentations*: Co-Author, *Intelligence, Surveillance, and Reconnaissance Force Mix Study: Final Report* (RAND 2003); Co-Author, *Asbestos Litigation Costs and Compensation: An Interim Report* (RAND 2002);  Co-Author, *Asbestos Litigation in the U.S.: A New Look at an Old Issue* (RAND 2001); Co-Author, *Class Action Dilemmas: Pursuing Public Goals for Private Gain* (RAND, 2000);  Co-Author, *Potential Vulnerabilities of U.S. Air Force Information Systems* (RAND, 1999); Co-Author, "Preliminary Results of the RAND Study of Class Action Litigation," (RAND, 1997). *Member*: State Bar of California.

**DANIEL M. HUTCHINSON**, born Oakland, California, May 25, 1977.  Admitted to practice in California, 2005; U.S. Court of Appeals for the Ninth Circuit, 2005; U.S. District Court, Northern District of California, 2005. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D., 2005), Senior Articles Editor, *African-American Law & Policy Report*, Prosser Prizes in Constitutional Law and Employment Law; University of California, Berkeley Extension (Multiple Subject Teaching Credential, 2002); Brown University (B.A., 1999), Mellon Minority Fellowship (1997-1999). *Employment*: Judicial Extern to the Hon. Martin J. Jenkins, U.S. District Court, Northern District of California, 2004; Law Clerk, Lewis &

Feinberg, P.C., 2003-2004; Teacher, Oakland Unified School District, 1999-2002.  *Member*:
State Bar of California; National Bar Association.

*ANDREW S. KINGSDALE*, born Boston, Massachusetts, November 4, 1974.  Admitted
to practice in Massachusetts, 2007; New York, 2007.  *Education*: Temple University School of
Law (J.D. 2006); Temple Journal of Science Technology and Environmental Law; Dartmouth
College (B.A. 1996).  *Member*: State Bar of Massachusetts; New York State Bar Association.

*KENT L. KLAUDT,* born Jamestown, North Dakota, September 6, 1968.  Admitted to
practice in California, 1996; U.S. District Court, Northern District of California, 1997; U.S.
District Court, Eastern District of California, 1998; U.S. District Court, Central District of
California, 2007.  *Education*: University of Minnesota Law School (J.D., 1996); Outside Articles
Editor, *Journal of Law & Inequality: A Journal of Theory & Practice*; National Association of
Public Interest Law (Summer Fellowship, 1995); University of Minnesota (B.A., 1991).
*Employment*: BlueDog, Olson & Small, PLLP, 1995-96; Cartwright & Alexander, LLP, 1996-
2001; The Cartwright Law Firm, Inc., 2001-2004.  *Publications & Presentations*: "Hungary
After the Revolution: Privatization, Economic Ideology, and the False Promise of the Free
Market," *13 Law & Inequality: A Journal of Theory & Practice* 301.  *Member*: American Trial
Lawyers Association; Consumer Attorneys of California; Trial Lawyers for Public Justice; San
Francisco Trial Lawyers Association; National Lawyers Guild.

*SHARON M. LEE*, born Richmond, B.C., Canada, January 19, 1975.  Admitted to
practice in New York 2002; U.S. District Court, Southern District of New York, 2003; U.S.
District Court, Eastern District of New York, 2003; Washington State, 2005.  *Education*: St.
John's University School of Law, (J.D. 2001); *New York International Law Review*, Notes &
Comments Editor, 2000-2001; St.  John's University, (M.A. 1998); St. John's University, (B.A.
1997).  *Employment*: Milberg Weiss & Bershad, LLP, 2003-2007.  *Member*: American Bar
Association; Washington State Bar Association.

*ANNIKA K. MARTIN*, born New York, New York, September 13, 1979.  Admitted to
practice in New York, 2005; U.S. District Court, Southern District of New York, 2005.
*Education:* Law Center, University of Southern California (J.D., 2004); Review of Law &
Women's Studies; Jessup Moot Court; Medill School of Journalism, Northwestern University
(B.S.J., 2001); Stockholm University (Political Science, 1999).  *Publications & Presentations*:
"Stick a Toothbrush Down Your Throat: An Analysis of the Potential Liability of Pro-Eating
Disorder Websites," *Texas Journal of Women & the Law* (Volume 14 Issue 2, Spring 2005);
"Welcome to Law School," monthly column on www.vault.com (2001-2004).  *Awards and
Honors*: 2005 Wiley W. Manuel Award for Pro Bono Legal Services awarded by the State Bar of
California for voluntary provision of legal services to the poor.  *Member*: New York State Bar
Association (General Practice Section and Young Lawyers Section); Swedish American Bar
Association; American Association for Justice; New York State Trial Lawyers Association; New
York County Lawyer's Association; New York City Bar Association.  *Languages*: Swedish
(fluent); French (DFA1-certified in Business French); Spanish (conversational).

*MICHAEL J.  MIARMI*, born Summit, New Jersey, April 2, 1978.  Admitted to practice
in New York, 2006; U.S. Court of Appeals for the Third Circuit, 2007; U.S. Court of Appeals for

the Eighth Circuit, 2007.  *Education*: Fordham Law School (J.D., 2005); Yale University (B.A., *cum laude*, 2000).  *Employment*: Milberg Weiss LLP, Associate, 2005-2007.

   **SHARMILA L. MURTHY**, Smithtown, New York, February 4, 1977.  Admitted to practice in New York, 2005; Tennessee, 2004; U.S. District Court, Middle District of Tennessee, 2004; U.S. Court of Appeals for the Sixth Circuit (2004).  *Education*: Harvard Law School, (J.D., *cum luade* 2003);  Harvard Legal Aid Bureau, (2001-2003); Reginald Lewis Summer Fellowship, (2001); Kennedy School of Government, Harvard University, (M.P.A., 2003); Cornell University, (B.S., *with honors*, 1997).  *Employment*: Law clerk to Judge Martha Craig Daughtrey, U.S. Court of Appeals for the Sixth Circuit, 2003-2004.  Skadden Fellow and Staff Attorney at Legal Aid Society of Middle Tennessee and the Cumberlands, 2004 – 2007.  *Awards & Honors*: Tennessee Alliance for Legal Services New Advocate of the Year, 2006; Nashville Bar Journal Article of the Year, 2006; Skadden Fellowship, 2004; Betty Allebach Award for Public Service at Harvard Legal Aid Bureau, 2003; Kennedy Scholarship at JFK School of Government, 1999; U.S.  Fulbright Award, 1998-1999. *Publications & Presentations*: "Lost in Translation?" Interpreters in the Courts," *The Nashville Bar Journal* (2006 ); "SEWA's  Rural Savings and Credit Program in Gujarat, India," *Kennedy School Review: Student Perspectives 2000*.  *Member*: Nashville Bar Association; Tennessee Bar Association; Lawyers Association for Women; Inn of Court; American Constitution Society; Tennessee Immigrants and Refugee Rights Coalition; Harvard Legal Aid Bureau Alumni Advisory Board.

   **DANIEL E. SELTZ**, born Alexandria, Virginia, April 24, 1974.  Admitted to practice in New York, 2004; U.S. District Court, Southern District of New York; Eastern District of New York.  *Education*: New York University School of Law (J.D., 2003); *Review of Law and Social* Change, Managing Editor; Hiroshima University (Fulbright Fellow, 1997-98); Brown University (B.A., *magna cum laude*, Phi Beta Kappa, 1997).  *Employment*: Law Clerk to Honorable John T. Nixon, U.S. District Court, Middle District of Tennessee, 2003-04.  *Publications & Presentations*: "Remembering the War and the Atomic Bombs: New Museums, New Approaches," in *Memory and the Impact of Political Transformation in Public Space* (Duke University Press, 2004), originally published in *Radical History Review*, Vol. 75 (1998); "Issue Advocacy in the 1998 Congressional Elections," with Jonathan S. Krasno (Urban Institute, 2001); *Buying Time: Television Advertising in the 1998 Congressional Elections*, with Jonathan S. Krasno (Brennan Center for Justice, 2000); "Going Negative," in *Playing Hardball*, with Kenneth Goldstein, Jonathan S. Krasno and Lee Bradford (Prentice-Hall, 2000).  *Member*: American Association for Justice; State Bar of New York.

   **STEVE M. SWERDLOW**, born Los Angeles, California, April 20, 1977.  Admitted to practice in California, 2007; U.S. District Court, Central, Eastern and Northern Districts of California, 2007.  *Education*: Boalt Hall School of Law, University of California, Berkeley, (J.D. 2006); Senior Notes & Comments Editor, *California Law Review*; Boalt Hall Public Interest Fellowship (2004); Chairman, Boalt Hall Committee for Human Rights (BHCHR); Asylum Advocate, California Asylum Representation Clinic; Boalt Hall Death Penalty Clinic; Columbia University, School of International and Public Affairs (M.A., Human Rights and International Affairs, 2003); Harriman Institute Certificate in Post-Soviet Studies (2003); University of California, Berkeley (B.A. *phi beta kappa* 1999).  *Employment*: Law Clerk to the Hon. Dean D. Pregerson, U.S. District Court, Central District of California (2006-2007); Consultant and Special Advisor on Refugee Programs, International Organization of Migration (IOM) (Russia,

2004 and 2006); Researcher, European Centre for Minority Issues (Georgia, 2005); Law Clerk, American Civil Liberties Union of Southern California (2004); Human Rights Monitor, Union of Councils for Jews in the former Soviet Union (Russia, 2000-2001). *Awards & Honors*: U.S. Department of State Young Leaders Fellowship for Public Service, Krasnodar, Russian Federation (2000-2001); U.S. Department of Education Foreign Language Area Studies Award (2002-2003 & 2004-2005); Harvard Tuition Scholarship, Harvard Ukrainian Research Institute. *Publications & Presentations*: "The Third Migration: Meskhetian Turks' Resettlement and Integration in the United States," *Integration, Repatriation or Resettlement?*, Berlin: LIT Verlag (2007); "Understanding Post-Soviet Ethnic Discrimination and the Effective Use of U.S. Refugee Resettlement: The Case of the Meskhetian Turks of Krasnodar Krai," 94 *Cal. L. Rev.* 1827 (2006); National Public Radio's "The World" on "Ethnic Discrimination in Russia" (Guest, Oct. 2007); *The Meskhetian Turks: An Introduction to their History, Culture and Resettlement Experiences*, Cultural Orientation Resource Center, Center for Applied Linguistics (2006); *Voice of America* Radio Interview, "Xenophobia in the Caucasus" (Guest, March 2005); "Stalin's Deported Peoples: Human Rights of Transnational Minorities," in Bulletin, Moscow (2004); *Radio Free Europe/Radio Liberty*, "Russia's Expulsion of Ethnic Minorities" (Panelist, 2002); "The Forgotten Jews of Nagorno-Karabakh," *Institute of War and Peace Reporting* (2001). *Member*: American Bar Association, Sections of International and Refugee Law, Sub-Committee of International Human Rights and Refugee Law; Bar Association of San Francisco. *Languages*: Russian, Ukrainian, Georgian.

**TODD A. WALBURG**, born Berkeley, California, January 5, 1973.  Admitted to practice in California, 2001; U.S. District Court, Northern California, 2001, Eastern, Central and Southern California, 2006. *Education*: University of San Francisco School of Law (J.D. 1999); Founder and President, USF Student Chapter, Association of Trial Lawyers of America (1997-1999); Investigation Intern, San Francisco Public Defender's Office; Mediation Intern, San Francisco Small Claims Court; Mediation Intern, U.S. Equal Employment Opportunity Commission; University of California at Los Angeles (B.A., 1995). *Awards*: Leesfield / Association of Trial Lawyers of America, National Winner (1998). *Prior Employment*: Partner, Emison Hullverson Bonagofsky, LLP (2007-2008); Associate, Bennett, Johnson & Galler (1992-2005). *Publications*: "Powerful Mediation Briefs," in The Verdict (ACCTLA 2006). *Member*: Alameda-Contra Costa Trial Lawyers Association; San Francisco Trial Lawyers Association; Consumer Attorneys of California; American Association for Justice; Bar Association of San Francisco.

**BARBRA L. WILLIAMS,** born Bellflower, California, July 10, 1974.  Admitted to practice in California, 2007; U.S. District Court, Northern District of California, 2007; U.S. District Court, Central District of California, 2007; U.S. Court of Appeals, Ninth Circuit, 2007. *Education*: University of California, Hastings College of the Law, (J.D., 2006, Concentration in Civil Litigation); Notes Editor, *Hastings Race & Poverty Law Journal;* UC Hastings Civil Justice Clinic, Individual Wage & Hour Representation; UC Hastings Admissions Policy Committee; Teaching Assistant, Legal Writing & Research; National Black Law Students Association (Sub-Regional Director); Hastings Black Law Students Association (Co-President); University of California, Irvine (B.A., 1997). *Member:* State Bar of California; American Bar Association (Labor & Employment Section); National Bar Association; California Association of Black Lawyers; Bar Association of San Francisco; Charles Houston Bar Association.

**HEATHER H. WONG**, born San Diego, California, July 5, 1978.  Admitted to practice in California, 2005; U.S. Court of Appeals, Ninth Circuit, 2005; U.S. District Court, Central and Northern Districts of California, 2005, 2006; U.S. District Court, District of Colorado, 2006.  *Education*:  University of San Francisco (J.D. & M.B.A., 2005); Beta Gamma Sigma Honor Society (2005); Technical Editor, *Maritime Law Journal*; University of California, Berkeley (B.A., 2000).  *Member*: State Bar of California, Labor & Employment Law & Litigation sections member; Bar Association of San Francisco, Labor & Employment Law & Litigation sections member; American Bar Association, Young Lawyers Division and Labor & Employment Law section member; American Constitution Society, mentor program; Consumer Attorneys of California; Association of Business Trial Lawyers.

Notice on the Firm's AV Rating:  AV is a registered certification mark of Reed Elsevier Properties, Inc., used in accordance with the Martindale-Hubbell certification procedures, standards and policies.  Martindale-Hubbell is the facilitator of a peer review process that rates lawyers.  Ratings reflect the confidential opinions of members of the Bar and the Judiciary.  Martindale-Hubbell Ratings fall into two categories – legal ability and general ethical standards.